**HENRY F. FURST – 9782**
80 Main Street
West Orange, New Jersey 07052
[973] 324-1000
Attorney for Dr. Steven S. Simring

|  |  |
|---|---|
| UNITED STATES OF AMERICA ex rel. STEVEN S. SIMRING, M.D. | : UNITED STATES DISTRICT COURT<br>: DISTRICT OF NEW JERSEY |
| Plaintiff, | : |
| vs. | : Civil Action No. 04-3530(JWB) |
| UNIVERSITY PHYSICIAN ASSOCIATES (UPA), UNIVERSITY OF MEDICINE AND DENTISTRY, UMDNJ-UNIVERSITY HOSPITAL, UMDNJ- NEW JERSEY MEDICAL SCHOOL, MICHAEL SAULICH, JAMES LAWLER, and JOHN DOES 1-25 (EMPLOYEES OF UNIVERSITY PHYSICIAN ASSOCIATES OR UMDNJ), AND ABC CORPORATIONS 1-10  (PRIVATE FOR-PROFIT OR NOT-FOR-PROFIT ENTIES) | : <br>: <br>: <br>: **FIRST AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT**<br>: <br>**JURY TRIAL DEMANDED**<br>: (FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)) |
| Defendants. | : |

The United States of America ex rel. Steven S. Simring, M.D., complaining of the Defendants, says:

## INTRODUCTION

1. This is an action to recover damages and civil penalties on behalf of the United States of America arising from false statements and claims made and presented by the defendants or

First Amended Complaint
Civil Action No. 04-3530
Page [2]

their agents, employees, and co-conspirators in violation of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729 et seq., as amended ("FCA" or "the Act"). The violations consist of misrepresentations and knowing omissions of material facts in connection with the longstanding practice of the defendants to bill Medicaid twice for the same services.

2. The FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of between $5,000 and $10,000 for each such claim submitted or paid, plus three times the amount of the damages sustained by the Government. The Act allows any person having information regarding a false or fraudulent claim against the Government (the "relator") to bring an action on behalf of the United States, and to share in any recovery. The Complaint is filed under seal for 60 days (without service on the defendants during that period) to enable the Government: (a) to conduct its own investigation without the defendants' knowledge, and (b) to determine whether to join the action.

3. Pursuant to the FCA, plaintiff/relator seeks to recover on behalf of the United States damages and civil penalties arising from the defendants' presentation of false or fraudulent

First Amended Complaint
Civil Action No. 04-3530
Page [3]

claims for payment for services provided patients under the
Medicaid reimbursement statutes and regulations.

4. Defendants have defrauded Medicaid by knowingly
submitting duplicate bills – one by defendant University
Physician Associates (UPA) and one by defendant University
Hospital (UH) -- for the identical physician services, by
concealing the double billing through the use of false
statements and the omission of material facts, and by conspiring
to prevent the Government from becoming aware of the double
billing.

**PARTIES**

5. Plaintiff and relator, Steven S. Simring, M.D. ("Dr.
Simring") is a physician licensed to practice medicine and
surgery in the State of New Jersey and a board certified
psychiatrist. Dr. Simring is an associate professor in the
Department of Psychiatry at the University of Medicine and
Dentistry of New Jersey ("UMDNJ") and an attending physician on
the staff of University Hospital. He served as a Director of
defendant University Practice Associates ("UPA") for several
terms.

6. Dr. Simring brings this action for violations of 31
U.S.C. §§ 3729 et seq., on behalf of himself and the United

First Amended Complaint
Civil Action No. 04-3530
Page [4]

States Government pursuant to 31 U.S.C. § 3730(b)(1).   Dr. Simring has personal knowledge of the false records, statements, or claims presented to the Government by and for the defendants and of defendants' fraudulent billing practices.

7.   UMDNJ is the New Jersey health sciences university with major schools throughout the state.   It also operates in conjunction with various for-profit and not-for-profit health care entities, including ABC Corporations 1-10.

8.   New Jersey Medical School ("NJMS") is one of the major schools of UMDNJ, and is a fully accredited medical school located in Newark, New Jersey.

9.   University Hospital ("UH") is the major teaching hospital of NJMS, located in the City of Newark.   A large percentage of the patients it serves are indigent and eligible for Medicaid.

10. University Physician Associates ("UPA") is a New Jersey corporation and a private medical group practice.   The physicians in UPA are faculty members of UMDNJ and serve as teaching physicians for physicians-in-training and residents. Additionally, they provide direct medical care at University Hospital,   Hackensack   University   Medical   Center,   Veterans Administration Medical Center, and a network of private and off campus hospitals and clinics.   As an organized practice plan,

First Amended Complaint
Civil Action No. 04-3530
Page [5]

UPA codes, bills, and collects professional fees in a centralized manner for services rendered to patients.

11. UPA was first formed under the name of the Faculty Practice Service ("FPS") in 1984, when the physician faculty members of UMDNJ entered into a formal written affiliation agreement ("the affiliation agreement" or "the agreement") with University Hospital. FPS changed its name to University Physician Associates in the late 1980's. The affiliation agreement has been revised periodically since it was initially adopted in 1984, most recently as of June 30, 1996.

12. UPA comprises of approximately 500 physicians in more than 25 specialties and sub-specialties that correspond to the clinical departments of NJMS, including dermatology, internal medicine, emergency medicine, general pediatrics, endocrinology, neurology, general surgery, gastroenterology, cardiology, ophthalmology, hematology/oncology, urology, neurosurgery, psychiatry, infectious diseases, pulmonary, immunology/rheumatology and cardiovascular surgery, among others.

13. UPA sends bills to various payors, including Medicaid, in the name of different entities of the practice (e.g., University

First Amended Complaint
Civil Action No. 04-3530
Page [6]

Surgery Associates, University Psychiatry Associates, University
Pediatric Associates, etc.).

14. UPA is governed by an unpaid Board of Trustees consisting
of elected representatives from each of the school's
approximately 18 clinical departments, called departmental
trustees, and approximately six members from UMDNJ
administration.

      a. The Board is chaired by a president, who is appointed
         by the Board from among the departmental trustees.
         UPA's current president is Dr. Larry Frohman.

      b. The UPA Board of Directors also includes, as ex
         officio members: the dean of the NJMS, the Senior
         Vice President for Administration and Finance of
         UMDNJ, and the Chief Executive Officer of University
         Hospital.

      c. The president chairs the management committee of UPA,
         which is also appointed by the Board of UPA. The
         management committee is responsible for the oversight
         of practice management.

15. Michael Saulich is the salaried executive director of UPA
and has served in that position for over ten years. He is
responsible for all administrative and operational aspects of

First Amended Complaint
Civil Action No. 04-3530
Page [7]

UPA, including billing and collection from Medicaid and other
payors.

16. UPA employs a staff under the administration of the
salaried executive director, who reports to the management
committee.

17. UPA currently generates almost $65,000,000 in billings
annually, a substantial portion of which represents charges for
services rendered to Medicaid and Medicare patients.  In 2002,
for example, 16% of the academic practice collections came from
care provided of Medicaid beneficiaries and, upon information
and belief, a similar amount was devoted to the care of Medicare
beneficiaries.

18. James Lawler ("Lawler") is the Chief Financial Officer of
University Hospital.  He has held that post since February 15,
2001.  Along with other hospital administrators, he exercised
responsibility for Medicaid billing policies and practices.
Lawler received salary bonuses during the years when he was
involved in the scheme to defraud Medicaid.

19. Catherine Gibbons ("Gibbons") was the Director of Payor
Contracting and Analysis from December 1999 to April 2002.
Since April 2002, she has been the Executive Director of Payor
Contracts and Analysis.  Her responsibilities included

First Amended Complaint
Civil Action No. 04-3530
Page [8]

preparation and execution of the cost reports that UH submitted
to the State of New Jersey in order to obtain reimbursement for
allowable costs incurred to serve Medicaid recipients. She
personally signed at least some of the fraudulent cost reports
at issue in this case.   Gibbons received salary bonuses during
the years when she was involved in the scheme to defraud
Medicaid.

20. ABC Corporations 1-10 are for-profit and not-for-profit
corporations related to defendants UPA and UMDNJ, which received
funds, directly or indirectly, or participated, directly or
indirectly, in the scheme set forth in relator's complaint.

21. John Does 1-25 are employees of UPA or UMDNJ and related
entities, including ABC Corporations 1-10, who participated in
or aided and abetted the fraud described more fully below.

## JURISDICTION AND VENUE

22. The Court has jurisdiction over the subject matter of
this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. §
3732.   31 U.S.C. § 3732 specifically confers jurisdiction on
this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and
3730, as well as for actions brought under the laws of any State
for the recovery of funds paid by a State if the action arises

First Amended Complaint
Civil Action No. 04-3530
Page [9]

from the same transaction or occurrence as an action under
§3730.

23. The Court has personal jurisdiction over the defendants
pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide
service of process, and because the defendants can be found in
and transact the business that is the subject matter of this
lawsuit in the District of New Jersey.

24. Venue is proper in this District pursuant to 31 U.S.C.
§3732(a) because defendants can be found and transact the
business that is the subject matter of this lawsuit in the
District of New Jersey.

## BACKGROUND

25. The essence of the fraud in this action is that UPA and
UH both knowingly and simultaneously billed Medicaid for the
identical medical services, and failed to disclose the double
billing as required by law and regulation.   The fraud was
carried out through both multiple false statements and omissions
of material facts.

First Amended Complaint
Civil Action No. 04-3530
Page [10]

### A. The Medicaid Program and Applicable Federal and State Regulations

26. Medicaid is a public assistance program to provide payment of medical expenses for low-income patients. Medicaid was created in 1965 when Title XIX was added to the Social Security Act. Funding for Medicaid is shared between the federal government and those state governments that choose to participate in the program. In New Jersey, the Medicaid program is funded approximately half with federal funds and half with state funds.

27. Providers and physicians who wish to participate in the these programs must ensure that their services are provided "economically and only when, and to the extent, medically necessary." 42 USC § 1320c-5(a). A comprehensive regulatory scheme is designed to ensure that Medicaid be the payor of last resort and that no program monies be paid out for services for which there is another source of payment.

28. New Jersey, through the Division of Medical Assistance and Health Services, likewise establishes a comprehensive regulatory scheme that providers and physicians must comply with in order to participate in Medicaid. New Jersey law further provides that in order for professional practices, such as UPA,

First Amended Complaint
Civil Action No. 04-3530
Page [11]

"to be eligible to participate in the Medicaid and NJ Family
Care programs, such practices shall comply with all applicable
State licensing statutes and rules governing their ownership and
direction."  N.J.A.C. 10:49-3.1(b).

29. All physicians and providers who wish to participate in
the Medicaid program in New Jersey by submission of requests for
payment either by paper or electronically are legally required
to sign a Provider Agreement in which they certify their
compliance with "State and Federal Medicaid laws, and rules and
regulations promulgated pursuant thereto."  N.J.A.C. 10:49-3.2
(a). UH and UPA both entered into such an agreement with the New
Jersey Department of Health and Human Services in this case.

30. Individual physicians who participate in a group practice
must also enter into the same agreement.  N.J.A.C. 10:49-
3.2(a)(2).

31. Two different means of submitting claims to Medicaid were
employed in this case. First, New Jersey physicians and group
practices, such as UPA, generally submit claims for
reimbursement of physician services to Medicaid on the CMS Form
1500 or its electronic equivalent. Because the CMS Form 1500 is
a generic form used by various government and private health
programs, the form incorporates by reference - in bold,

First Amended Complaint
Civil Action No. 04-3530
Page [12]

enlarged, and capitalized type across the top of the page – the
"separate instructions issued by applicable programs," including
Medicare and Medicaid.

32. Hospitals, medical centers, and clinics in New Jersey
obtain reimbursement from Medicaid funds through the submission
of "cost reports" as provided by various regulations in N.J.A.C.
Title 10. The reports themselves do not contain entries for each
medical service provided by each physician to each eligible
recipient. They do not label recipients by social security
number or similar unique identifier. Rather, the cost reports
set out claims for broad categories of reimbursable expenses
connected with the provision of medical services to Medicaid
eligible patients.

33. Throughout the period covered by this complaint,
Defendant UPA and others generally submitted its claims for
reimbursement using the CMS Form 1500 or its electronic
equivalent.

34. Throughout the period covered by this complaint,
Defendants UH and others submitted regular cost reports to New
Jersey HHS for reimbursement from Medicaid funds.

First Amended Complaint
Civil Action No. 04-3530
Page [13]

### B.   Providers' Duty to Disclose

35.   Consistent with the law that Medicaid remain the payor of last resort, all physicians and providers are required, under several provisions of both state and federal law, to disclose to Medicaid facts that are material to the obligation of Medicaid to reimburse the provider's claim.   As noted above, those legal requirements are expressly incorporated by reference in the standard agreement into which providers must enter in order to participate in Medicaid.

36.   New Jersey law expressly establishes a duty on the part of providers to disclose all material facts, and makes the failure to do so a criminal offense.

      a. The New Jersey Code of Criminal Justice, section 2C:21-4.2, specially defines "health care claims fraud" as follows:

> "Health care claims fraud" means making, or causing to be made, a false, fictitious, fraudulent, or misleading statement of material fact in, or omitting a material fact from, or causing a material fact to be omitted from, any record, bill, claim or other document, in writing, electronically or in any other form, that a person attempts to submit, submits, causes to be submitted, or attempts to cause to be submitted for payment or reimbursement for health care services.

First Amended Complaint
Civil Action No. 04-3530
Page [14]

> b. The Code of Criminal Justice, section 2C:21-4.3, specifies that the knowing commission of health care claims fraud is a crime of the second degree, and the reckless commission of health care claims fraud (defined later in the section, see section 2C:21-4.3(h), as the conscious disregard of a substantial and unjustifiable risk) is a crime of the third degree.

37. It is a material fact within the meaning of the above provision and the other pertinent provisions of state and federal law that another provider is billing for the exact same services and is claiming the sole legal entitlement to do so. Such a fact is, in the words of the governing legal test for materiality, plainly capable of influencing the decision of Medicaid whether to pay either claim. Moreover, New Jersey Medicaid expressly instructs providers and officials that duplicate claims should be denied, and that if a pattern of duplicate billing is identified, it may generate an investigation for fraud. See, e.g., Billing Supplement for Physician Services, at § 9.3 (manual published by Unisys, fiscal agent for New Jersey Medicaid); CMS Pub. 100-04, at section 120 (Medicare Claims Processing Manual).

First Amended Complaint
Civil Action No. 04-3530
Page [15]

38.    Additional provisions of New Jersey law set out below restate and reinforce the fact of double billing by two providers is a material fact subject to the providers' duty of disclosure.   The duty is especially pronounced where, as here, the double billing is difficult for Medicaid to discover in light of the two different billing methods employed by defendants UPA and UH, a fact on which the defendants relied.

39.    Thus, the failure to disclose the double billing constitutes health care fraud because, among other reasons, under New Jersey law both UPA and UH knew of and had a duty to disclose the existence of the double billing to the government.

40. Likewise, applicable federal law plainly imposes on providers a similar duty to disclose material facts. 42 U.S.C. § 1320a-7b(a)(3) creates a duty to disclose all facts affecting a provider's initial or continued right to payments of claims. The statute provides:

> Whoever . . . having knowledge of the occurrence
> of any event affecting (A) his initial or
> continued right to any such benefit or payment .
> . . conceals or fails to disclose such event with
> an intent fraudulently to secure such benefit or
> payment either in a greater amount or quantity
> than is due or when no such benefit or payment is
> authorized, . . . shall in the case of such a
> concealment or failure . . . be guilty of a
> felony.

First Amended Complaint
Civil Action No. 04-3530
Page [16]

41. That another provider is billing for the identical services and is claiming the sole legal entitlement to do so is an event that affects the initial or continued right to payment within the meaning of the above provision. Such a fact is plainly capable of influencing the decision of Medicaid whether to pay either claim.

42. Several provisions of federal law specific to federal health care programs preclude dual payments for identical services and instruct health care officials to deny payment where duplicate claims have been submitted. Moreover, New Jersey Medicaid expressly instructs providers and officials that duplicate claims should be denied. See, e.g., CMS Pub. 100-04, at section 120 (Medicare Claims Processing Manual section on duplicate claims). Additional provisions of federal law and practice set out below restate and reinforce that double billing by two providers is a material fact subject to the providers' duty of disclosure.

43. In addition to these express provisions, the CMS Form 1500, the particular form employed by UPA in this case or its electronic equivalent, contains the following language directed specifically to Medicaid providers:

First Amended Complaint
Civil Action No. 04-3530
Page [17]

Medicaid Payment (Provider certification):

Notice: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

44. These provisions require a provider, as a condition of participation in Medicaid, to disclose to the government any facts material to the government's decision to process and pay the claim. Providers who are or become aware of such material facts may not simply omit to disclose them and leave the onus on the government to discover them while accepting the windfalls from the public fisc that result if the material facts remain undiscovered.

C. Providers' Certification that There is No Double Billing

45. Applicable law and regulations also create a duty on the part of providers to certify that the charges for which it is claiming reimbursement are not being otherwise billed to the federal government or any other payor.

46. N.J.A.C. 10:49-9.8(b) is entitled "Provider certification and record keeping." Subsection 5 of that section specifies

First Amended Complaint
Civil Action No. 04-3530
Page [18]

"Providers shall agree to the following . . . that no part of

the net amount payable under any claim has been paid, except

that all available third party liability has been exhausted, in

accordance with program requirements."  Read in pari materia

other provisions in the Medicaid regulatory scheme, including

federal and state specifications that Medicaid is to be the

payor of last resort (see 48 U.S.C. 1396a(a)25), section 9.8(b)-

5, requires the provider to certify that the charges for its

services are not being otherwise paid by the federal government

or any other source.)

47. Likewise, federal health insurance programs require a

substantially identical certification, incorporated in the

providers' statutory and contractual requirement to certify

compliance with applicable regulations.  For example, 42 U.S.C.

1395y(b)(2)(i) provides the following with respect to Medicare

secondary payers, and on information and belief, the same

requirement applies to other federal health care cost

reimbursement programs:

> Payment under this subchapter may not
> be made, except as provided in subparagraph
> (B), with respect to any item or service to
> the extent that,

First Amended Complaint
Civil Action No. 04-3530
Page [19]

> i. payment has been made, or can
> reasonably be expected to be
> made, with respect to the item or
> service as required under
> paragraph (1).

48. Thus, providers who submit claims for reimbursement to Medicaid certify that, to the best of their knowledge, no other entity is or will be billing the government for the services for which reimbursement is sought.

## GENERAL ALLEGATIONS

### A. The Historical Relationship Between UPA and UMDNJ

49. The fraudulent scheme here, as well as its unraveling, took place against the background of a bitter and longstanding power struggle between UPA and UMDNJ. The battle focused particularly on the respective parties' right to bill the government and private insurance companies for physician services by UMDNJ employees.

50. UPA claims, by virtue of the affiliation agreement between UMDNJ and UPA and a 1984 court decision, the sole right to bill for services performed by faculty physicians at UH and other teaching hospitals. Physicians employed by UMDNJ are required as a condition of their employment with UMDNJ to affiliate with UPA, which is made a term of employment in the

First Amended Complaint
Civil Action No. 04-3530
Page [20]

appointment letter signed by the Dean.   UPA in return provides

negotiated percentages of its collected fees to the physicians

and to various UMDNJ entities.

    51. The historic relationship between UPA and UMDNJ has been

characterized, in the view of all parties, by tension, discord,

and lack of trust, particularly with respect to billing issues

and UPA's assertion of sole authority to bill for services

performed by UPA physicians.

    52. For many years, and with increased urgency since at least

2001, UMDNJ has challenged the Affiliation Agreement, and more

generally UPA's right to bill the federal government for

physician services by UMDNJ employees, on a number of grounds.

UMDNJ has asserted the following positions:

        a. UPA physicians are all employees of UMDNJ, paid by

           UMDNJ and under the control of UMDNJ.

        b. The affiliation agreement is obsolete and no longer

           binding as a result of unanticipated changes in the

           health care industry;

        c. The agreement is inconsistent, and to that extent

           void, with UMDNJ's statutory responsibility pursuant

           to N.J.S.A. 18A-64G-2 to operate its programs "in the

           most economical and efficient manner";

First Amended Complaint
Civil Action No. 04-3530
Page [21]

    d. The agreement is infirm because it lacks an end date;

    e. UPA has committed a number of material breaches of the agreement, rendering the agreement void; and

    f. UPA is not "the faculty practice plan at UMDNJ" under the language of the agreement.

For all these reasons, UMDNJ has argued that it, not UPA, is entitled to bill Medicaid for physician services by the staff physicians that it employs.

53. UMDNJ, as early as approximately 1999, began to bill private insurance companies such as Aetna for faculty provided medical services for which UPA claimed the sole right to bill.

54. UPA in response has repeatedly invoked its own interpretation of its prerogatives under the Agreement, which it refers to as "our Magna Carta and Constitution all rolled into one. It is the fundamental document which protects our right to practice medicine here and have it administered under our faculty practice plan."

    B.   The Dispute and Mediation Between UPA and UMDNJ Concerning Billing, Compliance, and Other Issues.

55. In or about May 2001, a newly appointed Dean of NJMS, Dr. Russell Joffe, convened a Task Force to address supposed organizational weaknesses between UPA and UMDNJ as well as the

First Amended Complaint
Civil Action No. 04-3530
Page [22]

issue whether UH could retain the money it received from Aetna and other private insurance companies. The Task Force issued a Report in October 2001 including several recommendations for organizational changes, including substantial changes in UPA's billing and collection role. The Report recommended the formation of a Clinical Enterprise Committee, comprising of NJMS, UH, NJMS, UPA, with the Dean functioning as the Committee's CEO. UPA strongly objected to this recommendation.

56. At around the same time, the Dean of NJMS, consistent with his own understanding regarding the Affiliation Agreement, began to alter the language in the appointment letters to faculty members so as to eliminate the formal assignment of billing to UPA. The altered language further stated that the faculty practice plan was operated jointly by UPA and NJ Med, an entity of UMDNJ.

57. As soon as UPA became aware of the practice of altering the appointment letters, it objected immediately and repeatedly over the next three years. Thus, from no later than approximately May 2001, UPA was aware that UH was asserting a right to bill for UPA physician services, and, on information and belief as detailed more fully below, that UH was doing so.

First Amended Complaint
Civil Action No. 04-3530
Page [23]

58. In May 2002, the Dean sent UPA a letter alleging five
breaches by UPA of the Affiliation Agreement and threatening to
terminate the Agreement.  UPA denied the claims and alleged that
they had been manufactured by the Dean as a means to force UPA
to cede much of its control over the billing and collections
from services by UPA physicians. UPA continued to seek repayment
for funds it claimed UH had improperly collected from Aetna and
other private insurance companies beginning in 1999 by double
billing for faculty provided services.

59. UMDNJ, ABC Corporations 1-10, Lawler, Gibbons and John
Does 1-10 continued to retain the funds collected from Aetna and
other private insurance companies and insisted that UH had a
general right to bill both private and government sources of
reimbursement  for  the  faculty  physician-provided  medical
services.  Dean Joffee threatened legal action to enforce UH's
asserted right to bill.

60. In approximately 2002-2003, UMDNJ and UPA agreed to
attempt to settle their differences through mediation.

61. UMDNJ raised several issues during the mediation that UPA
resisted and portrayed as attempts by UMDNJ to obtain control of
the revenue stream.  Most notably, UMDNJ raised requests in what
it termed the area of "compliance," including seeking the right

First Amended Complaint
Civil Action No. 04-3530
Page [24]

to perform compliance audits of physicians without UPA
representation. According to UMDNJ, the compliance requests
"related to safeguards required by the University to respond to
a well-known national environment of federal government scrutiny
of health care institutions and their employees."

62. During the mediation, UPA advised its members in a
Memorandum dated August 6, 2004 that it knew UMDNJ had
"interfer[ed] with your [the faculty physicians] right to bill
through UPA for services provided to Medicaid patients."

63. Attempts to resolve the problems informally as well as
the mediation process went on for several years, during which
time it turned increasingly vituperative, producing charges and
counter-charges and an accompanying stream of emails and
memoranda in which each party accused the other of bad faith and
various regulatory and contractual violations. Finally, in mid-
2004, the mediation process broke down without any tangible
resolution. It has not resumed.

C.   The Fraudulent Double Billing

64. At all times relevant to this complaint, defendants were
aware that Medicaid would not pay two claims for the same
physician services.

First Amended Complaint
Civil Action No. 04-3530
Page [25]

65. At all times relevant to this complaint, defendants were aware that the fact that another entity had billed the government for identical services was a material fact, in that it had a natural tendency to influence or was capable of influencing the decision of a reasonable Medicaid official whether to pay the claim.

66. Indeed, a Medicaid official confronted with duplicative claims for the same services from two prominent providers, one private and one state entity, each of whom asserted the right to payment under a contract between the two parties, would likely have declined to pay either party pending authoritative determination of the party who was entitled to payment. In fact, federal health insurance administrators who receive potential duplicate claims are instructed to obtain information from the provider before making payment, and to determine what data are needed to support payment or cancel action on the claim. See Medicare Claims Processing Manual (CMS Pub. 100-04), at section 120. In this case, that would have entailed an independent determination of rights under a contract governed by the laws of New Jersey, a determination that a Medicaid official could not reasonably be expected to undertake.

First Amended Complaint
Civil Action No. 04-3530
Page [26]

67. From at least approximately 1999 and continuing at least into 2004, defendants UPA and UH systematically billed Medicaid twice for the identical physician services, and knew at the time, and recklessly ignored, or came to know that their actions were improper and illegal. Defendants UPA and UMDNJ systematically failed to disclose the double billing to the government.

E.    Initiation and Nature of the Scheme to Defraud

68. The fraudulent scheme coincided during the period of discord and struggle between UPA and UMDNJ over billing prerogatives, when both parties were scrutinizing the other's billing practices and accusing the other of billing and compliance irregularities concerning particular government health insurance programs, including Medicaid. These accusations were made in numerous meetings between senior officials of UPA and UMDNJ as well as in the mediation process. No participant in any of these meetings advised any state or federal government official at any time about the ongoing double billing.

69. UH executed its part of the double billing through the submission of cost reports that covered both the statutory facility fee and the physician fee for services rendered. This

First Amended Complaint
Civil Action No. 04-3530
Page (27)

practice was consistent with the views it was asserting in the
mediation process that it, and not UPA, had the right to bill
Medicaid not only for the facility fee but also for the
physician services performed by its staff physicians.

70. At the same time, and while the parties were arguing
about UPA's legal right to bill Medicaid for physician services
performed by UMDNJ staff physicians, UPA continued to submit
bills for physician services to Medicaid on the CMS 1500 forms
or its electronic equivalent. UPA and the individual defendants
were aware, or recklessly ignored, that UH was billing for the
same services despite the UPA's interpretation of the
Affiliation Agreement.

71. Although the double billing was well known and argued
about among the Defendants, neither UPA nor UMDNJ nor any
individual or corporate defendant or entity informed Medicaid
that both parties were simultaneously billing Medicaid for the
identical faculty-physician medical services to the same
patients.

72. As the defendants knew, such double billing was feasible
because Medicaid was unaware, and generally had no way of
knowing, that the costs for which reimbursement was sought on
the CMS 1500 forms or in the electronic equivalent submitted by

First Amended Complaint
Civil Action No. 04-3530
Page [28]

UPA were also duplicated in another format -- the cost reports submitted by UMDNJ.

73. Defendants made a conscious and deliberate decision not to disclose the fact of double billing to the Government, though they were aware of its materiality.

74. Defendants further used or caused to be used false records and statements in order to obtain double payments for the identical physician services.

75. Thus, from at least approximately 1999 until at least 2004, UPA and UMDNJ sought reimbursement, and Medicaid generally paid two times, for the identical physician services.

F.   The Defendants' Knowledge of the Fraud

76. From the inception of the practice of submitting cost reports seeking reimbursement for services provided by UMDNJ physicians, UMDNJ was aware that UPA historically had submitted, and was continuing to submit, CMS-1500 claim forms or their electronic equivalent for reimbursement for the exact same services.

77. Relator has personal knowledge of UPA's awareness during part of the period of the fraud that UH was submitting cost reports that sought reimbursement from Medicaid for the exact same services for which UPA had sought, or intended to seek

First Amended Complaint
Civil Action No. 04-3530
Page [29]

reimbursement. Relator asserts, on information and belief as detailed more fully below, that UPA's knowledge extended to substantially the entire period of the double billing, and that it knew or recklessly ignored that UH was billing payors for faculty provided medical care.

    a. In July 2004, the Executive Director of UPA, Michael Saulich, told Dr. Simring that he was aware of the double billing, and that documents established that the double billing dated to 1999, "although they were probably doing it longer." Mr. Saulich further stated that UMDNJ was aware that UPA was submitting bills for the same services. He further told Dr. Simring that UPA had caught the double billing, and that the double billing problem "was going to blow up." He further told Dr. Simring that, in the event of disclosure, UMDNJ "wanted [UPA] to take the blame" and to "pay the fines" that were sure to result from disclosure.

    b. Around the same time, the President of UPA, Dr. Larry Frohman, told Dr. Simring that the double billing "went back at least four years, probably more" and had been "routine" for several years. He confirmed that

First Amended Complaint
Civil Action No. 04-3530
Page [30]

> "no one reported the double billing to the government."

78. There is substantial additional evidence that UPA's knowledge of the double billing, as well as the knowledge of defendant John Does 11-25 and ABC Corporations 1-10, existed well into the past and dated to as early as the inception of the practice.

> a. Issues of billing and compliance with federal program requirements were the most prominent and contentious in the mediation between UMDNJ and UPA and the discord that preceded it. In 2002, as part of the mediation, UMDNJ made a specific request that it described as concerning "compliance." In the Dean's pointedly circumspect phrasing, this request "related to safeguards required by the University to respond to a well-known national environment of federal government scrutiny of health care institutions and their employees."

> b. In 2001, a law firm advising UH learned of the double billing and raised the issue in a memorandum to Vivian Sanks King, Vice President and General Counsel of

First Amended Complaint
Civil Action No. 04-3530
Page [31]

UMDNJ. The memorandum was thereafter referred to the university's corporate compliance unit but there was still no disclosure to the government.

c. The double billing issue, and more generally issues of compliance with federal programs, were prominently and openly discussed issues in the mediation between UPA and UMDNJ. For example, an email sent to all UPA physicians on February 5, 2004, noted "many of you have heard of the University requesting that UPA agree to a temporary hold on billing of Medicaid Indemnity and Charity Care in hospital clinics. In fact, if you have not been contacted already, your Department Chair will shortly be asking you to sign a memo requesting a 30-day temporary exemption to the UPA billing requirements for Medicaid Indemnity and Charity Care services provided in hospital outpatient clinics. UPA has temporarily agreed to hold this billing pending discussions with the University for a period not to exceed 30 days."

79. Given the high profile and broad knowledge of the issue in the mediation, the fact that the tug-of-war over billing

First Amended Complaint
Civil Action No. 04-3530
Page [32]

prerogatives was at the core of the dispute, the ongoing parallel dispute concerning UH's double billing of Aetna and other private insurance companies, the importance of Medicaid and other federal insurance programs to the overall practice, and the substantial overlap and close working relationship between the individuals in UPA and UMDNJ, relator asserts on information and belief that UPA's awareness of the double billing, which is already documented to date before the beginning of 2004, originates well before, and likely since the inception of the fraudulent practice of double billing.

G. The Defendants' Knowledge that Their Actions Were Illegal

80. Although both UPA and UH asserted that it had the sole legal right to bill Medicaid for reimbursement for physician services by UMDNJ physicians, both UPA and UH, as well as Saulich, Lawler, and Gibbons were aware that the double billing was illegal and fraudulent.

81. Indeed, during the mediation, both UPA and UMDNJ worried about their legal exposure for their conduct. Each asserted that it would incur liability for the double billing as part of the parties' internal disagreement about who had the right to bill in the first place.

First Amended Complaint
Civil Action No. 04-3530
Page [33]

82. Thus, an April 19, 2004 memorandum from UPA negotiators to UMDNJ negotiators on the subject of the mediation stated as follows:

> Compliance: Your criticism regarding compliance starts from a flawed premise. You state that UMDNJ is the primary party which the federal government will hold accountable for billing irregularities that may occur as the result of conduct by the full time faculty employees of UMDNJ. You know that this is an incorrect statement based on historical practice and you should know it is an incorrect statement as a matter of law. The few times the government has come calling, it has dealt directly with the University with respect to hospital matters and directly with UPA on physician billing matters. . . . As for primary liability, pursuant to applicable federal statutes, direct liability attaches to those who actually submit the claims and/or directly receive reimbursement. Thus, it is the physicians and UPA (the entity to which the physicians have assigned their claims) who are primarily liable — not UMDNJ or University Hospital.

83. Both UPA and UMDNJ were also aware of their duty to disclose to the government the material fact of the double billing and to refrain from the practice. Thus, for example, in July of 2004, in a conversation with relator, Michael Saulich stated, although it was widely known within the institution, that no one had yet told the government about the double billing. It was in that context that he further stated, "it's

First Amended Complaint
Civil Action No. 04-3530
Page [34]

going to blow up. They [i.e. UMDNJ] wanted us to take the blame."

84. Thus, both UPA and UMDNJ recognized that in billing twice for the same services, they were acting in violation of Medicaid regulations and in ways that would subject them to legal liability, and, moreover, that they were violating a legal obligation to inform Medicaid of the double billing.

H. The Conspiracy Between UPA and UMDNJ

85. The struggle between UPA and UMDNJ over billing rights came to a head in early 2004 during the mediation process in a series of meetings involving officials at the highest level of both defendant institutions. In response to accusations from UMDNJ that the double billing was improper, UPA in March 2004 agreed to a temporary suspension of its own billing while UMDNJ's cost reports went forward. March through May 2004 was thus the first period since at least 2000 when UPA and UMDNJ did not submit duplicate bills to Medicaid.

86. After further negotiation with UMDNJ, UPA resumed its billing in June 2004. By express agreement with UMDNJ, as detailed below, UPA also submitted all the bills it had previously held in suspension between March and May 2004, which were for the identical services for which UH had sought

First Amended Complaint
Civil Action No. 04-3530
Page [35]

reimbursement through cost reports covering the same period.
UMDNJ in turn asserted in June 2004 that it would temporarily
suspend its longstanding practice of double billing.

87. A June 1, 2004 memorandum from the Executive Director/CEO
of UPA to all UPA physicians on the subject of "Medicaid
Billing" shows that UPA and UH were cooperating together while
continuing to hide the facts from the government. It reads as
follows:

> At the last UPA Board of Directors meeting,
> the Board decided that UPA would cease its
> voluntary suppression of Medicaid Indemnity
> billing. All previously suppressed (held) bills
> will be released and all new Medicaid Indemnity
> charges will be submitted. UPA will also
> calculate the lost reimbursement due to holding
> Health Start accounts and submit those charges to
> the University for payment since the initial
> request to suppress billing came from the Dean's
> office.

> Legal Management of the University is in
> agreement with this action.

> UPA would also like to thank Deborah
> Johnson, MD, Associate Dean/Clinical Enterprise
> of the School of Medicine for helping bring this
> issue to a positive conclusion.

88. Thus, the parties formed an express agreement that UPA
would submit previously withheld bills which contained faculty
physician charges for the identical services for which UH had
also billed Medicaid during the period from March-May 2004.

First Amended Complaint
Civil Action No. 04-3530
Page [36]

89. As to the balance of the time period encompassed by the fraudulent double billing, relator alleges, on information and belief, that both UPA and UMDNJ operated on a shared understanding that both parties would submit bills and neither would reveal the fact of double billing to the government. It was this shared understanding that made the double billing possible, since both parties were well aware that they would be exposed to significant liability in the event that either revealed the improper double billing to the government.

I. The Harm to the Government From the Defendants' Fraud

90. As a result of the defendants' fraudulent activities, Medicaid paid defendants twice for the identical physician services for at least four years.

91. Defendants' conscious and deliberate decision not to disclose the fact of double billing to the Government permitted them to retain monies otherwise reimbursable to the Government.

92. Defendants' false certifications of compliance with applicable law and of no double billing permitted them to retain monies otherwise reimbursable to the Government.

93. Medicaid and possibly other governmental health care cost payment programs suffered direct and substantial damage from

First Amended Complaint
Civil Action No. 04-3530
Page [37]

defendants' fraud by defendants' false and fraudulent claims for double payment for the same services.

### COUNT ONE

### (31 U.S.C. §§ 3729(a)(1), (a)(2), (a)(7) and 3732(b))

94. Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 93 of this Complaint.

95. This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

96. Through the acts described above, defendants and their agents and employees knowingly presented and caused to be presented to the United States Government and New Jersey Medicaid program fraudulent claims, records, and statements in order to obtain payment for health care services provided to beneficiaries of those programs.

97. Through the acts described above and otherwise, defendants and their agents and employees knowingly made, used, or caused to be made or used false records and statements in order to get such false and fraudulent claims paid and approved by the United States Government.

98. Through the acts described above, defendants and their agents and employees knowingly made, used, and caused to be made

First Amended Complaint
Civil Action No. 04-3530
Page [38]

or used false records and statements to conceal, avoid, and/or decrease defendants' obligation to repay money to the United States Government that defendants improperly or fraudulently received. Defendants also failed to disclose to the Government material facts -- i.e., facts that had a natural tendency to influence or were capable of influencing the decision of government officials whether to pay the submitted claims -- that if disclosed would have resulted in substantial repayments by them to the federal and state governments.

99. The United States and its agents, the New Jersey Medicaid program, were unaware of the falsity of the records, statements, and claims made or submitted by defendants and their agents, and employees paid and continue to pay defendants for claims that would not be paid if the truth were known.

100. The United States and its agents, and New Jersey Medicaid and its agents were unaware of defendants' failure to disclose material facts that would have reduced government obligations, and they have not recovered Medicaid funds that would have been recovered but for Relator's disclosures.

101. By reason of the defendants' false records, statements, claims, and omissions the United States and New Jersey Medicaid

First Amended Complaint
Civil Action No. 04-3530
Page [39]

have been damaged in the amount of tens of millions of dollars
in federal funds.

## COUNT TWO

### (False Claims Act Conspiracy
### 31 U.S.C. § 3729(a)(3) and 3732(b))

102. Relator realleges and incorporates by reference the
allegations made in Paragraphs 1 through 101 of this Complaint.

103. This is a claim for treble damages and for forfeitures
under the False Claims Act, 31 U.S.C. §§ 3729 et seq., as
amended.

104. Through the acts described above and otherwise,
defendants entered into a conspiracy or conspiracies among
themselves to defraud the United States and New Jersey Medicaid
program by getting false and fraudulent claims allowed or paid.
Defendants have also conspired among themselves to omit
disclosing or to actively conceal facts which, if known, would
have reduced government obligations to them or resulted in
repayments from them to government programs.   Such facts were
material in that they had a natural tendency to influence or
were capable of influencing the decision of government officials
whether to pay the submitted claims. Defendants have taken

First Amended Complaint
Civil Action No. 04-3530
Page [40]

substantial steps in furtherance of those conspiracies, _inter_
_alia_, by preparing false records, by submitting claims for
reimbursement to the Government for payment or approval, and by
directing their agents, consultants, and personnel not to
disclose or to conceal defendants' fraudulent practices.

105. The United States and its agents, the New Jersey Medicaid
program, were unaware of defendants' conspiracy or the falsity
of the records, statements and claims made by defendants and
their agents, and employees, and as a result thereof, have paid
and continue to pay tens of millions of dollars that they would
not otherwise have paid. Furthermore, because of the false
records, statements, claims, and omissions by defendants and
their agents, and employees, the United States and its agents,
the New Jersey Medicaid program, have not recovered federal
funds from the defendants that otherwise would have been
recovered.

106. By reason of defendants' conspiracies and the acts taken
in furtherance thereof, the United States and the New Jersey
Medicaid program have been damaged in the amount of tens of
millions of dollars in federal funds.

First Amended Complaint
Civil Action No. 04-3530
Page [41]

WHEREFORE, plaintiff prays for judgment against defendants

as follows:

a. That defendants cease and desist from violating 31
   U.S.C. § 3729 et seq.;

b. That the Court enter judgment against defendants in an
   amount equal to three times the amount of damages the
   United States has sustained as a result of defendants'
   actions, as well as a civil penalty against each
   defendant of $10,000 for each violation of 31 U.S.C. §
   3729;

c. That plaintiff be awarded the maximum amount allowed
   pursuant to § 3730(d) of the Federal Civil False
   Claims Act;

d. That plaintiff be awarded all costs and expenses of
   this action, including attorneys' fees; and

e. That the United States and plaintiff/relator receive
   all such other relief as the Court deems just and
   proper.

                                    HENRY F. FURST, ESQ.
                                    Attorney for Plaintiff


                                    By: _____
                                           HENRY F. FURST

Dated:     September 28, 2005

First Amended Complaint
Civil Action No. 04-3530
Page [42]

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff hereby demands trial by jury.

HENRY F. FURST, ESQ.
Attorney for Plaintiff

By: _____
    HENRY F. FURST

Dated:    September 28, 2005