# EXHIBIT D

# THE UNIVERSITY HOSPITAL

University of Medicine and Dentistry of New Jersey
www.TheUniversityHospital.com

Office of the Chief Financial Officer
Phone: (973) 972-3721
Fax:   (973) 972-5993

150 Bergen Street, D-217
Newark, NJ 07103-2406

November 16, 2004

John Guhl
Division of Medical Assistance and Health Services
7 Quakerbridge Plaza
Building 7 Room 302
Trenton, NJ 08625

Dear Mr. Guhl:

UMDNJ-University Hospital wishes to bring several matters to your attention relative to Medicaid's payment for physician activities on the Newark campus. While the reporting of teaching physician costs is always a complex issue, the matter has been further complicated on our Newark campus. Pursuant to Employment Letters, physicians have submitted separate bills directly for all payors, including Medicaid, for professional services inclusive of clinics, through University Physician Associates (UPA), the required contracted faculty-practice vehicle. We believe that many other New Jersey hospitals are reimbursed by Medicaid on an "all-inclusive" basis for the clinics, with direct patient care aspects of the physician's time included on and settled through the cost report mechanism.

In recent years, University Hospital has been striving to improve cost reporting relating to compensation costs for physician services by stressing the importance of physicians' completion of time studies. As you are aware, in instances when studies are unavailable, certain "default" rules under Medicare principles of reimbursement direct the physician costs to certain lines in the cost report. We believe that these defaults have sometimes produced greater reimbursement than if the studies had been completed and sometimes less reimbursement.

We believe that recent efforts to utilize time studies have generally improved the cost reports and have improved the likelihood of equitable reimbursement in the future. However, one matter has come to our attention that we would like to disclose to you. It appears that physicians have submitted bills for their professional services in the outpatient service areas directly to Medicaid while at the same time University Hospital received reimbursement for services through the supplemental D-3 form. While we have been unable to make a definitive determination that the reimbursement was obtained by both parties for the same rendered services, this would have the appearance, at least, of being an extra payment.

P001112

PLAINTIFF'S
EXHIBIT
Petillo-1
3-12-10  JT
PENGAD 800-631-6989

John Guhl
November 16, 2004
Page #2

While we have reason to believe that, on an overall equitable basis, combined payments to UMDNJ-University Hospital and its physicians may have actually been less than if physicians had foregone separate billing and all costs were appropriately reported in the cost reports, we want to avoid any possibility of actual or perceived overpayments. In order to achieve this, we will continue to report our costs, using time studies when available, as required under Medicare principles.   However, we specifically request that Medicaid instruct the Medicaid Intermediary (Riverbend), when auditing and settling the cost reports, to refrain until further notice from completing Schedule D-3 Supplemental, which adds outpatient physician professional costs as a credit to the Hospital's settlement.  We are working on a reconfiguration of ambulatory practices on the Newark campus and a realignment of physician compensation arrangements. We anticipate that this will obviate the need for making a request to suppress the D-3 in the future.

We would like to share these changes with you and also wish to explore all areas of past over or under reimbursement with the goal of ensuring that this issue is resolved appropriately. This exploration is likely to require some significant staff work. We are committed to make this investment, but would need concurrence from you or your staff at critical points along the way in order to make sure that the end-product is satisfactory to both parties.

We appreciate your assistance on this matter.   We trust that you know of our strong commitment to serve Medicaid beneficiaries and our desire to work with the Department to insure fair payment for services to these patients. We look forward to sitting down with you to discus these matters in further detail.

Sincerely yours,

James P. Lawler, CPA
Chief Financial Officer

Cc: Denise Mulkern
     Russell T. Joffe, M.D.
     Darlene Cox

# EXHIBIT E



**RECEIVED**
MAY - 9 2005
OFFICE OF CHIEF
FINANCIAL OFFICER

**State of New Jersey**
DEPARTMENT OF HUMAN SERVICES
DIVISION OF MEDICAL ASSISTANCE AND HEALTH SERVICES
P.O. Box 712
Trenton, NJ 08625-0712
Telephone 1-800-356-1561

RICHARD J. CODEY
*Acting Governor*

JAMES M. DAVY
*Commissioner*

ANN CLEMENCY KOHLER
*Director*

May 5, 2005

James P. Lawler, VP of Finance/CFO
University Hospital – UMDNJ
150 Bergen Street Room D217
Newark, New Jersey 07103

Dear Mr. Lawler:

As a follow up to our meeting held on April 29, 2005, we have adjusted your current Medicaid Outpatient Cost to Charge ratio to exclude Hospital Based Physician cost.

Your cost to charge ratio has been revised from 72.91% to 71.60% effective 1/1/2005.

The Hospital Based Physicians costs will continue to be excluded from future initial and final settlement until resolution of this issue.

Should you have any questions, please contact my office at (609) 588-2668.

Sincerely,

Michael P. Keevey, Director
Office of Reimbursement

MPK:bam

P001135

*New Jersey Is An Equal Opportunity Employer*

# EXHIBIT F



## State of New Jersey
DEPARTMENT OF HUMAN SERVICES
DIVISION OF MEDICAL ASSISTANCE AND HEALTH SERVICES
PO BOX 712
TRENTON, NJ 08625-0712
TELEPHONE 1-800-356-1561

RICHARD J. CODEY
*Acting Governor*

JAMES M. DAVY
*Commissioner*

ANN CLEMENCY KOHLER
*Director*

June 21, 2005

```
RECEIVED
JUN 2 9 2005
OFFICE OF CHIEF
FINANCIAL OFFICER
```

Mr. James Lawler
Chief Financial Officer
UMDNJ – University Hospital
30 Bergen Street
Newark, NJ 07107-3000

Dear Mr. Lawler:

As part of the follow-up to our meeting held on April 29, 2005, regarding physician billing at University Hospital, Division of Medical Assistance and Health Services (DMAHS) staff agreed to review University Hospital's calculations and documentation for the reported hospital-based physician costs on the CMS-2552 cost report. A few schedules were initially provided, but the review prompted several questions and a request for additional documentation. Several source items have been requested as part of the ongoing review and many items have been received, but unfortunately the review is not complete. Requests for additional documentation have been made in an effort to gain a better understanding of the hospital-based physician cost calculations. However, further explanations are still needed at this time.

Although the review is not complete, it has been determined that the professional component of the hospital-based physician salaries was to be billed through University Physician Associates (UPA) and, therefore, should not be reimbursed through the cost report. At this time, DMAHS is requesting Riverbend Government Benefits Administrator to reopen the cost reports for fiscal years 2001 through the current period. Reimbursement for hospital-based physicians will be recouped and the cost-to-charge ratio will be adjusted accordingly. It may be necessary for DMAHS to expand to other years at a later date if the findings determine it is appropriate. In addition, after the review is complete, there may be other adjustments to the overall cost identified as hospital-based physician costs, if it is determined that the total or individual components of costs were not properly reported on the cost report.

P001138



Mr. James Lawler
June 21, 2005
Page 2

The following amounts will be recouped at this time:

FY2001 – $619,755
FY2002 – $541,018
FY2003 – $490,338
FY2004 – $405,763

TOTAL – $2,056,874

We appreciate your cooperation in our efforts to resolve this issue.  If you have any questions, please contact me at (609) 588-7933.

Sincerely,

John R. Guhl
Chief Financial Officer

JRG:C
c:  Michael Keevey
    David C. Lowenthal
    Robert J. Bollaro
    Mary Jane Nickles
    Jacqueline Cantlin
    Kathryn Gibbons

P001139

# EXHIBIT G

McMORAN, O'CONNOR & BRAMLEY, P.C.
A Professional Corporation
Ramshorn Executive Centre
Bldg. D, Suite D-1
2399 Highway 34
Manasquan, New Jersey 08736
 (732) 223-7711
Attorneys for Plaintiff,
  James Lawler



Office of the Superior Court Clerk
By Deputy Clerk of the Superior Court

DEC - 8 2006

Received and Filed
ESSEX

JAMES LAWLER

        Plaintiff,

vs.

UNIVERSITY of MEDICINE and DENTISTRY of NEW JERSEY and UNIVERSITY HOSPITAL,

        Defendants.

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION: ESSEX COUNTY

Docket No. L - 10030-06

Civil Action

**COMPLAINT**

Plaintiff JAMES LAWLER, residing at 27 Deer Avenue, Millington, New Jersey, 07946, by way of Complaint against Defendants, says:

## THE PARTIES

1.    Plaintiff James Lawler is a New Jersey resident and former Chief Financial Officer of defendant University Hospital.

2.    Defendant University of Medicine and Dentistry of New Jersey ("UMDNJ") is a New Jersey not for profit organization with its principal place of business at 65 Bergen Street University Heights Newark, New Jersey 07107-3001. UMDNJ includes defendant University Hospital.

3.    Defendant University Hospital ("University Hospital" or the "Hospital") is a New Jersey not for profit organization with its principal place of business at 150 Bergen Street University Heights Newark, New Jersey 07107-3001. University Hospital is part of UMDNJ.

## PLAINTIFF'S EMPLOYMENT WITH DEFENDANTS

4.    On February 15, 2001, Plaintiff began his employment with University Hospital as its Chief Financial Officer.

5.    At the time he began his employment with University Hospital, plaintiff had thirty years of experience in hospital finance in New Jersey and New York.

6.    Immediately prior to his employment with University Hospital, plaintiff had been the Chief Financial Officer of Jersey City Medical Center in Jersey City, New Jersey.

7.    Plaintiff's performance as CFO of University Hospital was excellent.

8.    University Hospital had been losing money for several years before Plaintiff's employment.

9.    During his tenure as CFO, Plaintiff and his staff improved cash collections, improved documentation of charity care from $85 million to $137 million, and spearheaded the mission based funding model, which allowed the hospital to hire more doctors and increase volume.

10.    Plaintiff's efforts significantly improved University Hospital's bottom line and, through the investment in doctors, nurses and technology, positioned University Hospital for substantial future growth.

11.    Plaintiff's performance reviews reflect his various achievements during his employment as CFO.

12.    Plaintiff received an overall rating of 4 or 4.5 out of 5 on each review.

13.    His supervisor had the following comment about his performance: "Plaintiff is outstanding in administering strategically at UH, UMDNJ and at the state levels. Everything done is of the utmost quality. He creates an environment of overall trust and cooperation. Much progress has been made at UH financially because of his leadership."

14.    Because of his excellent performance, Plaintiff received a number of raises.

15.    At the time of his termination, plaintiff's salary was $334,000 annually.

16.    Plaintiff also received an 8% 401K match and a full range of benefits worth approximately $40,000.

## PLAINTIFF BLOWS THE WHISTLE ON DOUBLE BILLING

17.    in May 2001, Plaintiff learned that the physicians, through University Physicians Association ("UPA"), and University Hospital, through its cost reports, were billing the Medicaid program for the same physician services and technical costs.

18.    At the time, Plaintiff recommended meeting with the State in Trenton to resolve the issue directly with the State.

19.    However, Plaintiff's suggestion was met with resistance.

20.    Instead, an outside law firm, Kalison McBride, was retained, and UMDNJ did not receive the law firm's opinion until seven months later.

21.    The outside law firm issued an initial draft, which was never shared with Plaintiff.

22.    Plaintiff had no knowledge of the draft opinions until a criminal investigation into UMDNJ's billing practices conducted by the U.S. Attorney in 2005.

23.    The law firm's initial opinion was that University Hospital must disclose to the Medicaid fiscal agent the overpayment of physician costs received in the cost reports for fiscal year 2000, and should not submit those costs for University Hospital's outpatient clinics in fiscal year 2001 or thereafter until the billing issue had been resolved between University Hospital and UPA.

24.    However, in the final December 2001 legal opinion, the outside law firm stated that University Hospital did not have a duty to disclose the prior overpayments and could continue to seek reimbursement for physician costs documented and incurred in the outpatient clinics.

25.    Counsel recommended that UMDNJ should make UPA aware of the double payment problems so that steps could be taken to avoid future issues.

26.    This was the only opinion that UMDNJ shared with Plaintiff at that time and he followed it in good faith.

27.    After Kalison McBride issued its December 2001 opinion, University Hospital met with the Chairs of the Departments that had been billing Medicaid for technical costs known as "Code 11's".

28.    As a result of the discussions, the department chairs agreed that UPA would not bill "Code 11s", but, despite the agreement, the physicians continued to bill Code 11 costs.

29.    This created a major problem for the hospital because the technical costs associated with the operation of the clinics was a cost borne by the Hospital and, as such, a cost for which it should have been reimbursed.

30.    The Hospital was including the technical costs on its cost reports.

31.    Thus, the State was paying UPA and the Hospital for the same technical costs.

32.    Moreover, the billing of Code 11's suggested that the clinics were actually private practices for which the Hospital was not entitled to reimbursement.

33.    As a result, on June 27, 2003, Plaintiff and Adam Henick sent a memorandum objecting to the double billing to Vivian Sanks King, VP, Legal for UMDNJ.

34.    In response to Plaintiff's memorandum, another attorney-client working group was created.

35.    Nothing had been accomplished on the Code 11 issue by December 2003.

36.    At that time, Plaintiff and others met with Ms. King and objected to the fact that UPA was still billing on behalf of certain departments on a Code 11 basis.

37.    They noted that the continued practice of physicians billing on a Code 11 basis contradicted the Kalison McBride opinion of December 2001.

38.    Plaintiff also raised the point that despite several reminders, UMDNJ had never forwarded Kalison McBride's opinion to the UPA.

39.    In April 2004, Ms. King sent Plaintiff a memorandum summarizing various physician billing issues.

40.    Although she did not address Code 11's, she stated in the memorandum that her office had "consistently maintained" that in the absence of a specific contractual carve out of the UPA's right to bill hospital based physician services the hospital could not claim those physician costs on its Medicaid cost report.

41.    Ms. King's office had not consistently maintained that a contractual carve out was necessary for Medicaid reimbursement.

42.    To the contrary, her office had adhered at all times to the Kalison McBride opinion of December 2001 that the physicians did not have the right to bill for physician services rendered to Medicaid indemnity patients and the Hospital could continue to claim the costs.

43.    This was UMDNJ's first attempt to shift responsibility for the double billing to Plaintiff and his team.

44.    In the fall of 2004, because of the ongoing ambiguity regarding the billing of professional costs, Plaintiff pushed the work group to reach a resolution and gave a deadline of November 30, 2004, the due date for the Medicaid cost report.

45.    He also insisted that the group disclose the double billing to the State.

46.    On November 16, 2004, Plaintiff disclosed the double billing in a letter to John Guhl, the CFO of the New Jersey Medicaid program.

47.    In April 2005, Plaintiff met with the State and provided information regarding UPA's billing of physician services and the Code 11 and 22 issues.

48.    Around this time, the United States Attorney commenced its investigation into the double billing Plaintiff first sought to disclose in 2001.

49.    UMDNJ hired Epstein, Becker & Green to provide legal advice on the double billing issues.  Epstein, Becker & Green retained Parente Randolph, a consulting firm, to review the hospital cost reports and advise on the Code 11 and 22 issue.

50.    In September 2005, Plaintiff spoke with John Foley of Parente Randolph.

51.    Mr. Foley told Plaintiff that University Hospital had properly billed for all services and costs related to its outpatient clinics and that the UPA affiliation agreement is inconsistent with the Medicaid regulations.

52.    Plaintiff was also given a draft Power Point report containing the same points.

53.    However, UMDNJ's lawyers strongly disagreed with certain Parente Randolph conclusions and had a meeting or meetings with Parente Randolph from which Plaintiff was excluded.

54.    UMDNJ also excluded Plaintiff, the Hospital's Chief Financial Officer, from a September 13, 2005 private Board meeting at which Parente Randolph's findings regarding billing were discussed.

55.    Neither Epstein, Becker & Green nor UMDNJ inside counsel would confirm Mr. Foley's opinion in writing.

56.    Subsequently, on October 18, 2005, Dr. Robert Johnson, Acting Dean of N.J. Medical School, sent a memorandum to all clinical faculty, which cited the ongoing Federal and State investigations and cautioned the physicians not to bill Code 11 in hospital clinics.

57.    Dr. Johnson omitted from the attached list of hospital clinics, Pediatrics, OB/GYN and other clinics in which physicians were billing Code 11's and rebuffed Plaintiff's requests to reissue the memorandum with these clinics included.

### PLAINTIFF REFUSES TO SIGN THE MEDICAID COST REPORT

58.    The Medicaid cost report filing deadline was November 30, 2005.

59.    Prior to that deadline, Kati Gibbons, Executive Director – Revenue Policy and Analysis, who was Plaintiff's Medicaid specialist, sought confirmation from internal and external counsel on the points raised by Mr. Foley in prior meetings and related issues.

60.    However, counsel would not confirm Mr. Foley's conclusions that all clinic-related technical costs could be reported by University Hospital as hospital-based or provide guidance on other issues she raised.

61.    As a result, Ms. Gibbons did not sign the report.  She filed it unsigned.

62.    After Ms. Gibbons refused to sign the cost report, Darlene Cox, the President and CEO of University Hospital, instructed Plaintiff as Chief Financial Officer to sign the cost report.

63.    By instructing Plaintiff to sign a cost report that the Hospital's lawyers would not approve, Ms. Cox was effectively putting Plaintiff in a position where he could be prosecuted for signing a fraudulent cost report.

64.    Plaintiff refused to sign the report.

65.    Because counsel had refused to sign off on the report, he reasonably believed that the report was illegal or fraudulent.

66.    On December 7, 2005, Plaintiff sent an email to Ms. Cox, with copies to inside and outside counsel, in which he objected to being put in the position of signing a cost report that neither inside nor outside counsel would confirm was correct.

67.    Plaintiff also stated that if the hospital included the disputed claims from the outpatient clinics, then UMDNJ had a responsibility of disclosing the double billing by the physicians to the State.

### DEFENDANTS CONSTRUCTIVELY DISCHARGE PLAINTIFF

68.    Plaintiff never received a written response to his December 7, 2005 email.

69.    However, on December 8, 2005, the following day, Plaintiff received a telephone call from Herve Gouraige, Esq. of Epstein, Becker & Green, counsel to UMDNJ.

70.    Mr. Gouraige informed Plaintiff that the Board and the President wanted the signing of the cost report resolved by the end of the day.

71.    Mr. Gouraige also informed Plaintiff that the legal department could not respond to his email because they had been recused from participating in anything that related to the U.S. Attorney's investigation.

72.    This message effectively confirmed that the cost report was a topic of the federal investigation.

73.    Nonetheless, UMDNJ through its special counsel, insisted that Plaintiff sign the report without confirmation from its outside attorneys that the claims were legally valid or addressing his concern that UMDNJ should disclose that UMDNJ and UPA were reporting the same Code 11 costs.

74.    Plaintiff declined to sign the report because he believed it to be unlawful and/or fraudulent and asked for a conference call with his lawyer.

75.    His request was refused.

76.    That refusal, in the midst of a federal investigation, heightened his concerns regarding the double billing.

77.    On December 9, 2005, the following day, Mr. Gouraige told Plaintiff that John Petillo, the CEO of UMDNJ, and Ms. Cox had decided that Ms. Cox would sign the report.

78.    However, when Plaintiff called Ms. Cox, she had not signed the report and said that she would not be signing it until Parente had conducted an additional review.

79.    On information and belief, Ms. Cox did not sign the report until long after Plaintiff's termination, and then signed it only after she had received safe harbor from the U.S. Attorney.

80.    The following week, on December 14, 2005, Plaintiff attended a Board Finance Committee meeting.

81.    At the meeting, Price Waterhouse Cooper, UMDNJ's outside auditors, indicated that it could not complete its audit because the status of the hospital clinics as reimbursable or non-reimbursable items impacted on the final numbers in the financial statements.

82.    Later on the evening of December 14, 2005, Bob Witter of Parente Randolph informed Ms. Gibbons in writing that the clinics were not to be reported as hospital based but as non-reimbursable.

83.    The clinics to be excluded from the cost reporting included the Pediatrics, OB/GYN, DOC 4100 and Ophthalmology clinics that had been disputed throughout the fall of 2005.

84.    Mr. Witter informed Ms. Gibbons that the decision was made by Mr. Gouraige and Dean Robert Johnson.

85.    Thus, UMDNJ had attempted to coerce Plaintiff to sign a fraudulent cost report that its own outside counsel had determined contained claims which were not reimbursable.

86.    On December 15, 2005, Plaintiff spoke with Mr. Foley and asked if Parente Randolph had reversed its prior position.

87.    Mr. Foley told Plaintiff that Mr. Witter was not supposed to send his conclusion to Ms. Gibbons and that the hospital should ignore it.

88.    Plaintiff asked Mr. Foley to withdraw the Witter opinion in writing but he refused.

89.    Mr. Foley refused to answer any of Plaintiff's questions on the grounds he had been hired by Epstein, Becker & Green not University Hospital.

90.    By this time, it had become clear to Plaintiff that UMNDJ management and the attorneys and experts they had hired were excluding him, the CFO, from discussions regarding the Medicaid cost report and University Hospital's potential disclosure obligations to the State,

and refusing him access to legal advice during a time when UMDNJ was under federal investigation.

91.	They had attempted to coerce him into signing the cost report even though they knew that the cost report was fraudulent.

92.	Accordingly, on December 15, 2005, Plaintiff submitted his resignation letter based on "conditions and events at University Hospital which have prevented, and continue to prevent me from effectively fulfilling my responsibilities as CFO."

93.	He further stated that he expected that University Hospital would fulfill its severance obligations to him under his February 7, 2001 Offer Letter and reimburse him for the expense of independent representation of counsel as per University Hospital policies.

94.	On information and belief, after Ms. Cox signed the cost report under the safe harbor, UMDNJ subsequently filed an amended report, which excluded the code 11 costs that had been the subject of plaintiff's concerns.

95.	After his constructive termination from employment, plaintiff sought other employment.

96.	Plaintiff has been unable to find comparable employment since his termination from UMDNJ.

97.	On information and belief, UMDNJ has continued to retaliate against plaintiff by interfering with his attempts to find new employment.

98.	On at least one occasion, UMDNJ had attempted to discourage another employer from employing plaintiff or engaging his services.

## COUNT ONE (Unlawful Retaliation)

99.	Plaintiff repeats the allegations of the prior paragraphs as if set forth at length herein.

100.     Plaintiff had a reasonable belief that defendants were engaged in billing practices that were unlawful, fraudulent, and/or criminal.

101.     Plaintiff engaged in whistle-blowing activity protected by the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-3.

102.     Defendants retaliated against plaintiff because he had engaged in protected activity, in violation of the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-3.

103.     Plaintiff has suffered damages as a result of his unlawful termination.

WHEREFORE, plaintiff demands judgment against defendant for back pay, front pay, compensatory damages, attorney's fees, punitive damages and such other relief as the Court deems equitable and just.

### COUNT TWO (Unlawful Retaliation)

104.     Plaintiff repeats the allegations of the prior paragraphs as if set forth at length herein.

105.     After plaintiff's constructive termination from employment, he informed UMDNJ that he believed that he had been constructively discharged in violation of CEPA, N.J.S.A. 34:19-3.

106.     On at least one occasion since plaintiff's constructive discharge, UMDNJ has retaliated against plaintiff for engaging in protected activity by attempting to discourage another employer from employing plaintiff or engaging his services.

107.     Plaintiff has suffered damages as a result of defendants' unlawful conduct.

WHEREFORE, plaintiff demands judgment against defendant for back pay, front pay, compensatory damages, attorney's fees, punitive damages and such other relief as the Court deems equitable and just.

## COUNT THREE (Breach of Contract)

108.   Plaintiff repeats the allegations of the prior paragraphs as if set forth at length herein.

109.   Defendants failed to pay plaintiff the severance to which he was entitled under his February 7, 2001 Agreement.

110.   Plaintiff has suffered damages as a result of defendant's failure to pay him severance.

WHEREFORE, plaintiff demands judgment against defendant for compensatory damages, attorney's fees, punitive damages and such other relief as the Court deems equitable and just.

## COUNT FOUR (Breach of Contract)

111.   Plaintiff repeats the allegations of the prior paragraphs as if set forth at length herein.

112.   Defendants had a policy of reimbursing employees at plaintiff's level for legal fees related to their employment.

113.   In the fall of 2005, plaintiff received a subpoena to appear before the United States Attorney for the District of New Jersey for an interview related to the double billing at UMDNJ.

114.   Defendants have refused to reimburse plaintiff for all legal fees he incurred in connection with his interview by the United States Attorney.

115.   Plaintiff has suffered damages as a result of defendant's failure to pay his legal fees

WHEREFORE, plaintiff demands judgment against defendant for compensatory damages, attorney's fees, punitive damages and such other relief as the Court deems equitable and just.

McMORAN, O'CONNOR & BRAMLEY, P.C.
Ramshorn Office Centre
Building D, Suite D-1
2399 Highway 34
Manasquan, New Jersey 08736
Attorneys for Plaintiff

By: *Michael F. O'Connor*
MICHAEL F. O'CONNOR

Dated: December 7, 2006

## DESIGNATION OF TRIAL COUNSEL

Plaintiff hereby designates Bruce P. McMoran as trial counsel.

McMORAN, O'CONNOR & BRAMLEY, P.C.
Ramshorn Office Centre
Building D, Suite D-1
2399 Highway 34
Manasquan, New Jersey 08736
Attorneys for Plaintiff

By: *Michael F. O'Connor*
MICHAEL F. O'CONNOR

Dated:  December 7, 2006

## CERTIFICATION PURSUANT TO R. 4:5-1

I certify that the matter in controversy in the within action is not pending in any other court, or any pending arbitration proceeding, nor is any such court proceeding or arbitration

proceeding presently contemplated.  There are no other persons who should be joined at this

time.

                                          McMORAN, O'CONNOR & BRAMLEY, P.C.
                                          Ramshorn Office Centre
                                          Building D, Suite D-1
                                          2399 Highway 34
                                          Manasquan, New Jersey 08736
                                          Attorneys for Plaintiff

By: *Michael F. O'Connor*
                  MICHAEL F. O'CONNOR

Dated:  December 7, 2006

# EXHIBIT H

**GIORDANO, HALLERAN & CIESLA, P.C.**
Mail to:  P.O. Box 190, Middletown, N.J. 07748
Deliver to:  125 Half Mile Road, Red Bank, N.J. 07701
(732) 741-3900

Attorneys for Plaintiff, Kathryn Gibbons

| | |
|---|---|
| KATHRYN GIBBONS, | SUPERIOR COURT OF NEW JERSEY |
| | LAW DIVISION |
| Plaintiff, | MIDDLESEX COUNTY |
| | |
| v. | DOCKET NO. |
| | |
| UNIVERSITY OF MEDICINE AND | Civil Action |
| DENTISTRY OF NEW JERSEY; | |
| UNIVERSITY OF MEDICINE AND | **COMPLAINT AND DEMAND FOR** |
| DENTISTRY OF NEW JERSEY-NEW | **TRIAL BY JURY** |
| JERSEY MEDICAL SCHOOL; | |
| UNIVERSITY HOSPITAL; BRUCE | |
| VLADECK; VIVIAN SANKS-KING; | |
| DARLENE COX; ANDREA WALKER- | |
| MODU; DR. DENISE RODGERS; JOHN | |
| FOLEY; PARENTE RANDOLPH, LLC, and | |
| JOHN and JANE DOES 1-20. | |
| | |
| Defendants. | |

Plaintiff, Kathryn Gibbons, residing at 1306 Ravens Crest Drive, Plainsboro, New Jersey,

by way of complaint against Defendants University of Medicine and Dentistry of New Jersey,

University of Medicine and Dentistry of New Jersey-New Jersey Medical School, University

Hospital, Defendant Bruce Vladeck, Defendant Vivian Sanks-King, Defendant Darlene Cox,

Defendant Andrea Walker-Modu, Defendant Dr. Denise Rodgers, Defendant John Foley,

Defendant Parente Randolph, LLC and John and Jane Does 1-20 states as follows:



EXHIBIT
PKG-3

## FACTS COMMON TO ALL COUNTS

1.    Defendant UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEY (hereinafter "UMDNJ"), is the State of New Jersey's University of the health sciences and the nation's largest institution of its kind.  UMDNJ is New Jersey's statewide network of academic health centers which includes eight (8) schools on five (5) campuses, enrolling more than 4,500 students.  The eight (8) schools which comprise UMDNJ are:

UMDNJ-New Jersey Medical School, Newark;

UMDNJ-Robert Wood Johnson Medical School, Piscataway/New Brunswick/ Camden;

UMDNJ-School of Osteopathic Medicine, Stratford;

UMDNJ-New Jersey Dental School, Newark;

UMDNJ-School of Health Related Professions, Newark;

UMDNJ- School of Nursing, Newark;

UMDNJ-Graduate School of Biomedical Sciences, Newark and Piscataway; and

UMDNJ-School of Public Health, New Brunswick, Newark and Stratford.

2.    Defendant UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEY-NEW JERSEY MEDICAL SCHOOL (hereinafter, the "NJMS"), is owned and operated by UMDNJ. The NJMS is located at 185 South Orange Avenue, Newark, New Jersey.

3.    Defendant UNIVERSITY HOSPITAL is the teaching hospital for NJMS (hereinafter "UH" or "University Hospital") and is owned and operated by UMDNJ.  University Hospital is located 180 Bergen Street, Newark, New Jersey.

4.    Plaintiff Kathryn Gibbons, began her employment with University Hospital on or about December 14, 1999.  She is a resident of Plainsboro, Middlesex County, New Jersey.

2

5.      Defendant Bruce Vladeck (hereinafter "Vladeck") at all times relevant herein was and has been Interim President of UMDNJ since February 2006.

6.      Defendant Darlene L. Cox (hereinafter "Cox") at all times relevant herein was and remains President and Chief Executive Officer ("CEO") of the University Hospital since October 2004.   She has direct reporting responsibilities to the Executive Vice President of UMDNJ.   Prior to April 2006, this position reported to the Dean of the New Jersey Medical School.

7.      Defendant Vivian Sanks-King, Esq. (hereinafter "Sanks-King") at all times relevant herein was Vice President of Legal Management of University Hospital until December 2005.

8.      Defendant Dr. Denise Rodgers (hereinafter "Rodgers") at all times relevant herein was Chief of Staff to the President of UMDNJ since September 2005 and currently holds the position of Executive Vice President.

9.      Defendant Andrea Walker-Modu, Esq. (hereinafter "Walker-Modu") at all times relevant herein was employed as a Legal Director in the Office of Legal Management and worked under the supervision of Defendant Sanks-King until January, 2006.

10.      Defendant John Foley, (hereinafter "Foley") at all times relevant herein was a Certified Public Accountant ("CPA") and a principal in the accounting and consulting firm of Parente Randolph, (hereinafter "Parente")Wilkes-Barre, Pennsylvania.   His title at all times relevant herein was Managing Director of Parente's Healthcare Consulting Department. Defendant John Foley, through Parente, was engaged by legal counsel to University Hospital for the purpose of providing advice and counsel relating to UH/UMDNJ's Medicare and Medicaid compliance issues and reimbursement matters as well as assisting legal counsel in connection

3

with various State and Federal investigations of UMDNJ and UH. Defendant Foley claims to have extensive experience in Medicare and Medicaid fraud defense work.

11.    Defendant Parente is an accounting and consulting firm with its primary offices in Wilkes Barre, Pennsylvania. Parente was engaged by legal counsel to University Hospital to review previous cost reporting practices and to provide advice and counsel relating to UH/UMDNJ's Medicare and Medicaid compliance issues. In addition to Defendant Foley, Parente assigned approximately six (6) other professional employees to work on matters relating to University Hospital.

12.    Defendants John and Jane Does 1-20 are employees, administrators, officers and trustees or agents of UMDNJ, UH and NJMS.

13.    University Physician Associates of New Jersey (hereinafter "UPA") at all times relevant herein was the faculty practice plan of UH/UMDNJ and the NJMS. The faculty practice plan was an organization which, among other things, billed for, collected, and distributed clinical receipts to the faculty of NJMS.

14.    The New Jersey Medicaid Program (hereinafter "Medicaid") was established by an Act of Congress under the Social Security Act as a joint federal and state healthcare program which provides medical assistance based upon financial need. The New Jersey Medicare Program (Hereinafter "Medicare") was also established by an Act of Congress under the Social Security Act which provides payment for healthcare services primarily for the elderly.

I.    KATHRYN GIBBONS – EDUCATION, EMPLOYMENT, CREDENTIALS AND HONORS

15.    From December 13, 1999 to June 23, 2006, Plaintiff was employed by University Hospital. Initially, Plaintiff was employed as the Director of Payer Contracting and Analysis. Plaintiff was promoted in 2001 to Executive Director of Payer Contracting and Analysis. Then

4

in November 2005, Plaintiff was promoted to Executive Director-Revenue Policy and Fiscal Analysis. These promotions were merit based and in recognition of Plaintiff's superior work performance.

16.    Plaintiff had an accomplished and rewarding work history prior to her work at UMDNJ/UH. From 1991 to 1999 Plaintiff was employed with Liberty Healthcare Systems, Inc., and held the position of Vice President of Reimbursement and Managed Care Services. Plaintiff oversaw reimbursement and managed care services for three (3) acute care hospitals, two (2) family health centers, eight (8) faculty practice plans, a home care agency and liberty rehabilitation institute. Plaintiff negotiated the contracts with over seventy (70) managed care organizations, including the contracts for one hundred fifty (150) faculty practice physicians and served as an active member of the Mount Sinai Health Systems Medical Management Committee.

17.    From April 1984 to April 1987 Plaintiff worked at Alexian Brothers Health Systems whose headquarters are in Elk Grove, Illinois and from June 1981 to April 1984 she was employed with Jersey Shore University Medical Center. Plaintiff worked in the finance and information departments for these institutions and enjoyed an excellent reputation for her work. Plaintiff also worked as a private consultant and project manager directly relating to reimbursement, hospital analysis, physician compensation analysis, and contracts.

18.    At all times, Plaintiff has been regarded as one of the region's leading healthcare experts in Medicare and Medicaid regulatory compliance and third-party reimbursement matters. Moreover, Plaintiff has a superlative reputation for her integrity and honesty.

19.     Plaintiff received a Bachelors of Science degree in accounting and finance from La Salle University of Philadelphia, Pennsylvania in 1981. She received a Masters in Healthcare Administration ("MHA") from Seton Hall University in South Orange, New Jersey in May 2000.

20.     Plaintiff has participated in and/or held positions with various professional organizations and societies, including:

Fellow, Healthcare Financial Management Association (HFMA)

Fellow, the National Association of Public Health (NAPH);

Assistant Professor (adjunct) UMDNJ/School of Health Related Professions;

Board of Director, NJ Healthcare Financial Management Association

Chairwoman, NJ Education and Information Management Committee (HFMA)

Founder, Kathryn Gibbons Scholarship, University of Medicine and Dentistry of New Jersey.

21.     While employed at University Hospital, Plaintiff reported directly to the Chief Financial Officer ("CFO") of University Hospital. From January 2001 to December 2005 the CFO was James P. Lawler, a nationally renowned healthcare expert in third party reimbursement and Medicare/Medicaid regulatory compliance issues.

22.     Plaintiff, together with the CFO, directed and oversaw:

- The revenue policies and reimbursement strategies for University Hospital to assure compliance with federal and statutory regulations while optimizing allowable revenue opportunities;

- The mission based budgeting process for University Hospital as well as the operations and policies of the Reimbursement Division, which

6

administered the Medicare and Medicaid cost reporting function and the maintenance of the Charge Description Master file;

- The appeals process related to hospital reimbursement;

- The managed care recovery and payment verification units;

- All third-party governmental reimbursement audits and subsequent reviews of settlements of such audits; and

- The protocols and procedures of managed care organizations and negotiated contracts with third-party payers.

23.   Throughout her tenure at UH/UMDNJ, Plaintiff significantly reformed and enhanced the operations of the Reimbursement Division. Specifically:

- Plaintiff recruited and reconstructed the reimbursement and managed care team.

- Shortly after commencing employment, Plaintiff discovered that Charity Care pricing ratios used for University Hospital were in error. As a result of corrective actions, UMDNJ received millions of dollars of additional reimbursement for the Charity Care services.

- Plaintiff created a Revenue Enhancement Committee in which Plaintiff served as its chairperson. Plaintiff redesigned the Charge Description Master file (CDM) to include allowable billable items previously not recognized or recorded by UH/UMDNJ. As a result, UH/UMDNJ realized a substantial increase in reimbursement.

- Plaintiff implemented procedures, including new software programs, that significantly enhanced integrity and methodology to construct and derive accurate charges/claims.

- Plaintiff created the "mission based budget models" for University Hospital in an attempt to determine appropriate funding of clinical departments. This initiative was undermined due in part, to the exclusion of two (2) major components: physician salary expenses for the Open Heart program and community cardiologists. These components were excluded at the insistence of NJMS and certain Clinical Chairmen, over Plaintiff's objection.

- Plaintiff coordinated the $10 Million Medicare settlement that the Hospital was awarded in fiscal year 2003.

- Plaintiff successfully challenged the 1996 Base Year resident count. As a result, the Hospital received substantial payments retroactive to 1996.

- Plaintiff made numerous efforts to address UH/UMDNJ's noncompliance with Medicare/Medicaid regulations, including initiatives to secure completed Medicare physician time studies.

- Plaintiff initiated and organized the reporting of both the School of Nursing and Health Related Professions the Hospital's 2005 Cost Report resulting in a potential annual increase of $7 Million in reimbursement opportunities.

- Plaintiff reopened negotiations with fifteen (15) HMOs which resulted in tens of millions of dollars in managed-care reimbursements despite the internal impediments placed upon her.

- Plaintiff created and implemented a denial recovery unit, resulting in increased revenue to UH of approximately $3 million per year.

- Plaintiff implemented a program which uncovered millions of dollars of underpayments from managed care organizations (MCOs).

24.    Plaintiff was hired on December 13, 1999 by the former CFO of University Hospital at a salary of $108,000, and her title was Director of Payor Contracting and Analysis. In Plaintiff's first performance evaluation, for the period January 1, 2000 through December 31, 2000, she received the highest possible rating.

25.    The next three (3) performance evaluations consistently gave Plaintiff high overall ratings.  Plaintiff's annual salary rose to $161,275, by July 1, 2004 – a fifty percent (50%) increase in 4 years.  When Plaintiff was promoted to Executive Director, Revenue Policy & Fiscal Analysis in November 2005, her salary was again increased to $181,017. Approximately six months later, Plaintiff was terminated, without cause.  This termination was not based on any incompetence, unethical behavior or wrongdoing by Plaintiff but was the result of scapegoating and retaliation against the Plaintiff by the Defendants for her attempts to correct and disclose the deficiencies, irregularities and improper billing practices described herein.

## II.    BILLING AND COST REPORTING ISSUES RELATED TO UH/UMDNJ

26.    Throughout her employment at University Hospital, Plaintiff directed and oversaw the preparation of the annual cost reports for University Hospital which recorded the total costs and charges associated with providing services to all patients.  Portions of those costs

9

and charges were properly allocated to the New Jersey Medicare and Medicaid programs and were the foundation for the Medicare and Medicaid reimbursement payments received by University Hospital.

27.     During the six (6) years of her employment at University Hospital, Plaintiff, working under the supervision of the CFO, identified a number of deficiencies, irregularities and improper practices associated with the cost reports.  As a consequence of these deficiencies, irregularities and improper practices, University Hospital: (1) was not receiving the full extent of its entitlements to Medicare/Medicaid reimbursements; and (2) University Hospital was receiving improper or overpayments of Medicare/Medicaid reimbursement.  In other instances, Plaintiff identified practices which resulted in the overpayment of Medicare/Medicaid claims made by the UPA on behalf of the members of the faculty practice plan of UMDNJ and NJMS. These improper practices (collectively referred to herein as "billing and cost reporting issues") are described and categorized below as:

   A.     Double Payment for Physician Services by Medicaid and Cost Reporting Issues;

   B.     Improper Billing of Technical Component By Physicians ("Code 11" Issue); and

   C.     Double Payment of Facility Fees, Waiver of Facility Fees by UH and Potential Violations of Stark/Anti-Kickback Statutes.

28.     Upon learning of these deficiencies, irregularities and improper practices, Plaintiff reported them to senior administration officials in the Defendant University Hospital and UMDNJ, including the Office of Legal Management, the Office of Corporate Compliance and the Defendants named herein.  Plaintiff repeatedly urged the Administration of University Hospital/UMDNJ to take corrective action to stop the improper practices and to bring University Hospital/UMDNJ into compliance with federal and state statutory requirements.   The Administration of University Hospital and UMDNJ, through the Defendants, repeatedly and

continually failed to act and, instead, actively concealed and thwarted detection and disclosure of the various billing and cost reporting issues and frustrated Plaintiff's efforts to correct them.

**A.**   **Double Payment for Physician Services by Medicaid and Cost Reporting Issue**

29.   On or about May 16, 2001, Plaintiff discovered that certain physicians based in hospital-based clinics, were billing (through the UPA) Medicaid for outpatient services rendered in UH clinics.  Because a portion of these physicians' annual compensation from University Hospital was for outpatient services rendered in the hospital-based clinics, this billing practice resulted in an improper double payment by Medicaid for the same services.

30.   The physicians' annual compensation/salary for these outpatient services was included in the University Hospital's cost report.  Routinely, Defendant University Hospital would receive Medicaid reimbursement for the physician's salaries through the submission to the Medicare/Medicaid Fiscal Intermediary, Riverbend Government Benefits Administrator (hereinafter referred to as "Riverbend") via an annual cost report.  Plaintiff determined that a physician separately billing a fee-for-service to the New Jersey Medicaid Program for such services would result in Medicaid paying twice for the same service.

31.   Medicare/Medicaid regulations state that costs must be included in the cost report where they are incurred.  Plaintiff, in preparation of the cost reports, attempted to "step down" costs in the appropriate Sections of the cost report.  Prior to plaintiffs employment at UH/UMDNJ, cost reports were improperly prepared because these costs were grouped together and not stepped down to their appropriate cost reporting lines.

32.   Upon learning of this practice, Plaintiff immediately informed her supervisor, the CFO, that Medicaid was paying twice for the same service and that it may be necessary for Defendant University Hospital to amend previously submitted cost reports to insure University

11

Hospital was in compliance with Federal and State regulations and/or direct physicians to stop billing Medicaid for out-patient services in hospital-based clinics. Plaintiff also notified and sought guidance from Defendant University Hospital's Office of Corporate Compliance and Office of Legal Management. (See **Exhibit 1**)

33.    As a result of Plaintiff's disclosures, Defendant Andrea Walker-Modu, an attorney in the Office of Legal Management, reported to Defendant Sanks-King, Vice President for Office of Legal Management on or about May 25, 2001 that:

(a)    The UPA was currently billing for services rendered to Medicaid fee-for-service patients in the clinics;

(b)    UH/UMDNJ was reporting physicians salaries attributable to the delivery of healthcare services in the clinics ("physician cost") on the hospital cost reports;

(c)    The regulations do not permit UH/UMDNJ to reflect physician costs in the Hospital Cost Report and allow for the UPA to bill for physician services in the clinic for the same year; and

(d)    This issue needed to be promptly addressed and corrected since the UH/UMDNJ or the physicians were out of compliance with regulatory requirements. (See **Exhibit 2**)

34.    The staff of the Office of Legal Management agreed with Plaintiff and CFO that immediate action had to be taken to: (1) amend the previously submitted cost reports prepared prior to plaintiffs employment with UH/UMDNJ and (2) direct the UPA to suspend the physicians practice of billing fee for service in the hospital-based clinics.

12

35.     Despite this, the Office of Legal Management, under the Direction of Defendant Sanks-King, determined that University Hospital would take no action and that the Dean of NJMS would not direct the UPA (physicians) to suspend billing pending "further research."

**B.     Improper Billing of Technical Component By Physicians ("Code 11" Issue)**

36.     When a physician bills a payor for a service provided to a UH patient, the physician or the physician's billing service  (UPA) will code the bill as "code 11" or "code 22".

37.     A "code 11" designates that the physician is billing for both the technical and professional component for the patient's treatment, suggesting the physician is rendering the service in a private practice site-of-service.

38.     In a private practice site of service, the physician is responsible for all of the costs ("technical components") associated with the service, such as:  overhead, rent, staffing, supplies etc. These "technical component" costs are also referred to in the industry as "facility costs."

39.     The professional component of the physician's bill is for the compensation of the physician time spent rendering the service.  The professional component is also referred to in the industry as "evaluation/management fees."

40.     A "code 22" on the physician's bill designates that the service was rendered in a "hospital site-of-service" and that the physician is claiming only the professional component as compensation for rendering the service.   Essentially, the "code 22" informs a payor that University Hospital incurred the expense for the technical costs ("facility") and that it will be reported as an allowable cost and reimbursed through submission of UH's cost report.

41.     When a physician renders a service for a patient in a "hospital site of service," the physician may not use the site of service "code 11."  The site of service "code 11" is limited to only those situations where the physician incurs the technical ("facility") costs such as in a

13

private office. When the service is rendered in a hospital-based site of service, the hospital has or will report hospital-based technical ("facility") costs incurred as reimbursable expense on the Medicare/Medicaid cost report.

42.    On or about May 16, 2001, Plaintiff reported to the administration that she had discovered a significant "code 11" issue. Specifically she found that some physicians in the hospital-based clinics were improperly billing payors and receiving reimbursement for the technical ("facility") costs component for services rendered in the clinics. She made the report to the CFO, Office of Corporate Compliance and Office of Legal Management, as well as various administrators at UH/UMDNJ. In response to Plaintiff's report of improprieties, once again, the Office of Legal Management directed that no corrective action be taken pending further "research". (See **Exhibit 2**)

**C.    Double Payment of Facility Fees, Waiver of Facility Fees by UH and Potential Violations of Stark/Anti-Kickback Statutes**

43.    Unlike the practice with Medicare, managed care (HMO) reimbursement does not differentiate between professional and technical fees for a patient visit (referred to by HMO's as "evaluation and management"). A single payment is made for one comprehensive bill which includes both the professional and technical ("facility") fees for the physicians' services. Thus, the bills sets forth a single fee for the service, without categorizing charges for the professional or technical components referenced above. Medicaid has arrangements with many HMOs to manage certain Medicaid patients.

44.    Commencing in December of 1996, UH agreed to allow all physicians to see their commercial and Medicaid HMO patients in hospital-based clinics.

45.    During this time, University Hospital had "facility fee" contracts with some of the HMOs which permitted UH to bill and to be reimbursed for the same "facility" costs associated

14

with these physicians' services rendered to HMO patients in UMDNJ hospital-based clinics. UH also had contracts with some of the HMOs for ancillary services such as laboratory and radiology.

46.    In the Spring of 2001 Plaintiff learned that when physicians billed the HMOs for these services rendered in UMDNJ hospital-based clinics, they sought and received reimbursement for the technical portion of the charge ("facility") costs associated with these services.

47.    As a result, both the UPA, as billing agent for the physicians and UH were billing and receiving payments from HMOs for the technical ("facility") costs for services rendered in UH's hospital-based clinics.

48.    Upon discovery of this, Plaintiff reported this improper practice to the CFO and numerous administrators of UH and UMDNJ, including the Office of Corporate Compliance and Office of Legal Management.

49.    To avoid this double payment issue, Plaintiff and CFO immediately caused UH to suspend billing HMOs for the "facility fees" associated with these services.

50.    Plaintiff also raised questions as to whether the failure of University Hospital to bill and be reimbursed for the facility fee would constitute an illegal benefit to physicians for referring patients to University Hospital in violation of federal law (specifically and hereinafter referred to as the "Stark/Anti-Kickback Laws"). Plaintiff and CFO raised concerns that the improper waiver of the facilities fees would also induce the physicians to see their commercial HMO patients in the clinics.

51.    Shortly thereafter on or about June 11, 2001, an action plan was implemented in which patient charge tickets for Medicaid and commercial HMOs would be withheld for 40 days

15

until the issue could be resolved. The action plan was extended on multiple occasions pending an opinion from the Office of Legal Management.

### III.   COVER UP OF BILLING AND COST REPORTING ISSUES

52.   In the early summer of 2001, a working group ("Working Group I") within University Hospital and UMDNJ was formed for the purpose of reviewing the billing and cost reporting issues enumerated above. Members of the Working Group I included Defendant Sanks-King, Defendant Andrea Walker-Modu, an Associate Dean of Clinical Enterprise ("Physician A"), the Plaintiff, CFO and other administrators at UH/UMDNJ.

53.   Prior to the commencement of Working Group I, Plaintiff briefed the Senior Vice President of Administration & Finance, UMDNJ on these billing and cost reporting issues expressing concern about UH's statutory and regulatory noncompliance.

54.   During the spring and summer 2001, Plaintiff continued to report these billing and cost reporting issues to senior management of University Hospital and UMDNJ, including: the Senior Vice President of Administration & Finance, the Dean of NJMS, the President and CEO of University Hospital, the Director of Corporate Compliance, Defendant Sanks-King, Vice President, the Office of Legal Management, among others. (See **Exhibit 17, Tab B**)

55.   In or about June 2001, the law firm of Kalison McBride Jackson & Murphy, PA (hereinafter the "Kalison McBride" firm) was engaged by UH/UMDNJ to review the above identified cost reporting issues and to make recommendations to address and correct any improper or illegal practices.

16

A.    **Kalison Report – December 20, 2001**

56.    The Kalison McBride firm issued a written opinion dated December 20, 2001

("Kalison Report").  (See **Exhibit 3**)  With regard to the Double Payment for Physician Services

Issue (IIA above), the Kalison Report stated, in part:

- "As we understand, New Jersey Medicaid reimbursement, if a physician is salaried to provide outpatient services in a hospital clinic, the hospital may seek recovery of the physician costs on its cost reports and will receive reimbursement based upon the application of a cost to charge ratio.  In such situations, hospital-based physicians are not permitted to bill separately." (Kalison Report, p.5)

- "In the instant case, beginning in FY 2001, UH moved the physician costs from adult and pediatric inpatient to the appropriate outpatient clinic lines in the cost report.  Basic cost reporting principles require that UH costs be reported in the cost settings in which they are incurred." (Kalison Report, p. 5)

- ". . .UPA appears to have the contractual right to bill for clinical services of the faculty physicians. . . .  Notwithstanding New Jersey Medicaid Regulations, specifically state 'a hospital-based physician who is salaried and whose services are reimbursed as part of the hospital's cost shall not bill fee-for-service to the New Jersey Medicaid program.'" (Kalison Report, p. 6)

- "It seems clear that faculty physicians providing services in clinics operated by UH under its license and paid a salary for such service meet the definition of hospital-based physicians, whose services are reimbursed as part of the hospital's costs." (Kalison Report, p. 6)

- "It would appear from the facts reviewed that UPA billed for and UH sought reimbursement for a portion of the same professional services. . . . On the other hand, UH following cost reimbursement principles, properly submitted its Hospital-based physician costs on its cost report and billed charges for non-physician costs in clinics operated under UH's license. For the reasons previously stated, the Hospital-based physician costs should be billed to Medicaid in the UH cost report." (Kalison Report, p. 6).

- "Where the double billing for physician services in FY 2000 may have been inadvertent, it raises concerns for the UPA under the False Claims Act (the "FCA"). . . .  UH may also have false claim concerns if prior year

cost reports are reopened, and it is determined that certain non-physician costs in UH clinics were incurred by UPA and actually recovered by UH from Medicaid." (Kalison Report, p. 6-7).

- "Medicaid regulations provide that if a claim is incorrectly paid and the provider receives an overpayment or underpayment the provider shall notify the fiscal agent in writing. . . . The regulations place the reporting obligation on the provider who receives over or under payment. There is no mention of a third party reporting obligation. UH can take the position that this reporting obligation does not apply to it because UH was not overpaid for its costs in the UH clinics nor did it receive an inappropriate payment. On the other hand, UPA would appear to have a clear reporting obligation . . .". (Kalison Report p. 7)

- While UH may not have a legal duty to report this situation to a Medicaid Fiscal Agent, at a minimum, it should make the UPA aware of the double payment problem, so that steps can be taken to avoid it." (Kalison Report, p. 7)

57.  With regard to the Improper Billing of Technical Component By Physicians ("Code 11" Issue) (IIB, above),the Kalison Report stated, in part:

- "UPA received a payment that under the regulations, should not have been paid because UPA billed for overhead and physician services as a code 11 office visit, when the services were provided in UH clinics, where the same costs were included in the cost reports." (Kalison Report, p. 7)

58.  With regard to the Waiver of Facility Fees by UH (Potential Violation of Stark/Anti-kickback Statutes), (IIC, above), the Kalison Report stated in part:

- Waiver of co-insurance and deductibles under federal and state health care programs is problematic because regulators believe such waivers encourage over utilization of medical services and allow the providers an opportunity to steer patients to their facilities. The federal government initially relied upon the anti-kickback statute to dissuade such waivers. More recently, . . . HIPAA expressly prohibits the offer and transfer remuneration that is likely to influence individuals to order or receive from a particular provider items or services paid for in whole or in part under federal and state health care programs. (Kalison Report, p. 9)

- ". . . if UH has Managed Medicaid contracts which provide for the Hospital to bill a charge [for "facility fees"] for outpatient services, and UH waived this charge to accommodate the physicians, such a waiver could be problematic. While we are not aware of cases prosecuted for the waiver of [facility] fees, such conduct falls into a gray area which may

18

raise issue [sic] under the federal anti-kickback statute.  (Kalison Report, p. 9)

**B.**   **Kalison Report Recommendation**

59.    The Kalison Report concluded with "Recommendations" which were based upon the law firm's "review and analysis" of the information provided and the relevant law.  With respect to the Double Payment Cost Reporting issue (IIA above), the Report recommended:

- "UH representative should meet with UPA representatives to discuss the double payment for professional service issue.  At a bare minimum, UH should insist that UPA cease billing Medicaid and Managed Medicaid payors for Hospital-based physician services provided in the UH clinics and for which reimbursement is recovered in the UH cost reports." (Kalison Report, p. 10)

- "UH may continue to seek reimbursement for physician costs documented and occurred in the appropriate UH clinic cost center.  As part of the documentation, physicians providing services in UH clinics must complete uniform and consistent allocation agreements to document time spent in the clinics." (Kalison Report, p. 10)

60.    With respect to the Waiver of Facility Fee issue (IIC, above) the Kalison Report recommended:

- "Waiver of facility fees in government programs, if ongoing, should cease and be avoided in the future.  Any waiver of co-insurance or deductibles for federal or state payors should be limited to situations that fall within the anti-kickback "safe harbor" or exceptions under HIPAA. . . if UH wishes to bill only a facility fee, it will need to enter the same Managed Care contracts that its physicians participate in." (Kalison Report, p. 11)

**C.**   **Failure to Disclose and Implement the Kalison Report**

61.    The Kalison Report was provided to the CFO in December 2001.  Further distribution of the Kalison Report was restricted to several senior UH/UMDNJ administrators at the direction of Defendant Sanks-King.  The CFO was directed not to disclose the Kalison Report to the Plaintiff, although she had initially discovered and reported the various double billing/over-billing and cost reporting issues which led to the engagement of the Kalison

19

McBride firm.  In order to perform her duties relating to cost report preparation, the Plaintiff should have been permitted to formally review the report's legal analysis and recommendations and, thereafter, participate in the implementation of corrective action to bring UH into full statutory compliance.

62.     In or about January 2002, in response to Plaintiff's inquiry, the CFO informed the Plaintiff that the Kalison McBride firm had issued an opinion with respect to the various cost reporting issues and, although he was ordered not to disclose it to Plaintiff, the CFO secretly permitted the Plaintiff to read the Kalison Report.

63.     After reading the report, Plaintiff noted that it confirmed her understanding of the billing and cost reporting, double payment and other compliance issues set forth herein and that the Office of Legal Management, Corporate Compliance and the senior management of UH/UMDNJ would now have to take steps to ensure that report recommendations were implemented by taking appropriate steps with the UPA, NJMS, faculty, physicians, etc.  Plaintiff copied three (3) pages, including the cover page, of the Kalison Report and attached them to her cost reporting work papers/correspondence to document the propriety of UH's cost reporting practices.

64.     Upon information and belief, despite her role as the legal advisor to UH/UMDNJ administrators, defendant Sanks-King unbeknownst to Plaintiff, at that time, refused to direct the implementation of the Kalison Report recommendations, and directed that the Kalison Report be kept secret from key employees of UH, including the Plaintiff, and from the UPA and most of the faculty physicians.

65.     Upon information and belief, many senior administrators in UH and UMDNJ were aware of the Kalison Report and the decision to keep it secret.

20

66.    Defendant Sanks-King and other senior UH/UMDNJ administrators were aware that, without directions to the UPA and/or the Reimbursement Division, the double payment, billing and cost reporting issues set forth above would continue unabated despite the clear guidance and recommendations of the Kalison Report.

67.    With respect to the waiver of facilities fee issue and potential violation of the Stark and Anti-Kickback laws, Plaintiff repeatedly raised her concerns with these issues from June 2001 through May 2004 with various senior administrators, including Defendant Vivian Sanks-King and other members of the Office of Legal Management and the Office of Corporate Compliance.

68.    In the Spring of 2002, Plaintiff was assured by the Senior Vice President of Finance and Administration that all of the compliance billing and cost reporting issues relating to double billings, double payments, "code 11," etc. were being addressed and corrected by the Administration of UH and UMDNJ.

69.    In or around November, 2002, Plaintiff sent a memorandum to the Director of Corporate Compliance, the CFO and other administrators, stating that the Hospital will be filing its 2002 Cost Report and asking if there were any observations and issues that need to be addressed or disclosed in the filing.  Plaintiff received no response.  No guidance was given regarding disclosures about the billing and cost reporting issues delineated herein, despite her repeated requests for same.

70.    Five years after the publication of the Kalison Report, Plaintiff learned, in or about January 2006, that a preliminary "draft" report (the "Draft Kalison Report") had been prepared by the attorneys for the Kalison McBride firm.  This Draft Kalison Report initially reached conclusions that were contrary to those expressed in the final Kalison Report.

21

71.     Defendant Sanks-King and other members of the staff of Office of Legal Management, never disclosed these inconsistent opinions and recommendations or the Draft Kalison Report to Plaintiff.

72.     Upon information and belief, the preliminary conclusions contained in the Draft Kalison Report were modified after discussion with the Defendant Sanks-King and other members of her staff, who were directed to keep the preliminary conclusions secret.

73.     Among other changes, the Kalison attorneys preliminarily concluded in the Draft Kalison Report, that UH "must disclose to the Medicaid Fiscal Agent the overpayment received in cost reports for FY 2000 physician services of 1.2 Million."

74.     The attorneys for the Kalison McBride firm also concluded in the Draft Report that UH "should not submit the same physician costs for UH Clinics in FY 2001 or thereafter until . . . UH and UPA . . . negotiate a 'carve out' of physician billing for UH clinics which will be done by UH."

75.     Defendant Sanks-King, other members of the staff of Legal Management, and other administrators at University Hospital/UMDNJ were aware that:

   a.   Plaintiff had never been told about the opinions and the recommendations in the Draft Kalison Report or formally advised of the Final Kalison Report, even though they directly impacted her work responsibilities;

   b.   Until January 2004, no one from UH instructed that UPA cease billing Medicaid for hospital based services;

   c.   UH and UPA were not renegotiating a "carve out" to allow UH to bill physician services (other than Medicaid) in the UH clinics;

   d.   UH should discontinue seeking reimbursement for physician costs that occurred within UH clinic cost centers;

   e.   Plaintiff was not instructed, despite her requests for guidance, that UH had a legal duty to make any disclosure to the Medicaid fiscal agent of possible double payment issues described in section IIA and IIB above; and

22

f.   Plaintiff had been misled to believe that UH and the Kalison McBride firm were in the process of negotiating a revised affiliation agreement with the UPA and that the billing and cost report issues would be addressed as part of that process.

76.   On or about April 29, 2003, during a meeting with the Pediatric Department regarding its Mission Based Budget, Plaintiff learned that physicians in the Pediatrics D-Yellow clinic were still billing as a site of service "code 11," "private practice."

77.   Plaintiff immediately urged the CFO, the Vice President of Medical Affairs and Associate Dean, and the Vice President of Ambulatory Care to bring this issue to the attention of Legal Management and other senior administrators at UH/UMDNJ for correction.

78.   Two (2) months later on or around June 23, 2003, in follow-up discussions, the Vice President of Ambulatory Care revealed to Plaintiff that physicians in certain hospital-based settings were continuing to bill for services using a "code 11" modifier. The Vice President for Ambulatory Care had been led to believe that the "code 11" billing practice "had ceased or would cease" as a result of direction from the Office of Legal Management. Plaintiff discussed her concerns with the CFO of the ongoing billing and cost reporting issues. As a result, in a letter dated June 27, 2003, the Vice President of Ambulatory Care and the CFO communicated their concerns regarding this "code 11" issue to Defendant Sanks-King. (See **Exhibit 4**)

79.   In response, on July 15, 2003, an attorney in the Office of Legal Management, acting under the direction of Defendant Sanks-King, sent a memorandum to the CFO and the Vice President of Ambulatory Care establishing a new working group ("Working Group II") which included the CEO, University Hospital, the Senior Vice President for Administration and Finance, Defendant Sanks-King, the Dean of NJMS, the CFO, Plaintiff and others. (See **Exhibit 5**) Plaintiff was told that the purpose of this Working Group was to address and recommend solutions to "code 11" billing issues (Section IIB, above).

80.    Members of Working Group II were directed by Defendant Sanks-King that they could only "communicate with those individuals which [sic] were designated as the control group" and to "avoid sending any communications regarding this matter over the e-mail system unless it is regarding administrative matters, such as scheduling meetings." The memorandum stated that the Office of Legal Management would retain authority to decide "what actions, if any, should be taken" regarding the billing issues.

81.    Upon information and belief, Defendant Sanks-King and others wanted to ensure that there would be no written record of billing and cost reporting issues emanating from the Working Group II and that all final decisions with respect to corrective actions regarding these issues would be completely within the control of Defendant Sanks-King and other senior administrators at UH/UMDNJ.

82.    After formation of Working Group II, Plaintiff learned the double billing issue (Section IIA) was still not resolved and requested that this item be added to the issues to the agenda of the Working Group II.

83.    On or before October 6, 2003, Defendant Walker-Modu issued a memo to the Working Group II stating: "This reconfirms Kalison McBride's opinion . . . that our physicians qualify as hospital based physicians . . . because the hospital pays a portion of the physician salary (the patient service component.)   [The report] concludes by stating that the distinction between "11" or "22" remains an issue that needs to be resolved."

84.    Plaintiff was stunned at the lack of action and clarity regarding the billing and cost reporting issues as reflected in Defendant Walker-Modu's memorandum.  Consequently, on or about December 3, 2003, Plaintiff sent an e-mail to Defendant Sanks-King, the CFO, the CEO

of UH and others which suggested that the Administration "re-read" the Kalison Report, dated

December 19, 2001, and its "very clear direction and guideline" that:

      (a)    UH should insist that UPA cease billing Medicaid indemnity and Managed Medicaid payors for hospital based services provided in UH clinics;

      (b)    UH has the right to seek reimbursement for these costs (not the physician); and

      (c)    UH should avoid the waiver of the facility fees as to any government payor.

      85.    This was the first time that Defendant Sanks-King became aware that Plaintiff had

seen or had access to the Kalison Report.  In response to Plaintiff's December 3, 2003 e-mail, on

December 4, 2003, Defendant Sanks-King, obviously infuriated that the report had been leaked

to Plaintiff, circulated an e-mail (in block capitals and bold face) ignoring the merits of

Plaintiff's concern and instead stating:

      **PLEASE BE ADVISED THAT THE CIRCULATION OF THE REFERENCED DECEMBER 19, 2001 OPINION FROM KALISON/MCBRIDE IS BOTH INAPPROPRIATE AND A SERIOUS BREACH OF THE ATTORNEY/CLIENT PRIVILEGE.**

      **I CAUTION EACH OF YOU NOT TO RELY ON THIS DOCUMENT FOR SEVERAL REASONS 1) IT IS NOT THE FINAL OPINION FROM THE FIRM, 2) THERE WERE ADDITIONAL REVISIONS TO THE DECEMBER 19TH DOCUMENT THAT INCORPORATED CLARIFICATIONS AND CORRECTIONS NOTED BY MYSELF AND OTHER ATTORNEYS IN THE OFFICE OF LEGAL MANAGEMENT, 3) IN ORDER TO PROTECT PRIVILEGE, THERE CAN BE DISTRIBUTION ONLY TO A FEW INDIVIDUALS WHO COMPRISE THE CONTROL GROUP, 4) THE OFFICIAL OPINION DATED DECEMBER 20, 2001 WAS TRANSMITTED BY ME TO [THE CFO] WITH THE APPROPRIATE CAUTIONARY NOTE REGARDING FURTHER DISTRIBUTION.**

      **AGAIN LET ME REMIND EACH OF YOU THAT OPINION FROM OUTSIDE COUNSEL IS ADVICE WHICH MUST BE CONSIDERED IN VIEW OF THE SPECIFIC CIRCUMSTANCES POSED BY THE UH'S OPERATIONS. AS I KNOW FULL WELL AND SOME OF YOU LEARNED RECENTLY IF YOU DIDN'T KNOW IT ALREADY, OUTSIDE COUNSEL'S**

UNDERSTANDING OF THE UNIVERSITY IS SOMEWHAT LIMITED AND THEREFORE ANY OPINION MUST BE READ WITH THAT UNDERSTANDING.  MUCH OF THAT OPINION IS MORE THE WORK OF REVISIONS AND CLARIFICATIONS MADE BY [NAME] AND ANDREA MODU-WALKER [SIC] AS IN-HOUSE COUNSEL AND OUTSIDE COUNSEL WORKED TO DEVELOP AND OPINION THAT WAS RESPONSIVE TO THE SPECIFIC QUERY.

I LOOK FORWARD TO BRINGING THIS MATTER TO RESOLUTION AND SUGGEST THAT ANY OTHER COMMUNICATION REGARDING THIS MATTER BY [SIC] HANDLED IN A MEETING OR BY PHONE, NOT BY E-MAIL.

86.    On or around December 5, 2003, Plaintiff, the CFO and the Vice President of Ambulatory Care attending a meeting with Defendant Sanks-King.  Defendant Sanks-King questioned how Plaintiff had obtained access to the Kalison Report and chastised the CFO for allegedly violating the attorney-client privilege, despite the clear appropriateness and import of sharing the Report's findings with Plaintiff, given her position and responsibilities.  Defendant Sanks-King made no mention of the Draft Kalison Report.

87.    At this meeting, Plaintiff told Defendant Sanks-King that it appeared to her that one of the members of the Working Group II (Physician A) had a conflict of interest which would render her ineffective in protecting the best interests of UH/UMDNJ in these matters and should, therefore, be disqualified from participating in discussion of certain cost report and billing issues.  Defendant Sanks-King, fully aware of the conflict, ignored Plaintiff's request.

88.    In this same discussion and at Plaintiff's urging, Defendant Sanks-King conceded that the technical costs related to the clinics (delineated in IIA or IIB, above) should continue to be recorded as allowable costs on the cost reports.

89.    Also at Plaintiff's urging, Defendant Sanks-King also conceded that the Kalison Report was correct in its analysis of the double payment cost reporting issue (IIA, above), which implied she would take some action to resolve this issue.

26

90.    However, on or about January 20, 2004, Defendant Sanks-King informed the CFO that she directed the Kalison firm to not have any discussions with UH and UMDNJ management, stating, "I believe there is a great deal of confusion" regarding the conclusions of the Kalison report. Clearly, Defendant Sanks-King did not want all relevant factual information to be provided to the Kalison firm.

91.    On or about January 23, 2004, Plaintiff met with Working Group II. Plaintiff expressed concern and frustration that nothing concrete had happened and that it appeared that some administrators and participants in Group II were "stonewalling" corrective action of the on-going billing and cost report issues.

92.    Plaintiff's concern and frustration were mounting and she became more aggressive in seeking correction of the ongoing improper billing and cost reporting issues. To that end, she felt it was necessary to bypass Defendant Sanks-King and the Office of Legal Management.

93.    On or about January 30, 2004, Plaintiff met with the Dean of NJMS and stated, in substance:

(a)    That there were serious compliance issues that had been ongoing for many years involving fraudulent double payment from Medicaid, among others;

(b)    That the UH administration, including the Defendant Sanks-King and Office of Legal Management, were "stonewalling" and refusing to address the issues;

(c)    That one of the members of Working Group II (Physician A) had an obvious conflict of interest regarding the billing issues as she was one of the more persistent and egregious offenders in billing as a private practice while using hospital resources; and

(d)    That the Kalison Report recommendations should have been implemented and the issues should have been resolved two years ago.

(e)     That, if the Office of Legal Management found a flaw in the Kalison Report analysis, they should have corrected it and required the reissuance of the opinion.

94.    The Dean of the NJMS stated (1) that he felt "powerless" to do anything about the billing and cost reporting issues, and (2) that Defendant Sanks-King would support the position of Physician A as it relates to any physician billing issues and (3) that she would place little importance on the Dean's opinions.

95.    On or about the same day, Plaintiff also met with the President of UMDNJ and the CEO of UH and reported the same issues as stated to the Dean, above.  Plaintiff told the President that she was going to report these matters to Centers for Medicare/Medicaid Services ("CMS") and Office of Inspector General for Health and Human Services ("OIG").  The President asked the Plaintiff to hold off making a report while he took steps to resolve these issues.  Plaintiff also requested that the President inform the Board of Trustees of all of the above billing and cost reporting issues.

96.    In early 2004, NJMS requested the UPA to suspend Medicaid billing in out-patient clinics until the billing issues (IIA and IIB above) could be resolved.  Plaintiff understood that on or about January 27, 2004, UPA ceased billing Medicaid.  Plaintiff was led to believe that the UPA, at the direction of senior administrators of UH and NJMS, would be following the recommendations set forth in the Kalison Report and would either cease billing or work out a new arrangement with UH in the negotiations for a new Affiliation Agreement.  (See **Exhibit 6**)

97.    In or about February 2004, the Kalison Report was forwarded to counsel for UPA for the first time.  In response, counsel for UPA sent a letter in March of 2004 to the legal department at UMDNJ stating that it was UPA's position that only UPA could bill Medicaid for fees for physicians' service.   The Office of Legal Management did not provide this

28

correspondence to Plaintiff, although it would have been appropriate and proper to do so given Plaintiff's position and job responsibilities.

98.    In March 2004, representatives of UH/UMDNJ and UPA met on several occasions to discuss billing issues.  Upon information and belief, it was agreed that both UH and the physicians (through UPA), could not continue to seek reimbursement for the same service and that this double billing practice had to stopped.  It was agreed that the issue would be addressed and resolved in the upcoming contract (Affiliation Agreement) negotiations between UH and the UPA.  (See **Exhibit 7**)

99.    Based upon the findings and recommendations of the Kalison Report, Plaintiff understood that there should be no changes or modification to the preparation of the cost reports. Plaintiff understood that the senior administration of the Hospital, NJMS, the Office of Legal Management and its outside counsel, the Kalison McBride firm, were involved in negotiations with the UPA and would be acting in accordance with the recommendations and opinion as stated in the Kalison Report to address the billing and cost reporting issues.  Plaintiff was not involved in the negotiations with the UPA.

100.    In connection with the UPA negotiations, on or about March 10, 2004, Plaintiff circulated an article entitled "Formulas for Fair-Market Compensation: Paying MDs Without Violating Fraud Laws" to the CFO, the Vice President of Ambulatory Care, Defendant Walker-Modu, Physician A, and the Offices of Hospital Compliance and Corporate Compliance.  The article addressed the risk of violating Stark/Anti-Kickback laws in context of global fee arrangements with Medicaid and commercial HMOs.  (See **Exhibit 8**)

101.    As Plaintiff had repeatedly advocated, the article recommended that compensation arrangements with physicians should be formula-based.  The critical component of the formula

29

was the actual hours spent by physicians at the Hospital. This calculation should have been derived from time studies prepared by every physician working at UH, including the clinics. Proper application of the formula would ensure that physicians were not overpaid, that UH or the physicians would not be in violation of the Stark/Anti-Kickback laws and that UH would receive its full entitlement of reimbursement.

102.    Medicare regulations require that all physicians receiving any form of remuneration from University Hospital complete a time study twice a year for a two (2) week time period. Prior to Plaintiff's arrival, the Medicare time studies were not even distributed to the physician community much less completed.

103.    From as early as 2000, shortly after Plaintiff commenced her employment, she repeatedly prodded UH/UMDNJ administrators and physicians to comply with Medicare regulations by completing the required time studies in order to:

   (a)    Confirm that physicians were being compensated by the Hospital for treating patients in the clinics;

   (b)    Reveal whether UH was overpaying for physician services;

   (c)    Identify where patient care services were rendered and prevent false claims by physicians billing as a private practice ("Code 11") when it should have been billing as a "Code 22" for in-clinic service.

   (d)    Quantify physician time spent teaching and supervising interns and residents as well as time spent on administrative functions.

   (See **Exhibit 15, Tabs A, B, D and J**)

104.   In December 2001, the Kalison Report also addressed this issue, stating, "Physicians providing services in the UH clinics must be required to complete uniform and consistent allocation agreements to document time spent in the clinics." (Kalison Report, p. 10)

105.   Despite the efforts of Plaintiff, recommendations of the Kalison Report, and federal regulations, the physicians rendering services in University Hospital clinics were never required to complete time studies.

106.   Physicians at NJMS were required to account for their time in "Effort Reports" which were utilized to support their grant and research applications, among other things.   The Effort Reports revealed the amount of physician time, on an individual physician basis, spent rendering services in the Hospital.   Despite Plaintiff's requests for access to the Effort Reports, senior administration officials at UH/UMDNJ and NJMS refused to disclose such reports to Plaintiff.

107.   In February of 2006, shortly before her forced leave of absence, Plaintiff obtained access to an Effort Report from a representative in Corporate Compliance for the latest available period.   A preliminary review revealed that physicians had been overcharging University Hospital by approximately $20 million for physician services.   Plaintiff was in the process of identifying the specific overcharges for each physician, when she was forced out of University Hospital on a leave of absence.   Plaintiff and the Compliance representative reported the initial findings to Defendant Cox, Compliance and others.

108.   Over the next several months the Working Group II periodically met to discuss these billing and cost reporting issues.

109.   In or about May 2004, without explanation, the Office of Legal Management, under the direction of Defendant Sanks-King, retained yet another law firm (the "new firm") to

replace the Kalison McBride firm. No public explanation was made for discontinuing the service of the Kalison McBride law firm.

110.   On or about April 26, 2004, Defendant Sanks-King sent a memorandum to the CFO stating that if UH was going to claim the outpatient clinic physician costs on the cost reports, there must be a "contract between the physicians and the hospital which, at a minimum, sets forth the physicians agreement to forego billing for providing services for which they are, without such an agreement, entitled to bill." (See **Exhibit 9**)

111.   With respect to the waiver of facility fees issue and the potential for a violation of Stark/Anti-Kickback laws, Defendant Sanks-King stated "we have concluded that these federal laws are not relevant to these discussions as these transactions are internal involving employees of UMDNJ." (See **Exhibit 9**).

112.   Plaintiff and CFO continued to question the Office of Legal Management's conclusion concerning the absence of relevancy of Stark/Anti-Kickback laws to the waiver of facility fees. Specifically, Plaintiff raised concerns regarding the Office of Legal Management's conclusions that the billing entity for the physicians should be considered part of the University when, in fact, (1) it had a separate employer identification number; (2) it utilized a separate Medicare provider number; and (3) it was not included on UMDNJ's consolidated financial statements.

113.   In response to Defendant Sanks-King's memorandum, on May 5, 2004 the CFO wrote to Defendant Sanks-King that her memorandum was "inadequate" because it did not give any specific direction as to how UH should proceed. The CFO also questioned other conclusions reached by Office of Legal Management, including its failure to give guidance on the Stark/anti-

32

kick back issues relating to the waiver of the facilities fee (IIC above) and the and "Code 11" billing issues (IIB above). (See **Exhibit 10**)

114.    Upon information and belief, Defendants Sanks-King, Walker-Modu and the Office of Legal Management continued to ignore these billing and cost reporting issues and refused to respond to the CFO's May 2004 memorandum.

115.    On or about May 7, 2004, Plaintiff and the CFO met with an attorney from the new firm retained by Defendant Sanks-King.

116.    On or about May 17, 2004 Working Group II met to discuss the on-going billing and cost reporting issues.    Attendees included the Dean of NJMS, the CFO, Physician A, Defendants Walker-Modu and Sanks-King, and Plaintiff, among others.    (See, **Exhibit 11**) During this meeting, the CFO and Plaintiff suggested it was critical to disclose the double billing issue to the New Jersey Division of Medicaid Assistance.

117.    Subsequently, the new firm concluded that UH must have an agreement with the physicians in order to claim the physician costs in the out-patient clinics on the cost reports because "the government does not want to pay twice for the same service."

118.    Shortly thereafter, on or about June 1, 2004, the UPA announced that the UPA would "cease its voluntary suppression of Medicaid indemnity billing." In effect, this reinstated the same systemic problem of double billing/double payments by UH and the UPA which Plaintiff first discovered and reported on May 16, 2001 (IIA above).    The announcement proclaimed that legal management was in agreement with this action and even thanked Physicians A for "helping bring this issue to a positive conclusion." Plaintiff was unaware of this announcement until June 2005. (See, **Exhibit 12**)

119.    Between June 2004 and November 2004, Working Group II continued to meet to discuss billing and cost reporting issues.  During these meetings, the CFO recommended, and Plaintiff agreed, that UH/UMDNJ should make disclosure to Medicaid that UH and the UPA had been receiving double payment for the same physician services for many years.  The Working Group II, encumbered with dissension and lacking authority, took no definitive steps to address these issues.  It became clear to Plaintiff that Working Group II was merely a powerless, bureaucratic device to justify further delays in resolving the billing and cost reporting issues.

120.    In the fall of 2004, Defendant Darlene Cox became the new CEO of UMDNJ. Plaintiff briefed Defendant Cox regarding all of the billing and cost reporting issues of Working Group II.  Plaintiff also informed her that the upcoming cost report was coming due and, once prepared, would have to be signed by a member of the senior management.

121.    Plaintiff was instructed by Defendant Walker-Modu and by others that it was appropriate to continue including the technical costs related to the clinics as allowable costs on the cost report (IIB, above).  This position was consistent with the Kalison Report.  Despite this, the Office of Legal Management ignored the fact that the UPA continued its improper "Code 11" billing practice.

122.    On or about November 16, 2004, the CFO sent a letter to New Jersey Division of Medical Assistance and Health Services and stated, in part:

> "It appears that physicians have submitted bills for their professional services in the out-patient service areas directly to Medicaid while at the same time University Hospital received reimbursement for services through the supplemental D-3 form."
>
> . . . we will continue to report our costs, using time studies when available, as required under Medicaid principles.  However, we specifically request that Medicaid instruct the Medicaid intermediary (Riverbend), when auditing and settling the Cost Reports, to refrain until further notice from completing Schedule

34

D-3 supplemental, which adds outpatient physician professional costs as a credit to the hospital settlement.

123.    On or about November 24, 2004, Plaintiff executed the Cost Report for the period July 1, 2003 through June 30, 2004 which included a note on the attestation page which stated, "UMDNJ-University Hospital requests that Riverbend (Medicaid Intermediary) refrain from completing Scheduled D-3 supplemental for Medicaid purposes until pending discussions and resolution with the State Department of Medicaid Assistance and Human Services."  By doing this, UH was declining to be reimbursed for its costs of compensation to its physicians for rendering services to patients in the hospital-based clinics.  This was done despite the Kalison Report opinion that it was proper for UH to report this as an allowable cost for which it would routinely be reimbursed.  Declining reimbursement, however, was the only way to prevent a double payment from Medicaid since the physicians (UPA) had recommenced their separate fee-for-service billings.  This resulted in UH losing reimbursement money it was entitled to receive, but, at least, avoided the double payment issue for the 2005 Cost Report.

124.    In 2005, the Defendants Cox, Sanks-King Walker-Modu and Cox, as well as other senior UH/UMDNJ Administrators, continued  their refusal to directly confront and address the various billing and cost reporting issues which were initially raised by Plaintiff in May 2001.

### IV.    STATE AND FEDERAL INVESTIGATIONS

125.    In or about June 2005, the Office of the Inspector General ("OIG") for the U.S. Department of Health and Human Services ("HHS") commenced an investigation into allegations of Medicare/Medicaid fraud involving UH/UMDNJ.

126.    Upon information and belief, in or about July, 2005, a State grand jury, under the supervision of the Division of Criminal Justice, also commenced a grand jury investigation into allegations of Medicaid fraud involving UH/UMDNJ.

35

127.   Upon information and belief, in or about July, 2005, the U.S. Attorney's office for the District of New Jersey commenced a grand jury investigation into allegations of Medicaid and Medicare fraud involving UH/UMDNJ.

128.   Grand Jury subpoenas and document demands were served upon UH/UMDNJ, calling for the production of records relating to, among other things, the billing and cost reporting issues referenced above, by the U.S. Attorney's Office for the District of New Jersey, the State grand jury and the OIG for HHS.

129.   Upon information and belief, in or about June 2005, Defendant Sanks-King engaged the services of another outside law firm from Newark, New Jersey (the "Newark Firm") to represent UH/UMDNJ in connection with the above investigations.

130.   Defendant Sanks-King, despite her involvement in the allegations under investigation, was responsible for directing the activities of the above referenced Newark Firm and supervising the response by UH/UMDNJ to the above investigations.

131.   In or about July 2005, the Newark Firm engaged the services of Parente Randolph, LLC, ("Parente") an Accounting and Healthcare consulting firm from Wilkes Barre, Pennsylvania.

132.   Defendant Foley was a principal in Parente and oversaw the firm's activities in connection with the UH/UMDNJ engagement.  Upon information and belief, Mr. Foley worked under the supervision of the Newark Firm and, at times, reported directly to Defendant Sanks-King, Defendant Cox and the Board of Trustees of UMDNJ.

133.   On or about July 20, 2005, Plaintiff was advised by counsel from the Newark Firm, in the presence of the CFO, Defendant Darlene Cox, President/CEO and others that the

investigations were probably triggered by a "whistleblower," the former Vice President of Ambulatory Care.

134.  Plaintiff was advised that the "whistleblower" probably told the government everything he knew and the "whistleblower" probably "claimed" that the billing issues under investigation were a "deliberate fraud."

135.  Plaintiff was told by counsel, in the presence of Defendant Cox, that it was important to work together collectively and that there was no need for anyone to engage independent counsel.

136.  Plaintiff stated, in the presence of Defendant Cox, counsel and others that there were serious issues of noncompliance and double billing by UH/UMDNJ and the UPA.  In substance, she stated that the whistleblower allegations were correct.  Plaintiff explained, in some detail, that she had discovered the double billing (IIA) and "Code 11" (IIB) issue in 2001, that she reported them to Defendants and that she had worked since May 2001 to have the issues corrected.

137.  Plaintiff was told that an allegation had been made by  a representative of the UPA that the double billing issues started shortly after Plaintiff had commenced her employment.  Plaintiff understood that this statement was an implied allegation against her and was intended to get her to work cooperatively with Defendants and to refrain from engaging her own counsel.  Plaintiff stated that some of these issues went back to 1985, and that they were only detected by her in 2001.

138.  On July 22, 2005, Plaintiff engaged an independent law firm to represent her in connection with the various investigations involving UH/UMDNJ.

139.   On or about July 25, 2005 a request was made to Defendant Sanks-King that UH/UMDNJ pay for Plaintiff's counsel fees.  The request to Defendant Sanks-King was ignored for two months before it was denied.

140.   In the summer of 2005, employees of UH/UMDNJ were directed to gather documents which had been subpoenaed by the federal and state grand juries.  Employees, including Plaintiff, were directed to make a copy of relevant records and produce original documents to a document control center in UH which was supervised and controlled by Defendant Sanks-King through Corporate Compliance, UH Compliance and Defendant Walker-Modu.  At one point, an assistant to Defendant Cox was also involved in the control of documents.

141.   Plaintiff expressed concerns to UH administrators about this arrangement, specifically questioning Defendant Walker-Modu's ability to fairly supervise and maintain the integrity of the document collection and production process, since she had been heavily involved in the matters under investigation.  Despite her concerns, Plaintiff responded to the request for the production of documents fully and to the best of her ability.

142.   During the summer and fall of 2005, there were public reports of break-ins in the document control center at UH/UMDNJ.  Upon information and belief, the responsible parties have never been identified.  Plaintiff feared that these break-ins might compromise the integrity of the documents residing in the document control center.

143.   Although Plaintiff produced an extensive amount of documentation to the document control center, after the break-ins, she was never requested to verify the completeness or integrity of the documents she had produced.

38

144.    During the course of the summer and fall of 2005, Plaintiff was requested by Defendant Foley to provide voluminous documentation to Mr. Foley and his associates and attend meetings and to provide information relating to the U.S. Attorney's Office and federal grand jury investigation as is related to the preparation of cost reports. Upon information and belief, Defendant Foley was reporting to Defendant Sanks-King directly and/or through the Newark Firm.

145.    In late August of 2005, Defendant Foley outlined a potential defense to the allegations of double billing. This defense was factually inaccurate. Defendant Foley advocated that a presentation could be made to the U.S. Attorney's office and to the Board of Trustees that there were numerous mistakes in the cost reports and, therefore, any errors leading to double payments or double billing, etc., could be explained as inadvertent, mistaken and unintentional. Defendant Foley claimed that he could "complicate" the issues for the U.S. Attorneys so they would not be able to go after UH for criminal violations and the matter would be resolved by paying some money. This was contrary to the information which Plaintiff had previously provided to Defendant Foley and ignored the reality of the past several years.

146.    Plaintiff advised Defendant Foley that the claim of inadvertence and mistake was not accurate and neither she nor her staff would participate in fabricating such a defense. Subsequently, Defendant Foley became adversarial to Plaintiff and seemingly viewed her as uncooperative.

147.    During the Summer and Fall of 2005, on a number of occasions, Plaintiff detected a number of unusual events regarding the retention of records on her desktop, access to her desktop, and destruction of emails.

148.   On one occasion, a mass deletion of Plaintiff's e-mails occurred without warning. On another occasion, Plaintiff found that she had been denied remote access to her computer from home for a period of several days.  During that time, someone had accessed her computer and read hundreds of her e-mails.

149.   Upon inspection of her computer system by an Information Technology expert employed by University Hospital, Plaintiff was advised that there had been an intrusion into her computer, that the intrusion was purposeful, and that it could not have occurred as a result of a malfunction.  Plaintiff reported these events to Corporate Compliance, UH Compliance and other UH administrators.

150.   On September 22, 2005, Defendant Sanks-King summoned Plaintiff to her office. In response to Plaintiff's July 25, 2005 request that UH pay for her counsel fees, Defendant Sanks-King stated, in substance that:

   (a)   Plaintiff was a "major player" in the federal investigation involving the cost reporting and double billing issues;

   (b)   Accusations had been made by other employees of UH that Plaintiff bore some responsibility for the double billing issues which were under investigation;

   (c)   Defendant Walker-Modu and Physician A were two of the employees who made such allegations;

   (d)   Counsel for the Hospital, the Newark Firm, would represent all staff involved in the investigation;

   (e)   Defendant Sanks-King had not retained counsel and there was no compelling reason for Plaintiff to have her own counsel; and

   (f)   She would not recommend UH to pay the counsel fees for any employee whose actions were not "supportive" of UH/UMDNJ.

151.   Plaintiff understood from her discussion with Defendant Sanks-King that Defendant Sanks-King believed that the Newark Firm and Defendant Foley would represent

interests of all the employees of UH and that Plaintiff was not cooperating with a common defense. Defendant Sanks-King made it clear that she would never recommend that UH pay for expenses for an employee, unless counsel had been approved by her and since Plaintiff chose her own counsel she would have to pay her own expenses. Plaintiff understood that the import of Defendant Sanks-King words was to intimidate Plaintiff into being more cooperative with a common defense which was in the interests of the Defendant Sanks-King personally.

152.    During the late fall of 2005, it was widely circulated within UH/UMDNJ that Plaintiff was not cooperating with Defendant Sanks-King but instead was cooperating with federal authorities.

153.    Upon information and belief, Plaintiff was viewed as an "outsider" and whistleblower by many UH/UMDNJ administrators, including Defendants Sanks-King, Cox, Rodgers and Defendant Foley.

154.    Upon information and belief, the same senior UH/UMDNJ administrators and Defendants believed that Plaintiff was not a team player in preparing a common defense to the allegations under investigation and directed that she be treated as an adverse or hostile employee.

155.    In early October, an employee of UH told Plaintiff that Plaintiff and another employee would be fired due to their alleged roles in the "physician billing issue."

156.    On or about October 7, 2005 the UPA sent a memorandum to their members stating that the UPA, to the exclusion of University Hospital, is the only entity authorized to bill for services rendered for outpatient services by faculty positions in hospital-based clinics.

157.    On or about October 14, 2005 Plaintiff reported the UPA pronouncement to Defendants Cox and Sanks-King and noted that it promoted the improper practice of double billing condemned by the Kalison Report in December 2001 by encouraging physicians to bill

for services rendered in hospital-based clinics despite receiving compensation from University Hospital for the delivery of such patient care. Plaintiff recommended immediate corrective action. Plaintiff also recommended that steps be taken to educate the UPA and its members regarding their obligations to discontinue the practice of using a point of service "Code 11" in hospital-based clinics. The CFO immediately forwarded a concurring memorandum to Defendants Cox and Sanks-King.

158.    Thereafter, the Dean of NJMS directed that the faculty physicians should stop improperly entering the point of service "Code 11" (private practice) on their bills where UH was paying for the technical costs. The Dean also took steps to correct the double payment issue (IIA, above) identified in the Kalison Report with respect to most of the hospital-based clinics, but he exempted three clinics (including OB-GYN and Pediatrics) from his directive, claiming they were "in dispute." By exempting these clinics, the Dean permitted a continued practice of improper double billing by physicians in these clinics resulting in Medicaid paying twice for the same service. Physician A was the Department Head of one of the Pediatric clinics.

159.    Subsequently the Plaintiff and CFO requested that Defendants Cox and Sanks-King take corrective action and direct the Dean of NJMS to reverse his position regarding the so-called disputed clinics.

160.    In or about mid-October, 2005, Defendant Cox accused Plaintiff and the CFO of "stirring the pot" in connection with the federal and state investigations.

161.    On or about October 19, 2005, Defendant Sanks-King stated that Plaintiff should be on a leave of absence because Plaintiff's need to consult with counsel was interfering with UH business. Plaintiff believed that this statement was rooted in Defendant Sanks-King's

hostility toward Plaintiff for her failure to cooperate with Defendant Sanks-King's defense to the investigations.

162.   From September through November of 2005, Plaintiff requested that relevant records be made available to her to assist her in preparation for upcoming testimony before the grand jury.  Defendant Sanks-King and the Newark Firm refused to provide such records despite prior assurances that such records would be made available.

163.   While failing to honor their agreement to produce such records, Defendant Sanks-King and the Newark Firm represented that one document, the so-called "Seeger" e-mail (August 17, 2000), was a "compelling" document allegedly showing Plaintiff's knowledge of and concurrence in the billing practice under investigation.  In fact, the so-called Seeger e-mail was unrelated to the issues under investigation.

164.   In or about October 27, 2005 Plaintiff was subpoenaed to testify before a federal grand jury.

165.   In conjunction therewith, Defendant Sanks-King and the Newark Firm were advised by the U.S. Attorney that it would be a conflict of interest for the Newark Firm to appear for the Plaintiff in connection with the grand jury investigation.

166.   Given this, Defendant Sanks-King was left with no choice but to acknowledge that Plaintiff was justified in engaging independent counsel.  Defendant Sanks-King agreed that UH/UMDNJ would indemnify Plaintiff for legal expenses.  Defendant Sanks-King refused to seek authorization to pay any of Plaintiff's counsel's fees prior to November 4, 2006.

167.   At or about this time, upon information and belief, Defendant Sanks-King directed the Newark Firm to obtain information regarding Plaintiff's statements to the federal government in connection with the investigations.   In response to a request by the U.S.

43

Attorney's Office regarding this, Plaintiff chose not to share information with Defendants regarding information she imparted to the federal prosecutors.

168.    During the course of debriefings by the federal government, Plaintiff was asked about documents relating to her work at UH/UMDNJ.  Plaintiff maintained a copy set of documents from UH/UMDNJ files in order to prepare for her debriefings.  Plaintiff knew that such documents would be relevant to the billing and cost reporting issues under investigation.

169.    During the course of her debriefing, it became apparent to Plaintiff that certain relevant documents had not been produced by the Defendants to the U.S. Attorney's Office. Plaintiff knew that these documents were in Defendants' possession because she had provided originals of the documents to the document control center at UH/UMDNJ when directed to do so in the summer of 2005.

170.    On November 17, 2005, Plaintiff advised UH/UMDNJ that she had been subpoenaed by the Grand Jury to produce documents in her possession that UH/UMDNJ failed to produce.

171.    Plaintiff was told by a source close to Defendant Sanks-King that she should not have revealed these documents to the federal investigators, and that as a result her position at UH was in jeopardy.

172.    On November 27, 2005, Plaintiff received a second subpoena for documents related to the investigation.  Plaintiff was directed by Defendant Sanks-King to produce the documents to the Newark Firm, which would then be responsible to produce them to the U.S. Attorney's Office.

173.    Plaintiff was never told why UH failed to produce all of the documents in its possession (and held in the document control center) to the federal prosecutors.  Plaintiff did not

receive the documents promised to her by UH and the Newark Firm until January 2006, shortly after the Defendants Sanks-King and Walker-Modu left the employ of UH.

## V. VERIFICATION AND SUBMISSION OF 2005 COST REPORT ATTESTATION

174. Upon information and belief, one of the tasks assigned to the Parente firm was to conduct a review of UH's classification of hospital clinics as "hospital-based" for cost report purposes. The definition of the term "hospital-based" was a technical term established by Medicare and Medicaid regulations. Up until this review, UH had treated these clinics as "hospital-based" in its annual cost report. Defendant Foley was given 90 days to provide a resolution for any clinics improperly classified.

175. On August 11, 2005, Defendant Walker-Modu wrote: "Parente Randolph is currently looking at OB/GYN and Pediatrics (among other areas) to determine how these areas have been treated in the past (and currently) for the purpose of determining whether they qualify for treatment as out-patient [or hospital-based] clinics under the regulations." (See **Exhibit 13**)

176. On September 13, 2005, Plaintiff and CFO reviewed a draft of Defendant Foley's report (Parente Report No. 1) which concluded "the OB-GYN and Pediatrics clinics meet the Medicare/Medicaid criteria for provider-based (hospital-based) clinic status."

177. On or about September 13, 2005, Defendant Foley and the Newark Firm made a presentation to selected Members of the Board of Trustees of UMDNJ regarding Defendant Foley's initial conclusions. Upon information and belief, Defendant Foley stated his conclusion that OB-GYN and Pediatric clinics, among others, met the Medicare/Medicaid criteria for "hospital-based clinic" status. In effect, this confirmed the findings in the Kalison Report and Plaintiff's assessment of these clinics. Moreover, Defendant Foley's conclusion underscored the

45

impropriety of the practice of some physicians to separately bill a fee for services rendered in hospital-based clinics (Section IIA above)

178.   Upon information and belief, Defendants Cox and Sanks-King directed that the Plaintiff and the CFO (1) should not be invited to the Board of Trustees meeting; (2) should not be briefed on the meeting thereafter ; and (3) should not receive the final Parente Report, despite the fact that Defendant Foley's findings directly impacted the preparation of the 2005 Cost Report and were critical to the verification and execution of the "Attestation" of the 2005 Cost Report.

179.   In November 2005, Plaintiff, on behalf of UH, was preparing it's Cost Report for the fiscal year ending June 30, 2005.

180.   Prior to the submission of the 2005 Cost Report it was important for the CFO and Plaintiff to obtain confirmation of the Parente firm's finding regarding "hospital-based" clinics. This was particularly true given the pronouncement by the Dean of the Medical School in October 2005 that there was a "dispute" with respect to three (3) of the clinics.  If the clinics were not deemed to be "hospital-based," the cost report for 2005 would have to be substantially revised.

181.   During the month of November and early December, Plaintiff repeatedly requested Defendant Foley to confirm his findings which had previously been reported to the Board of Trustees that the clinics in question were "hospital-based."  In Plaintiff's judgment, this was essential before anyone at UH could execute the Attestation page and thereby verify the accuracy of the first cost report for 2005.

182.   Defendant Foley repeatedly refused, without reason or justification, to confirm his firm's conclusions regarding the "hospital-based" status of the clinics in question.  At times, he

46

implied that he had not done sufficient work to reach such a conclusion, despite having complete access to all of the Reimbursement Division's records and being provided with voluminous documentation by Plaintiff and her staff.

183.   Defendants Cox and Sanks-King refused the requests of the CFO to direct the Newark Firm and Defendant Foley to release the Parente Report to Plaintiff and to direct Defendant Foley to confirm his findings regarding "hospital-based" clinics.

184.   In response to Plaintiff's repeated requests for guidance and affirmation from Defendant Foley, Defendant Foley, fabricated an excuse for failing to share his reports with Plaintiff.  He told Plaintiff that his findings were rendered for the benefit of the Newark Firm and, as such, were "attorney work product" which could not be disclosed to the CFO or Plaintiff.

185.   The CFO objected to Defendant Foley's disingenuous position, in writing, on December 7, 2005 stating:

> In consideration of the Parente role in this matter, which is as an aid to outside counsel and ultimately to UMDNJ's Chief Legal Officer [Defendant Sanks-King] in arriving at an appropriate conclusion, I believe that we need a definitive stance from legal that confirms Parente's conclusion that the clinics in question are, in fact and in law, hospital-based, if that is indeed the Parente conclusion.  (See **Exhibit 14**)

186.   On or about November 30, 2005 a Cost Report was submitted on behalf of University Hospital to the fiscal intermediary for Medicare and Medicaid.  The "Attestation" (verification) page was not executed due to the failure of Defendant Sanks-King, Cox and Foley to confirm the Parente firm's findings regarding the classifications of certain "hospital-based" clinics, among other reasons.

187.    A week after the unexecuted 2005 Cost Report was submitted, the CFO stated, in an e-mail to Defendants Sanks-King, Cox, Foley and others that he would not reconsider his decision to decline to execute the cost report without:

(a)    the Parente opinion confirming the "hospital-based" clinic classifications;

(b)    a confirming legal opinion regarding the "hospital-based" clinic classifications;

(c)    a correction of the memorandum from the Dean of NJMS regarding the so-called "disputed clinics;" and

(d)    a legal opinion regarding the content and adequacy of disclosures concerning the "Code 11" issue.

**(See Exhibit 14)**

188.    On or about December 14, 2005, the CFO was summoned to an Audit Committee meeting of the Board of Trustees to account for his failure to execute  the 2005 Cost Report. Upon information and belief, the CFO informed the Audit Committee of the outstanding billing and cost reporting issues and the critical need for opinions from Defendant Foley, Sanks-King and/or the Newark Firm and of their refusal to respond to such requests.

189.    On December 15, 2005 the CFO resigned from UH/UMDNJ stating that the Administration had made it impossible for him to perform his functions as CFO and meet his fiduciary responsibilities.

## VI.    RETALIATION AGAINST KATHRYN GIBBONS

190.    From November 2005 through mid-January 2006, despite her promotion to Executive Director, Plaintiff's duties and responsibilities were restricted and continuously diminished.  She was no longer permitted to attend meetings or conferences which, previously,

48

she had attended routinely and which were necessary for her to fully perform her duties and responsibilities.

191.   Upon information and belief, Defendant Cox, Sanks-King, Rodgers, Walker-Modu and other senior administrators determined that the Plaintiff had been uncooperative with UH/UMDNJ, the Newark Firm and Defendant Foley during the course of the various investigations and that Plaintiff could not be viewed as part of the Defendants' team with respect to the billing and cost report issues.

192.   These actions restricting Plaintiff's duties and ostracizing Plaintiff were taken in retaliation for Plaintiff's four year struggle to correct the billing and cost reporting issues discussed above and her failure to "cooperate" with Defendants in presenting a uniform defense against the various state and federal investigations.   This retaliation was intended to limit Plaintiff's effectiveness in performing her functions before, and after the resignation of the CFO and to limit her access to information which would have permitted her to fully perform her duties as Executive Director, Revenue Policy & Fiscal Analysis and to develop a record which would justify a decision to place Plaintiff on a leave of absence and/or terminate her employment.

193.   Upon information and belief, Defendants Rodgers, Sanks-King, Cox and Foley were aware of the extent of the double billing and overpayment issues arising out of the cost reports as initially identified by Plaintiff in the Spring of 2001, as well as the failure of UH/UMDNJ to address and correct the billing and cost reporting issues identified herein and to authorize full and complete disclosure to the authorities.

194.   Upon information and belief, full and complete information was never presented by Defendants to the Board of Trustees of UH/UMDNJ for appropriate action, including

49

correction of the practices which resulted in the billing and cost reporting issues and lack of compliance with Medicare and Medicaid regulations.

## VII.   UNDERSITY OF BEHAVIORAL HEALTH CARE ("UBHC") ISSUE

195.   Prior to February 15, 2006, Plaintiff had been conducting a review of University Behavioral Health Care ("UBHC"), a division of UMDNJ. Her focus was on the recordation of costs included in UH's prior cost reports. Plaintiff determined that UBHC had been reporting, as "directly assigned costs," such items as "operation of plant," "employee benefits," etc. Simultaneously, UH's costs, such as "operation of plant" and "employee benefits" were being stepped down (allocated) to the UBHC line in UBHC's cost report. This resulted in a double counting of certain UBHC costs in UH's cost reporting and, in turn, resulted in an overstatement of UH's entitlement to reimbursement from Medicaid and is referred to herein as "the UBHC issue". (See **Exhibit 15**)

196.   On February 15, 2006 Plaintiff reported these findings in a written report. (See **Exhibit 15**) Plaintiff recommended to the Defendants Cox, Rodgers, the Senior Vice President of Administration and Finance, the Office of Legal Management and the Office of Corporate Compliance that UH immediately disclose this UBHC issue to the New Jersey Department of Medicaid Assistance and Riverbend, the Medicare/Medicaid auditors.

197.   The Parente firm, under the direction of Defendant Foley had previously been engaged to review the UH/UMDNJ Cost Report for fiscal year ending June 30, 2005, but, upon information and belief, had not, as of the date of Plaintiff's discovery, detected this UBHC issue.

198.   On March 2, 2006, Plaintiff was summoned to attend an oral presentation by Defendant Foley of the Parente review of the billing and cost reporting issues. Foley's written

50

report, (Parente II Report) dated January 31, 2006 (hereinafter the "Parente II Report") was not provided to Plaintiff prior to the meeting.

199.    At the meeting on March 3, 2006 attended by Defendants Cox, Rodgers, Foley and others, including two auditors for CMS, Defendant Foley delivered a scathing review of Plaintiff's work on cost reports, suggesting that the billing and cost reporting "irregularities" were so extensive that they should be investigated by the governmental integrity unit of Medicaid and that it appeared that Plaintiff was "gaming" the system.

200.    Upon information and belief, this presentation by Defendant Foley was purposefully arranged to publicly embarrass and discredit Plaintiff and to ensure that Plaintiff would have no opportunity to respond since Plaintiff was not given the Parente II Report.

201.    As to the UBHC issue, Defendant Foley attributed the error to Plaintiff despite the fact that the UBHC issue had existed since 1985 and had been reviewed and approved by numerous outside and independent auditors and consultants, including three of the big four accounting firms.  His own accounting firm had failed to detect the UBHC issue until it was reported by Plaintiff.

202.    Shortly after the meeting, Plaintiff was summoned to the Human Resource Department and in the presence of various administration officials advised that she was placed on involuntary paid administrative leave pending "the results of further analysis relating to cost reporting."  (See **Exhibit 16**).  Upon information and believe, this adverse action was in retaliation for her four (4) year effort to reform the improper billing and cost reporting issues and practices at UH/UMDNJ and in retaliation for Plaintiff's refusal to assist UH in presenting a unified, misleading and false defense to the various investigations discussed above.  Plaintiff was

given a few minutes to return to her office to retrieve her personal effects before being escorted

off the premises.

## VIII.   UNIVERSITY HOSPITAL'S "ANALYSIS" OF COST REPORTING

203.    Upon information and belief the Defendants quickly spread the word of Plaintiff's

humiliating departure under a forced leave of absence throughout UH/UMDNJ and the

healthcare industry in New Jersey.

204.    According to Defendant Cox, UH would undertake an "analysis of (unspecified)

cost reporting" during Plaintiff's leave of absence, presumably to evaluate her performance as it

pertained to the issues identified in the Parente II Report. In fact, the so-called "analysis" was a

charade to justify Plaintiff's termination.

205.    Defendant Cox refused repeated requests for a copy of the Parente II Report  and

only in response to a request by Plaintiff's counsel, was a copy of the Parente II Report made

available to Plaintiff on March 22, 2006.

206.    On April 4, 2006, Plaintiff submitted her response to the Parente II Report.  (See

**Exhibit 16**).  Plaintiff's response detailed:

<blockquote>

(a)    That there were numerous deficiencies, exaggerations, miscalculations, mistakes and misinterpretations of the relevant regulations or the application of such regulations by Defendant Foley;

(b)    That many of the cost reporting issues arose not during the Plaintiff's tenure but rather could be traced back to the years and decades prior to the commencement of her employment;

(c)    That many of the deficiencies or improper practices in the cost reports had been previously identified, reported and disclosed by the Plaintiff;

(d)    That the most significant financial issue (the "UBHC issue"), had been discovered, not by Defendant Foley as suggested by the Report, but by the Plaintiff;

(e)    That report also failed to note that the reporting practice on the UBHC issue extended back to 1985, and that it had been undetected by numerous

</blockquote>

52

consultants and experts, including major accounting firms, which had been tasked to detect such issues;

(f)     That Defendant Foley had failed to detect some of the deficiencies or irregularities itself for a period of eight (8) months after its engagement; and

(g)     That it was deficient in an acknowledging Plaintiff's thoroughness, competence, dedication and professionalism in performing her duties for the previous six (6) years.

207.     The purpose of the Parente II Report was to discredit the Plaintiff and to provide cover for the Defendants to discharge the Plaintiff for cause or to force her resignation.

208.     During the Spring of 2006, various journalists in New Jersey were informed by sources within UH that Plaintiff had been placed on an involuntary leave of absence.

209.     Plaintiff made repeated requests for an opportunity to challenge the allegations made in the Parente II Report which were refused by Defendants Cox, Vladeck, Rodgers and other Senior Administration Officials at UH/UMDNJ.

210.     During her leave of absence, Plaintiff remained in constant contact with various administrators at UH and continued to provide proper advice and counsel regarding a variety of reimbursement issues still unresolved.

211.     Plaintiff's insight and counsel assisted the current Reimbursement Division in handling a variety of matters during her leave of absence.  This counsel was communicated to, but largely ignored by, Defendants Cox, Vladeck and Rodgers, as well as other senior UH/UMDNJ Administrators.  If properly pursued, Plaintiff's recommendation may have had a dramatic impact in off-setting any negative impact from the UBHC issue.

212.     Despite Plaintiff's continued loyalty and devotion in continuing to serve UH during the leave of absence, employees in the Reimbursement Division were instructed by Defendant Cox and others to cease communicating with Plaintiff.  Upon information and belief,

53

it was feared that continued reliance by these employees on Plaintiff's counsel would undermine the decision to terminate her regardless of the outcome of the "analysis" of cost reporting.

213.    On or about April 24, 2006, Defendant Vladeck acknowledged the UBHC issue had been ongoing for many years, that contractors for the federal government reviewed the cost reports and missed this issue, that the amount that UH received in improper reimbursement was less than two (2) percent of the overall reimbursement received by UH and the legal liabilities were nominal when you put them in the proper context.

214.    Upon information and belief, an internal review was completed in June 2006, and it was determined by certain senior administrators who were not previously involved in the billing and cost reporting issues that there was no basis to find that Plaintiff's performance of her duties and responsibilities or her integrity or honesty were deficient or subject to question.

215.    Ultimately, the Parente II Report was regarded as "unprofessional," and various administrators refused to endorse its findings.

216.    On June 22, 2006, The Defendant Cox, President/CEO University Hospital, with the approval of Defendants Vladeck, Rodgers and others, despite the results of the "analysis," terminated Plaintiff's employment at UH/UMDNJ effective the following day, June 23, 2006. (See **Exhibit 18**).  No cause for the termination was stated and the Defendants refused requests for disclosure of the results of the "analysis" referenced in Defendant Cox's letter of March 3, 2006.

**FIRST COUNT**

**Retaliation in Violation of New Jersey Consciousness Employee Protection Act ("CEPA")**

217.    Plaintiff repeats and realleges each of the prior allegations of the above Complaint as though set forth fully herein.

218.    Defendants' retaliation and adverse treatment of Plaintiff, including, but not limited to, the hostile, threatening and intimidating treatment of Plaintiff during the federal/state grand jury investigations, the OIG investigation and the U.S. Attorney investigation, the limitation of the scope duties and responsibilities, the placement of Plaintiff on an involuntary leave of absence on March 3, 2006, the failure to allow the Plaintiff to participate in the investigation of the cost reporting analysis undertaken by UH from March through June 2006, and the termination of Plaintiff without cause on June 23, 2006,

(a)    was wrongful and in retaliation for Plaintiff's disclosures and threatened disclosures regarding the activities, policies, practices of UH/UMDNJ which Plaintiff reasonably believed were in violation of the laws, rules and regulations of Medicare and Medicaid and other federal and state statutory laws concerning the billing and cost reporting issues, and other matters as set forth above; and

(b)    was wrongful and in retaliation for Plaintiff's disclosures and threatened disclosures to the United States Attorney's Office, the OIG, a state grand jury and a federal grand jury during the investigations of UH/UMDNJ, and disclosures and threatened disclosures to other governmental authorities, including CMS of billing and cost reporting issues which would disclose

55

various activities of the Defendants, its policies, practices and procedures

as set forth herein which Plaintiff reasonably believed to be (1) violation

of the law, rules and/or regulations; (2) fraudulent or criminal and/or (3)

incompatible with a clear mandate of public policy concerning the public

health, safety and welfare.

219.   Defendants' conduct is in violation of CEPA, N.J.S.A. 34:19-1, *et seq.* and further

constitutes a pattern and practice of conduct in violation of CEPA.

220.   Defendants UMDNJ, University Hospital, NJMS, Vladeck, Sanks-King, Cox,

Walker-Modu, Rodgers, Foley, Parente and John and Jane Does 1-20 participated in and

condoned, ratified, perpetuated conspired and/or aided and abetted in the CEPA violations.

221.   Defendants' conduct and actions were malicious and/or undertaken with a wanton

and willful disregard for Plaintiff.

222.   Plaintiff has been and continues to be severely damaged physically,

psychologically and emotionally and has suffered economic loss as a result of said CEPA

violations.  Further, Plaintiff has suffered severe damages to a professional and occupational

reputation, position and loss of opportunities for future employment as a result of said CEPA

violations.

**WHEREFORE,** Plaintiff, Kathryn Gibbons, demands judgment against the Defendants

jointly and severally for harm suffered as a result of the violations of CEPA, N.J.S.A. 34:19-1 et

seq. as follows:

(a) Plaintiff be awarded compensatory and consequential damages, including but

not limited to lost wages, benefits, emotional distress damages, injury to

personal and business and professional reputation damages and other

remuneration (including enhancements thereof to or setoff negative tax consequences);

(b) That Plaintiff be awarded punitive damages;

(c) That Plaintiff be awarded any and all attorneys fees, expenses and/or costs including, but not limited to enhancements thereof permitted under <u>Rendine</u> and its progeny and to offset negative tax consequences; and

(d) That Plaintiff be granted such other and further relief as the Court deems just and equitable.

## SECOND COUNT

### Intentional Interference with Prospective Economic Advantage

223.    Plaintiff repeats and realleges each of the prior allegations of the within Complaint as if set forth at length herein.

224.    Plaintiff was employed at University Hospital as the Executive Director, Revenue Policy and Fiscal Analysis since December 1999 and had a prospective continuing economic relationship with University Hospital.

225.    Plaintiff had a legitimate and justified expectation that her employment with University Hospital would continue, based upon her performance evaluations, increases in compensation, periodic promotions, and recognition of her job performance by various senior administrators at UH who praised her work ethic, integrity, competency and other employment related attributes.

226.    Defendants Vladeck, Sanks-King, Cox, Walker-Modu, Rodgers, Foley, Parente and John and Jane Does 1 through 20 have intentionally and maliciously interfered with Plaintiff's prospective continued economic relationship with University Hospital/UMDNJ by:

(1)     Preventing her from performing her duties and discharging her
        responsibilities;

(2)     Disparaging and undermining her competency and reputation for integrity;

(3)     Publicly humiliating Plaintiff and placing Plaintiff on an involuntary leave
        of absence without justification;

(4)     Threatening her with a deprivation of economic benefits, including
        termination of her services, for her refusal to join in the preparation of a
        uniform defense to the various investigations;

(5)     Accusing Plaintiff of improperly "gaming" Medicare/Medicaid system;

(6)     By falsely claiming a fair and independent evaluation of Plaintiff's
        performances an employee would be undertaken after her leave of
        absence.

(7)     By terminating Plaintiff, at the conclusion of the investigation, despite
        finding there was no cause for such termination and refusing to
        acknowledge the lack of merit to Foley and Parente  allegations that
        Plaintiff was incompetent and/or dishonest.

227.   The Defendants' actions were undertaken intentionally, without  justification or
excuse, and arose out of Plaintiff's long-standing complaints concerning the improper billing and
cost reporting practices set forth above, her refusal to cooperate in preparation of a uniform

defense to the various investigations, her disclosures and threatened disclosures to federal law enforcement regarding the activities of all Defendants.

229.   By virtue of their wrongful and malicious actions, Defendants have caused Plaintiff to sustain economic and other damages with respect to her employment at University Hospital and with respect to her career and professional advancement at University Hospital.

**WHEREFORE**, Plaintiff, Kathryn Gibbons demands judgment against Defendants jointly and severally for harm suffered as result of the above as follows:

(a)   That Plaintiff be awarded compensatory damages, consequential damages (including, but not limited to, lost wages, benefits, emotional distress damages, injury to personal business and professional reputation and other remuneration;

(b)   That Plaintiff be awarded punitive damages;

(c)   That Plaintiff be awarded any and all attorneys fees, expenses and/or costs, including but not limited to, enhancements thereof permitted; and

(d)   That Plaintiff be granted such other and further relief as the Court deems equitable and just.

59

## DEMAND FOR TRIAL BY JURY

**PLEASE TAKE NOTICE**, that the Plaintiff demand a trial of the issues by a jury of six.

**GIORDANO, HALLERAN & CIESLA**
A Professional Corporation
Attorneys for Plaintiff, Kathryn Gibbons


By:_____
JAY S. BECKER, ESQ.


By:_____
PETER B. BENNETT, ESQ.

Dated:  November ___, 2006


## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, Jay S. Becker and Peter B. Bennett are hereby designated as trial counsel.

**GIORDANO, HALLERAN & CIESLA**
A Professional Corporation
Attorneys for Plaintiff, Kathryn Gibbons


By:_____
JAY S. BECKER, ESQ.


By:_____
PETER B. BENNETT, ESQ.

Dated:  November ___, 2006

## CERTIFICATION PURSUANT TO R. 4:5-1

The undersigned hereby certifies that this matter is not the subject of any other action pending in any court or arbitration proceeding, and no other action or arbitration proceeding is contemplated. The undersigned hereby certify that they knows of no other parties who should be joining in the action at this time.

GIORDANO, HALLERAN & CIESLA
A Professional Corporation
Attorneys for Plaintiff, Kathryn Gibbons

By:_____
    JAY S. BECKER, ESQ.

By:_____
    PETER B. BENNETT, ESQ.

Dated: November ___, 2006

61

# EXHIBIT I

AO 398 (Rev. 01/09) Notice of a Lawsuit and Request to Waive Service of a Summons

# UNITED STATES DISTRICT COURT
for the
District of New Jersey

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. SIMRING | ) |
| *Plaintiff* | ) |
| v. | ) |
| UNIVERSITY PHYSICIAN ASSOCIATES et seq | ) |
| *Defendant* | ) |

Civil Action No.   04-3530(WJM)

## NOTICE OF A LAWSUIT AND REQUEST TO WAIVE SERVICE OF A SUMMONS

To:  JAMES LAWLER, C/O BRUCE P. McMORAN, ESQ.
*(Name of the defendant or - if the defendant is a corporation, partnership, or association - an officer or agent authorized to receive service)*

**Why are you getting this?**

A lawsuit has been filed against you, or the entity you represent, in this court under the number shown above. A copy of the complaint is attached.

This is not a summons, or an official notice from the court. It is a request that, to avoid expenses, you waive formal service of a summons by signing and returning the enclosed waiver. To avoid these expenses, you must return the signed waiver within   30   days *(give at least 30 days, or at least 60 days if the defendant is outside any judicial district of the United States)* from the date shown below, which is the date this notice was sent.   Two copies of the waiver form are enclosed, along with a stamped, self-addressed envelope or other prepaid means for returning one copy. You may keep the other copy.

**What happens next?**

If you return the signed waiver, I will file it with the court. The action will then proceed as if you had been served on the date the waiver is filed, but no summons will be served on you and you will have 60 days from the date this notice is sent (see the date below) to answer the complaint (or 90 days if this notice is sent to you outside any judicial district of the United States).

If you do not return the signed waiver within the time indicated, I will arrange to have the summons and complaint served on you. And I will ask the court to require you, or the entity you represent, to pay the expenses of making service.

Please read the enclosed statement about the duty to avoid unnecessary expenses.

I certify that this request is being sent to you on the date below.

Date:      02/02/2010

*Signature of the attorney or unrepresented party*

HENRY F. FURST, ESQ
*Printed name*

52 UPPER MONTCLAIR PLAZA
MONTCLAIR, NEW JERSEY 07043

*Address*

HF1111@AOL.COM
*E-mail address*

973-744-4000
*Telephone number*

# EXHIBIT J

HENRY F. FURST -9782
80 Main Street
West Orange, New Jersey 07052
[973]   324-1000
Attorney for Plaintiff

RECEIVED
WILLIAM T. WALSH, CLERK

2004 JUL 23 P 6: 00

UNITED STATES
DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. STEVEN S. SIMRING, M.D. | : UNITED STATES DISTRICT COURT<br>: DISTRICT OF NEW JERSEY<br>: |
| Plaintiff, | : |
| vs. | : DOCKET NO.   04-3530<br>: (JWB)<br>: Civil Action |
| UNIVERSITY OF MEDICINE AND DENTISTRY, UMDNJ – UNIVERSITY HOSPITAL, NEW JERSEY MEDICAL SCHOOL, JAMES LAWLER and JOHN DOES 1-25 (EMPLOYEES OF UNIVERSITY OF MEDICINE AND DENTISTRY, UMDNJ – UNIVERSITY HOSPITAL and/or NEW JERSEY MEDICAL SCHOOL) | : **QUI TAM COMPLAINT**<br>: (FILED UNDER SEAL)<br>:<br>:<br>:<br>:<br>: |
| Defendants. | : |

The United States of America ex rel. Steven S. Simring,
M.D., complaining of the Defendants, says:

### PREAMBLE

This is a qui tam action filed pursuant to 31 U.S.C. 3730(b)
by Relator Dr. Steven Simring who recently discovered a massive
fraud perpetrated by high level officials of University Hospital
in Newark, New Jersey, who knowingly took advantage of loopholes
in the Medicaid billing system to fraudulently obtain revenues
for the hospital.

*Qui tam Complaint*
*July 23, 2004*
*page [2]*

## PARTIES

1.    The University of Medicine and Dentistry of New Jersey ("UMDNJ") is the state supported medical school located at 150 Bergen Street, Newark, New Jersey 07103.   UMDNJ is a health sciences university with major schools throughout the state of New Jersey.

2.    New Jersey Medical School ("NJMS") is one of the major schools of UMDNJ.   NJMS is a fully accredited medical school located in Newark, New Jersey.

3.    UMDNJ – UNIVERSITY HOSPITAL ("University Hospital") is the hospital of the University of Medicine and Dentistry located at 150 Bergen Street, Newark, New Jersey 07103.

4.    Steven S. Simring, M.D. ("Dr. Simring") is a physician licensed to medicine and surgery in the State of New Jersey and a board certified psychiatrist.   Dr. Simring is an associate professor in the Department of Psychiatry at UMDNJ.   He formerly served as Vice Chair of the Department of Psychiatry and, for 28 years, was the Department's Director of Medical Student Education.   He has served on multiple committees at UMDNJ and NJMS.   Dr. Simring is an attending physician on the staff of University Hospital.   He served as a Director of University Practice Associates ("UPA") for several terms.   His office is

*Qui tam Complaint*
*July 23, 2004*
*page [3]*

located at the Behavioral Health Sciences Building (BHSB – E 1457), 183 South Orange Avenue, Newark, New Jersey.

5.   James Lawler ("Lawler") is the Chief Financial Officer of University Hospital and has held that position during the period when the fraud at issue in this complaint arose.  His office is located at University Hospital.

6.   John Does 1-25 are employees of University Hospital, UMDNJ and/or NJMS and individuals who aided and abetted the fraud set forth herein.


**BACKGROUND**

The Billing Arrangement For The Faculty at University Hospital

7.   University Hospital is the major teaching hospital of NJMS.

8.   University Hospital serves a medically indigent population in the City of Newark, New Jersey and surrounding communities, many of whom are eligible for payment of their bills for physician services through the Medicaid program.

9.   The physician faculty members of the medical school render medical services to the patients of the University Hospital.

*Qui tam Complaint*
*July 23, 2004*
*page [4]*

10.    UMDNJ requires as a condition of employment that full-
time faculty engaged in clinical activities participate in the
UMDNJ faculty practice program and that all patient care activity
of full-time faculty be conducted within such programs.

11.    As a result, on August 14, 1984, the physician faculty
members of UMDNJ entered into a formal written affiliation
agreement with the University Hospital regarding billing with the
establishment of the Faculty Practice Service ("FPS").

12.    FPS changed its name to University Physician Associates
("UPA") in the late 1980's.  It is managed by a Board of
Directors which includes, as ex officio members,

        a.    The Dean of the NJMS;

        b.    The Senior Vice President for Administration and
Finance of UMDNJ; and

        c.    The Chief Executive Officer of University
Hospital.

13.    The affiliation agreement has been revised periodically
since the adoption of the initial agreement, most recently as of
June 30, 1996.  Copies of the agreements are annexed hereto as
Exhibit 1.

*Qui tam Complaint*
*July 23, 2004*
*page [5]*

14.   The revisions have not altered the essential terms of
the original affiliation agreement:

a.   The University Hospital recognized UPA (or its
predecessors) as the exclusive billing agency for all services
provided by the full-time faculty members of NJMS and attending
physicians of University Hospital.

b.   UPA bills and collects all fees for services
rendered by the full-time faculty members.

c.   Every employment agreement between the UMDNJ and a
faculty member requires UPA to bill and collect for all
professional patient care and services rendered at UMDNJ through
UPA.

d.   Failure to comply with this billing procedure may
result in disciplinary action by the UPA and referral to the
UMDNJ for appropriate discipline as well.

15.   UPA is essentially a large group practice, currently
comprised of in excess of 500 physician faculty members.

16.   UPA sends bills to various payors, including Medicaid,
in the name of different entities of the practice (e.g.
University Surgery Associates, University Psychiatry Associates,
University Pediatric Associates, etc.) pursuant to the
affiliation agreement.

*Qui tam Complaint*
*July 23, 2004*
*page [6]*

17.   UPA currently generates almost $65,000,000 in billings
annually, of which, upon information and belief, the most
substantial portion represents billings for services rendered to
Medicaid and Medicare patients.

<u>The Multi-Million Dollar Scheme to Defraud Medicaid</u>

18.   Approximately four years ago, James Lawler was
appointed the Chief Financial Officer of University Hospital.

19.   Rather than honoring the agreement set forth in
Exhibit 1, Lawler and John Does 1-25 instituted a scheme, without
the knowledge of the UPA participants, to cheat Medicaid by
knowingly billing the same physician services to Medicaid that
the physician faculty members were required to and were already
billing through UPA.

20.   The scheme involved repeatedly submitting overall cost
reports to Medicaid for reimbursement for services rendered by
University Hospital.  The cost reports covered <u>both</u> the facility
fee and the physician fee for services, despite Lawler's and John
Does 1-25 knowledge that UPA had the sole legal right to bill
Medicaid faculty physician provided medical services.

21.   Lawler and John Does 1-25 thereby knowingly
participated in causing Medicaid to pay false claims and were

*Qui tam Complaint*
*July 23, 2004*
*page [7]*

involved in a conspiracy to cause the payment of false claims in violation of 31 U.S.C. 3729(a)(3).

    a.   The submissions were false and fraudulent since the defendants knew that UPA was billing for the same services and had the exclusive right to bill for such services.

    b.   The overall cost reports, regularly submitted to Medicaid by Lawler and John Does 1-25, disguised the fact that University Hospital was billing for faculty physician services that were already being paid to the physicians through UPA.

    c.   The cost reports were submitted in a different format than the individual bills submitted by UPA which misled Medicaid into paying twice for the same physician fee without being caught.

    d.   The billing scheme, orchestrated by Lawler and John Does 1-25, was achieved because the Medicaid program was unable to discern the double billing.

    22.  In early 2004, meetings were held between representatives of UPA and representatives of University Hospital, including Lawler, and their respective counsel.

    a.   Multiple emails were exchanged in which details of the billing practices and the fraud were discussed.

*Qui tam Complaint*
*July 23, 2004*
*page [8]*

b.     Meetings were held, attended by Lawler and John Does 1-25, at which admissions were made concerning the implementation and execution of the scheme to defraud Medicaid.

23.   Dr. Larry Frohman is a faculty member of the Department of Ophthmology at the NJMS.  He possesses precise knowledge of the details of the fraud committed by the University Hospital.

a.     Dr. Frohman serves as the unpaid President of UPA. He is elected by the faculty members of UPA.

b.     Dr. Frohman participated in the meetings with officials of the University Hospital in which the scheme to defraud was acknowledged.

c.     Dr. Frohman was outraged when he discovered the scheme and insisted that the scheme stop <u>immediately</u>.

d.     Dr. Frohman is aware of the admissions and statements made by Lawler and others on behalf of University Hospital concerning the scheme to double bill the Medicaid program for physician services.

24.   Michael Saulich, located at 30 Bergen Street, Newark, New Jersey, and whose phone number is 1-973-972-7383, is the paid executive director of UPA.

a.     Mr. Saulich has knowledge of the scheme engineered by the Defendants.

*Qui tam Complaint*
*July 23, 2004*
*page [9]*

b.    Mr. Saulich attended some of the meetings at which the perpetrators made admissions concerning the operation of the scheme.

25.    If only 15% of the bills sent by Defendants over the last four years for the same services billed by UPA were reimbursed by Medicaid, the total fraud would exceed $10,000,000.00.

## COUNT ONE

26.    The allegations of the preceding paragraphs are incorporated herein as if set forth at length.

27.    The scheme lasted until approximately June 2004 when the University Hospital agreed, under pressure from Dr. Frohman and others, to halt the double billing.

28.    Neither James Lawler nor John Does 1-25 have reported the scheme to Medicaid.

*Qui tam Complaint*
*July 23, 2004*
*page [10]*

**WHEREFORE,** Plaintiff demands judgment against the Defendants
for:

      a.   Treble Damages;

      b.   Attorney fees;

      c.   Costs of suit; and

      d.   Such other and further relief as may be allowed by
         law.

                       HENRY F. FURST, ESQ.
                       Attorney for Plaintiff

                       By:   _____
                              Henry F. Furst

Dated: July 23, 2004

**JURY DEMAND**

    The Plaintiff hereby demand trial by jury as to all
issues of fact.

                       HENRY F. FURST, ESQ.
                       Attorney for Plaintiff

                       By:   _____
                              Henry F. Furst

Dated: July 23, 2004

As Adopted by
UPA Board on
October 10, 1990

### AFFILIATION AGREEMENT

This Agreement is made by and between the University of
Medicine and Dentistry of New Jersey (the "University") and
University Physician Associates of New Jersey, Inc., a New
Jersey Non-Profit Corporation ("UPA"), for the establishment
and conduct of a Faculty Practice Program at the UMDNJ-New
Jersey Medical School (the "School").

Background

The School requires as a condition of employment that
full-time faculty engaged in clinical activities participate in
the School's faculty practice program and that all patient care
activity of full-time faculty be conducted within that program;

UPA is organized exclusively for charitable, scientific and
educational purposes as a New Jersey non-profit corporation, as
set forth in its Certificate of Incorporation and By-Laws,
including the purpose of the operation and maintenance of
administrative services in support of the activities of the
faculty of the School;

The School and UPA wish to provide for a responsive and
cost-effective administrative organization and information
system for faculty practice at the School as a means of
ensuring high-quality management and accountability;

The School and UPA have determined after due consideration
that participation of the School's faculty in a faculty
practice program established and managed by UPA under the
purposes set forth in UPA's By-Laws will benefit the School,
the School's core teaching hospital, University Hospital
("Hospital"), and the Medical Office Complex to be located at
the University premises in Newark, New Jersey (the "MOC"), and
will enhance the quality and cost-effectiveness of medical
teaching, service and research in the State of New Jersey;

The parties have previously entered into an Affiliation
Agreement dated August 14, 1984.  The parties wish to enter
into a new Affiliation Agreement which will supersede and
replace the former Affiliation Agreement.

01401

Therefore, in consideration of the premises and obligations set forth herein, the parties agree as follows:

I.   **DEFINITIONS.**

A.   "Academic base salary" is the salary component paid to faculty members for teaching, research (both basic and applied), academic service (i.e. committee work, curricular development and other assignments), professional growth and direct services rendered to those medically indigent patients at University owned and/or operated facilities for which no direct reimbursement is received from any source.  The academic base salary consists of the salary within the appropriate salary range.  The academic base salary does not include compensation derived from billings for direct patient care.

B.   "Campus" — The School, Hospital, MOC and Community Mental Health Center are referred to collectively herein as the "Campus".

C.   "Chairman" is the Chairman or Chairwoman of the clinical department of the School in which a faculty member has his or her primary appointment.

D.   "Contracted clinical services" are services for which fees are paid on a basis which does not reflect services rendered to a particular patient.  Examples of contracted clinical services include supervision of patient care, and providing services for a certain period of time, regardless of the number of patients receiving care during that period of time.  Fees for contracted clinical services do not include payments to a Participant which are made with the approval of the Dean of the School and the Board of Directors of UPA in lieu of all or a portion of that Participant's academic salary.

E.   "Full-time faculty" are members of the faculty of the School who receive payments from the University and/or the Veterans Administration such that the sum total equals or exceeds fifty percent (50%) of the academic base salary for their respective academic ranks.

F.   "Part-time faculty" are members of the faculty of the School who receive payments from the University and/or Veterans Administration such that the sum total is less than fifty percent (50%) of the academic base salary for their respective academic ranks.

G.   "Voluntary faculty" are members of the faculty of the School who receive no academic salary from the University or the Veterans Administration.

01

H.   "Participants" are faculty members who are required to or permitted to participate in the Plan.

I.   "Plan" means the School's faculty practice program organized and managed by UPA, pursuant to which Participants submit charges for patient care services to UPA, and UPA handles the billing and collection of these charges.  The Plan is a University-approved program.

J.   "Tort Claims Act" means the New Jersey Tort Claims Act, N.J.S.A. 59:1-1, et seq.

## II.   CONFORMITY WITH UNIVERSITY BY-LAWS

The Agreement set forth herein is not intended to and shall not interfere with, conflict with or supersede either the By-Laws of the University or School or the By-Laws of the Medical and Dental Staff of the Hospital or the MOC.

## III. PARTICIPATION

### A.  Participants:

All full-time faculty who engage in the professional care of patients shall be required as a condition of employment to participate in the Plan.

Full-time faculty engaged in patient care services will render patient care services exclusively in University-approved faculty practice sites, including the MOC, the Hospital, other hospitals, programs and offices as approved by the Dean of the School.

As required by the appointment letter or employment contract between the University and a faculty member, all faculty members (full-time, part-time and voluntary) shall be required to participate in the Plan with respect to patient care services rendered at the Hospital, the MOC, or any other University owned and/or operated facility, except as follows: (i) voluntary and part-time faculty shall not be required to participate in the Plan with respect to patient care services which are not rendered in University-approved faculty practice sites; (ii) voluntary faculty members may not be required to participate in the Plan with respect to patient care services rendered by the voluntary faculty members to private patients admitted by them to the Hospital; and (iii) other exceptions approved by the UPA Board of Directors and the Dean of the School.

01403

0140

Part-time faculty and voluntary faculty are encouraged to and may become Participants upon receiving approval of the Dean of the School, who will make a determination after receiving recommendations from the Chairman and the Board of Directors of UPA.

No one may participate in the Plan who is not a School faculty member. Termination or suspension of a faculty appointment in the School will result in simultaneous termination or suspension of subsequent participation in the Plan.

B.  Malpractice Insurance:

(1)  The University shall provide professional liability insurance coverage for approved faculty practice activities conducted pursuant to this Agreement, through a program of self-insurance governed by the provisions of the Tort Claims Act.

(2)  A written explanation of the coverage shall be provided by the University to each faculty member upon execution of this Agreement, and to any new faculty member upon his or her becoming a faculty member. Any changes in this coverage will be provided to each faculty member in writing. Such explanation will be in a form comparable to a "policy" specifying the terms of coverage, however, no such explanation shall supercede the terms of coverage as provided in the Tort Claims Act.

(3)  The University shall report annually to the UPA Board of Directors on the status of the self-insurance program.

C.  Participants' Activities and Compensation:

(1)  The appropriate mix of a Participant's activity among patient care, research and teaching will be determined by the Chairman and approved by the Dean.

(2)  Consistent with the practice current on the effective date of this Agreement, a Participant's academic base salary, compensation, and associated fringe benefits paid by the University will be determined in accordance with policies adopted by the University Board of Trustees from time to time.

## IV.  UPA BILLING AND FUND MANAGEMENT

### A  Assignment of Billing; Outside Billing:

(1)  Each full-time faculty members's employment agreement with the University shall entitle UPA to bill and collect for his or her professional patient care services and to distribute any income according to the rules and regulations established by UPA pertaining to disbursement of monies.  The right to collect and distribute payments for professional patient care services rendered by a Participant has been assigned to UPA by each Participant pursuant to his or her appointment letter or employment agreement with the University.

(2)  In rare instances, specific written exceptions to this requirement may be made as follows when deemed desirable to further the common, long term interests of the University and UPA.  A Participant who requests an exception shall provide full and complete disclosure and fiscal accountability with respect to practice income and expense and shall demonstrate satisfactory accomplishment of academic duties.  A request for an exception shall be made in writing to the Participant's Chairman.  Such a request will be granted or denied without unreasonable delay by the University Board of Trustees after considering the recommendations of the Chairman, the Dean and UPA Board of Directors.  The Chairman, Dean and UPA Board of Directors will expeditiously review all requests for exceptions.  Exceptions granted shall be limited in duration, but in any case shall be subject to annual review and reconsideration.

(3)  With respect to patient care services rendered and/or originating at the Campus, Participants approved prior to January 1, 1990 for outside billing (billing not handled by UPA through the Plan) may continue to use outside billing for services rendered on or before June 30, 1992, subject to timely settlements and annual approval.  Unless specifically excepted, as in (A)(2) above, patient care services rendered and/or originating at the Campus after June 30, 1992 must be billed through the Plan, but every effort will be made to bring all billing through the Plan by January 1, 1992.

(4)  Failure to comply with this billing policy will result in disciplinary action by the Board of Directors of UPA, which may include the imposition of fines and suspension of outside billing privileges.  This noncompliance will be reported to the Dean of the School and the Board of Trustees of the University for appropriate action by the University.

014

01405

(5)   It is the Participant's responsibility to maintain patient records which are adequate to ensure professional liability insurance coverage by the University and adequate for audit by UPA accountants.

B. Source of Funds:

(1)   Income of Participants which must be billed and collected for pursuant to the Plan and this Agreement shall include all patient care fees, and fees received for contracted clinical services, whether performed on or off the Campus. Income for contracted clinical services that are used to pay a portion of a Participant's negotiated academic salary is not required to be billed and collected pursuant to the Plan.   The Dean's office will provide UPA with a list (at least annually) of faculty members who receive income for contracted clinical services that are used to pay a portion of the Participant's negotiated academic salary.

(2)   Income not related to professional patient-related activities shall not be considered to be an UPA source of funds.   Such income shall include but not be limited to: teaching income, grant or contracted salary support, royalties, honoraria, income earned from non-medical or non-academic activities, participation in site visits, grant reviews, or participation by way of testimony or review in professionally-related legal processes.

C. Limitations on Use of UPA Income:

(1)   This Agreement does not authorize UPA to have or exercise any power or authority either expressly, by interpretation, or by operation of law, or to engage directly or indirectly in any activity, that would prevent it from continuing to qualify as an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, as amended, (or corresponding provisions of any subsequent federal tax laws).

(2)   No part of UPA's assets or net earnings under the Plan shall inure to the benefit of or be distributable to any private individual, except that UPA may provide for the payment of reasonable compensation for services actually rendered and reimbursement in reasonable amounts for expenses actually incurred in carrying out the exempt purposes of UPA.

(3)   Neither the whole nor any part or portion of the assets or net earnings under the Plan shall be used, nor shall the Plan be operated for, objects or purposes other than those permitted under UPA's Certificate of Incorporation or By-Laws.

## V.   RESPONSIBILITIES OF UPA

UPA shall not be responsible for the practice of medicine or the quality and standards of patient care.  These issues are governed by federal, state and local laws, rules and regulations, Departmental and University standards, the Medical and Dental Staff By-Laws of the Hospital, and the By-Laws of other hospitals and/or sites in which Participants have approved clinical activities.

UPA shall develop and maintain the Plan in accordance with the following provisions:

### A. Plan Management and Governance:

(1) Management.  The Plan shall be managed in a manner which will satisfy, to the extent possible, the reasonable requirements of all parties in interest.  The Board of Directors shall be responsive to requests for improvement of management audit methodology and general accountability.  UPA's Board of Directors shall adopt and apply policies which are consistent with generally accepted standards for performance measurement of management systems and administration of internal and external relations.

(2) Governance.  Authority and responsibility for setting policy and directing Plan administration and fiscal affairs shall reside in the Board of Directors of UPA, subject, however, to the UPA By-Laws and this Agreement.

(3) Operation.  UPA shall bill for and receive all fees due on account of the provision of professional patient care services by Participants, excepting those Participants for whom outside billing has been authorized.  Accordingly, UPA shall perform the functions described below:

a.   Obtain information concerning demographic data and the financial status of the patient and his or her ability to pay for the professional patient care services provided. The University, MOC, and the Hospital shall cooperate in obtaining such information for patients at the Hospital and the MOC.

b.   Maintain and process records concerning patient care services.

c.   Provide satisfactory billing and collection services.

01

01407

d.    Provide collection procedures for delinquent accounts.

e.    Monitor each Participant's compliance with his or her responsibilities under the Plan, and refer cases of alleged non-compliance to the Dean for appropriate action.

f.    Disburse funds in accordance with the provisions of this Agreement.

g.    Develop, with the assistance of its advisors, and enforce guidelines and protocols governing expenditure of any funds held by UPA on behalf of Departments or Participants to ensure that disbursements made are in accordance with Internal Revenue Service regulations.

B. Reports and Audits:

(1)  UPA shall provide each month an appropriate report of billing activities to Participants, to Chairmen and its Board of Directors.  Detailed financial information and a summary of management activities for the previous month shall be provided to the Board of Directors.

(2)  UPA shall provide an annual report to the Board of Trustees of the University through the Dean, summarizing the financial and management information provided pursuant to subparagraph (1) above.

(3)  UPA shall assure maintenance of adequate internal control by periodic review and an annual external audit performed by a nationally recognized certified public accounting firm selected by UPA resulting in a certified statement and management comments.  A compilation and review shall be performed for the purpose of organizing and improving, if necessary, the record keeping and reporting policies and methods of UPA.  The University agrees to reimburse UPA for 50% of the cost of such review and audits provided that prior written approval of the University is obtained when such costs are expected by UPA to exceed $25,000.00 (increased for inflation in each year beginning July 1, 1992 based on the Consumer Price Index for the New York Metropolitan region).  To the extent possible, UPA and University will engage different auditors for their respective audits.

(4)  The UPA Board of Directors shall, within a reasonable time, correct any deficiencies reported in review and audits.

(5)  The Senior Vice President for Administration and Finance of the University, upon prior written notice to the President of the Corporation, may inspect the corporate

01

financial records of UPA at reasonable times and places.  The
Senior Vice President for Administration and Finance of the
University may, in writing, provide the President of the
Corporation with the names of two designees who may review
these records in his place.

C. Funds:

(1)  All professional patient care fees collected by UPA
will be deposited in one or more bank accounts maintained by
UPA.

(2)  Allocation of Funds.

a.   Percentages of gross cash receipts ("Receipts")
of UPA for patient care services shall be allocated and
transferred quarterly to designated accounts, as follows:

(i)   7% of Receipts will be credited to a
Dean's Fund.

(ii)   7% of Receipts will be credited to the
Department through which the funds were generated; by agreement
within each Department, a portion of this allocation may be
made to Divisions of a Department.

(iii) 3% of Receipts will be credited to the
University to assist in defraying the costs of malpractice
coverage for the Participants in the Plan.

(iv)   Receipts will be disbursed to cover the
cost of operation of UPA.

(v)   An allocation to the New Jersey Medical
School Development Fund (in addition to the 7% allocation
referred to in Section V.C.2.a.(i) above) shall be made as
follows:

An assessment will be placed on all Participant
Receipts for patient care services based on the following
schedule:

| Participant Receipts | Assessment |
|---|---|
| – 0 – to $50,000 | – 0 – |
| $50,001 – $100,000 | 3% |
| $100,001 – $150,000 | 10% |
| $150,001 – $200,000 | 17% |
| $200,001 – $250,000 | 24% |
| $250,001 – $300,000 | 31% |
| $300,001 – $350,000 | 20% |
| Over $350,000 | 15% |

01408

01409

– 9 –

The assessments on Participant Receipts over $300,000 will be reduced so that the total of all allocations made pursuant to this Section V.C.2.a. does not exceed fifty percent (50%) of total Receipts of a Participant annually.

Assessment limits (the $50,000 increments) will be adjusted for inflation based on the Consumer Price Index for the New York Metropolitan region, with an annual increase (if adjustment is required) as of July 1st each year.  Example:  if the inflation index were 5% for 1991 the lowest tier of compensation would have an upper limit of $52,500 (105% of $50,000.00) with corresponding 5% increases in each increment.

The assessments for the New Jersey Medical School Development Fund are to be paid directly to the New Jersey Medical School Development Fund and the Dean's office will periodically report, at least once each year, to the UPA Board on how these funds are spent.

An allowance of up to 10% of each Participant's Receipts may be used to purchase equipment for use in University Hospital and other University sites approved by the Dean's office.  This allowance will be allocated based on the useful life of the purchase, and such an amount will be exempt from the assessment for the New Jersey Medical School Development Fund.  Such purchases must be approved by the Dean.

This assessment for the New Jersey Medical School Development Fund will be in effect for three (3) years, after which time the terms may be renegotiated.

Promptly after receipt of a written request from a Participant, the Dean's office will provide the Participant with a schedule illustrating the assessments for the New Jersey Medical School Development Fund.

Exception:

Pursuant to the provisions of Section V.C.2.a.(v) of this Agreement, assessments for the Dean's Development Fund begin when Participant Receipts reach $50,001.  In certain circumstances, these assessments may be waived until Participant Receipts of a geographic full-time faculty member Participant reach higher levels, if the Chairman and Dean agree and give notice to UPA of the levels of Participant Receipts at which the assessments will occur.  This exception is intended to apply in situations where a geographic full-time faculty member Participant has waived or deferred receipt of a portion or all of his or her academic salary, and the Participant, Chairman and Dean have agreed that Participant Receipts (net of all assessments to be made pursuant to Sections V.C.2.a.(i) -

(iv) of this Agreement) will replace the deferred or waived portion of the academic salary, without being subject to assessment for the New Jersey Medical School Development Fund. A geographic full-time faculty member is a faculty member with a full-time appointment, who renders services on the Campus on a full-time basis, regardless of the academic salary paid to that faculty member.

    b.   Funds remaining after the disbursements set forth above have been made will be utilized for reasonable compensation of Participants and for other budgeted expenses in accordance with written formulae submitted annually to UPA by the Departments and approved by the Dean and the UPA Board.

    c.   Unless otherwise required by the approved Departmental formulae, UPA shall not be required to distribute all its funds in any one year, except for the allocations to the Dean, and the malpractice fund, as set forth in V.C.(2)a(i) and (iii) above which must be made at least quarterly, and to the Departments according to written formulae submitted pursuant to UPA pursuant to paragraph b above.  UPA may allow the income in these funds to accumulate from year to year subject to such limits as may be determined by the UPA Board of Directors; provided, however, that all such funds shall be used only in furtherance of the tax-exempt purposes of UPA.

## VI.   GENERAL CONDITIONS

A. UPA shall operate as a non-profit corporation under the statutes of the State of New Jersey and maintain its status as a federally tax exempt operation under Section 501 (c)(3) of the Internal Revenue Code of 1986, as amended, or corresponding provisions of any subsequent federal tax laws.  UPA shall notify the University within three (3) days of receipt of notice of any change in its status as a non-profit or tax-exempt corporation.

B.  Trustee Liaison:

    The UPA Board of Directors may request inclusion on the agenda of the University Affairs Committee of the University's Board of Trustees when necessary or desirable to discuss matters of common interest or to facilitate or clarify communications.

C.  Other Agreements Between the Parties:

    (1) On execution of this Agreement, all prior practice plan arrangements now in effect for the School shall be null and void; the Plan provided herein shall be the sole and exclusive practice plan arrangement for Participants.

01411

(2)   UPA and the School may enter into collateral agreements as mutually deemed necessary and desirable, including, but not limited to, an agreement to lease University space and facilities for UPA use, including the MOC.

(3)   The parties agree to execute such collateral instruments as may be necessary to effect and maintain the relationship between the parties.

(4)   UPA will not, without the express written agreement of the University's Board of Trustees, delete, add, amend or alter the following provisions of the UPA By-Laws: Article I, Section 2: Purpose, Article X: Amendments, and Article III, Section 3: Qualifications, Number and Term of Directors; and the following provisions of the UPA Certificate of Incorporation: Ninth and Tenth Clauses, Dissolution.

D.   University Hospital and MOC:

Recognizing the importance of a more active relationship between clinical faculty members and the University Hospital and the MOC, it shall be the policy of the Plan to establish the Hospital and MOC as the center of UPA activities and to encourage, to the greatest extent, development of patient care activities on the Campus.

E.   Communication:

The parties agree to use their best efforts to advise and inform each other of information which may affect this Agreement, and to anticipate and avoid problems in their mutual endeavors.   Toward these ends, informal regular meetings shall be held between UPA officers and School administrators.

VII.   TERM; TERMINATION; AMENDMENT

This Agreement shall take effect on December 1, 1990.

Either party shall have the right to terminate this Agreement upon ninety (90) days' prior written notice if the other shall have breached any material covenant or provision hereof; provided, however, that any such notice shall set forth in detail the grounds for such alleged breach, and the defaulting party shall have the right to cure the alleged default within the ninety (90) days after notice is received.

By mutual agreement in writing, the parties may terminate or amend this Agreement at any time.

0143

## VIII.  INSURANCE

UPA shall maintain general liability insurance covering its activities in amounts acceptable to the University.

## IX.  DISCRIMINATION

There shall be no discrimination against any employee engaged in the work required to produce the services and programs covered by this Agreement, or against any applicant for such employment because of age, race, creed, color, national origin, sex, ancestry, marital status, handicap or liability or military services.  This provision shall include, but not be limited to the following:  employment upgrading, demotion, transfer, recruitment or recruitment advertising, layoff or termination, rates of pay or other forms of compensation.

The parties to this Agreement do hereby agree that the provisions of N.J.S.A. 10:2-1 through 10:2-4, dealing with discrimination in employment on public agreements, and the rules and regulations promulgated pursuant thereunto, are hereby made a part of this Agreement and are binding upon them.

## X.  NOTICES

The address given below, or another address specified in accordance with a notice given as set forth herein, shall be the addresses of the parties to which all notices and reports required by this Agreement shall be sent by certified mail, return receipt requested are:

> If to the University:
>
> President
> University of Medicine and Dentistry of New Jersey
> 111 Administration Complex
> 30 Bergen Street, Newark, New Jersey 07107-3000
>
> with a copy to:
>
> Dean, University of Medicine and Dentistry
>   of New Jersey
> New Jersey Medical School
> University of Medicine and Dentistry of New Jersey
> 185 South Orange Avenue
> Newark, New Jersey  07103-2757

01413

0141

and

Senior Vice President for Administration and Finance
University of Medicine and Dentistry of New Jersey
110 Administration Complex
30 Bergen Street
Newark, New Jersey 07107-3000

if to UPA:

The President
University Physician Associates of
New Jersey, Inc.
A Non-Profit Corporation
30 Bergen Street - 1202
Newark, New Jersey 07107

Notices given as provided herein shall be effective on receipt.

## XI. CHOICE OF LAW

This Agreement shall be governed and construed and the rights and obligations of the parties hereto shall be determined in accordance with the laws of the State of New Jersey.

## XII. WARRANTIES

The undersigned do hereby warrant and represent that this Agreement has not been solicited or secured, directly or indirectly, in a manner contrary to the laws of the State of New Jersey and that said laws have not been violated and shall not be violated as they relate to the procurement or the performance of this Agreement by any conduct, including the paying or giving of any fee, commission, compensation, gift, gratuity, or consideration of any kind, directly or indirectly to any State employee, officer or official.

## XIII. ENTIRE AGREEMENT

This Agreement constitutes the entire agreement between the parties pertaining to the subject matter hereof, and supersedes all prior and contemporaneous agreements, and understandings of the parties in connection therewith, including the Affiliation Agreement dated August 14, 1984. No change or waiver of any of the provisions hereof shall be binding upon party hereto unless in writing and signed by the party or an authorized officer of the party against whom any such change or waiver is asserted.

01

## XIV.   SUCCESSORS

This Agreement shall be binding upon and inure to the benefit of the successors, assigns and legal representatives of the respective parties hereto, except that neither party may assign, delegate or subcontract this Agreement, or any part thereof, without the prior written consent of the other.

## XV.   SEVERABILITY

In the event that any term or provision of this Agreement is held to be illegal, invalid, or unenforceable under the laws, regulations or ordinances of any federal, state, or local government to which this Agreement is subject, such term or provision shall be deemed severed from this Agreement and the remaining terms and provisions shall remain unaffected thereby.

## XVI.   EXECUTION

This Agreement may be executed in several counterparts, each of which shall be an original, but all of which constitute one instrument.

## XVII.   WAIVER OF BREACH

The failure of either party to require the performance of any term of this Agreement or the waiver of either party of any breach hereunder shall not prevent a subsequent enforcement of such term nor be deemed a waiver of any subsequent breach.

## XVIII.   TITLES TO SECTIONS OR SUBSECTIONS

The titles to the Sections and subsections of this Agreement are for convenience only and do not in any way limit or amplify the terms and conditions of the Agreement.

l

y

he
les
of
>n
of
ess
of
.

014

01415

IN WITNESS WHEREOF, the parties hereto have caused these presents to be signed below by their duly authorized corporate officers and caused their corporate seals to be hereto affixed.

UNIVERSITY OF MEDICINE AND
DENTISTRY OF NEW JERSEY

Witness: _____

By: _____

Date: ____4/8/91____

UNIVERSITY PHYSICIAN ASSOCIATES
OF NEW JERSEY, INC.
A NON-PROFIT CORPORATION

Witness: _____

By: _____

Date: ____4/8/91____

014

### Addendum to Affiliation Agreement

**UNIVERSITY PHYSICIAN ASSOCIATES OF NEW JERSEY, INC.** and the **UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEY** having entered into an Affiliation Agreement dated October 10, 1990 and signed on April 8, 1991, hereby amend said Agreement as follows:

1. All references through the Agreement to Medical Office Complex ("MOC") are references to the Doctors Office Center ("DOC").

2. Paragraph I.E. shall be deleted and replaced in its entirety with the following:

   "F. "Part-time faculty" are members of the faculty of the School who receive payments from the University which are less than fifty percent (50%) of the academic base salary for their respective academic ranks."

3. Paragraph I.G. shall be deleted and replaced in its entirety with the following:

   "G. "Voluntary faculty" are members of the faculty of the School who receive no academic salary from the University."

4. Subparagraph (i) of the third paragraph of Paragraph III.A. shall be deleted in its entirety and replaced with the following:

   "(i) voluntary and part-time faculty shall not be required to participate in the Plan with respect to patient care services not originating on the Campus and not rendered on the Campus effective May 1, 1992, and exemptions for prior periods may be approved by the Dean of the School at his sole discretion for faculty who agree to participate in the Plan from and after May 1, 1992;"

5. The last two paragraphs of Paragraph III.A. commencing on page 4 of the Agreement are hereby deleted and the following shall be inserted at the end of Paragraph III.A.:

   "Any licensed clinical practitioner with an M.D., D.O., Ph.D. or equivalent degree, who practices on the Campus, must hold an New Jersey Medical School faculty appointment. Non-faculty members may be considered for participation in UPA upon approval of the UPA Board. Since non-faculty are not covered by UMDNJ's self insurance trust fund, non-faculty participants in UPA shall be required to obtain professional liability insurance with terms and coverage limits acceptable to UPA, and to provide to UPA evidence of such coverage in a form acceptable to UPA. Licensed clinical practitioners holding

01418

D.D.M. or D.D.S. degrees who practice on the Campus, whose primary faculty appointment is at New Jersey Dental School, can be exempt from participation in the faculty practice plan if the Dean of New Jersey Medical School and the Dean of New Jersey Dental School agree.

Persons who hold "temporary" medical staff appointments from New Jersey Medical School will be treated as faculty members of New Jersey Medical School for purposes of the faculty practice plan, and these persons will be considered faculty members and will be required to participate in the faculty practice plan to the same extent as faculty members, except that they will not be eligible to vote or to serve as directors or officers of UPA.

Part-time faculty and voluntary faculty are encouraged to and may become Participants upon receiving approval of the Dean of the School, who will make a determination after receiving recommendations from the Chairman and the Board of Directors of UPA.

No one may participate in the Plan who is not a School faculty member, except as provided in the following paragraph. Termination or suspension of a faculty appointment in the School will result in simultaneous termination or suspension of subsequent participation in the Plan.

Persons who are not faculty members of New Jersey Medical School may contract with UPA to provide administrative services, on terms approved by the UPA Board, so long as the terms of those arrangements do not jeopardize UPA's tax-exempt status.

Persons who are faculty members of UMDNJ but not New Jersey Medical School may participate in the UPA Plan (in addition to any other faculty practice plan in which they are obligated to participate) on terms agreed to for annual periods by the UPA Board and the governing authority of the other faculty practice plan."

6.    Paragraph IV.A. is amended to add the following as paragraph (6):

"(6)    Upon receiving the recommendation of the Chair of his or her department, the Dean, and approval of the UPA Board of Directors, each non-faculty non-physician health care provider at University-approved practice sites for faculty of New Jersey Medical School shall have the billing for his or her patient care services undertaken by UPA. Distribution of revenue for these services shall be made in accordance with the letter of employment between UMDNJ and the provider or between UPA and the provider. This arrangement

shall not give the provider status as a UPA Participant or any rights of a UPA
Participant. Additionally, since non-faculty non-physician health care providers
are not covered by UMDNJ's self insurance trust fund, such providers shall be
required to obtain professional liability insurance with terms and coverage limits
acceptable to UPA, and to provide to UPA evidence of such coverage in a form
acceptable to UPA."

7.    Paragraph V.B. is amended to add the following as paragraph (6):

"(6)    In consideration of the receipt of the clinical component of his or her salary, each
Participant authorizes UPA to disclose to the Dean of New Jersey Medical School the
revenue received by that Participant from patient care activity ("Participant Earning
Information"), as reflected on the books and records of UPA; provided, however, that the
Dean of New Jersey Medical School shall restrict the use and disclosure of the Participant
Earning Information as follows:

> The Participant Earning Information shall be requested of UPA without
> attribution to a particular Participant (anonymously) whenever possible;
>
> The Participant Earning Information may only be used and disclosed to assist in
> establishing compensation levels for faculty members at New Jersey Medical
> School or for establishing financial arrangements relating to the faculty members
> at New Jersey Medical School;
>
> The Participant Earning Information shall not be disclosed except to
> representatives of the Dean and the Chair of the Department in which the faculty
> members whose compensation is under discussion will have their primary
> appointment;
>
> The disclosure of the Participant Earning Information shall be made in a manner
> which minimizes the possibility of inadvertent disclosure and copies of any
> written Participant Earning Information shall not be made unless necessary;
>
> All written or other evidence of the Participant Earning Information shall be
> destroyed as soon as practicable, to avoid inadvertent disclosure.

The parties acknowledge that except as stated herein, the provisions herein with
respect to the disclosure of Participant Earning Information do not replace or modify the
terms of the Order of Dismissal in the case entitled Larry Frohman, M.D. et al. v.
University of Medicine and Dentistry of New Jersey et al., in the Superior Court of New
Jersey (Law Division, Essex County, Docket No. C-128-93), which requires defendants

581.02
-02678

#0150581.02
27277-02678

3

to provide ten (10) days' notice of their intent to release the patient care earnings of members of UPA."

8.    Paragraph V.C.(2)(a)(v) is amended, in part, such that the assessment schedule set forth on the bottom of page 9 shall be replaced with the following:

| "Participant Receipts | Assessment |
|---|---|
| -0- to $65,000 | .5% |
| $65,001 - $130,000 | 3% |
| $130,001 - $300,000 | 13% |
| $300,001 - $1,000,000 | Fixed annually by UPA Board, between 3% and 8% |
| over $1,000,000 | 3%" |

9.    Paragraph V.C.(2)(a)(v) shall be amended, in further part, by deleting the third, fourth and fifth paragraphs therein in their entirety, commencing with the terms "The assessments on Participant Receipts over $300,000" and continuing through and including the terms "to the UPA Board on how these funds are spent." and shall be replaced with the following:

"The assessments for the New Jersey Medical School Development Fund are to be paid directly to the New Jersey Medical School Development Fund and the Dean's office will periodically report, at least once each year, to the UPA Board on how these funds are spent.  All assessments to the New Jersey Medical School Development Fund which exceed 3% of UPA's gross revenue may be retained by UPA for such purposes as the UPA Finance Committee may determine."

10.    In addition, the sentence within section V.(C).(2)(a)(v) which currently reads:

"This assessment for the New Jersey Medical School Development Fund will be in effect for three (3) years, after which time the terms may be renegotiated."

shall be deleted in its entirety and shall be replaced to read as follows:

"This assessment for the New Jersey Medical School Development Fund shall be in effect from June 30, 1996 until June 30, 1998."

#0150581.02
27277-02678

4

11.   Paragraph V.C.(2)(a)(v) shall be further amended by deleting the last paragraph therein in its entirety, commencing with the term "Exception" and continuing through and including the terms "that faculty member."

12.   Paragraph VII shall be amended by adding the following provisions to the end of the paragraph:

"Amendments of this Agreement or of the UPA Bylaw provisions referred to in section VI.(C).(4) hereof, which are proposed by UPA, shall be delivered to the President of UMDNJ, who shall promptly submit the amendments to the UMDNJ Board for action. Within 120 days of receipt of the proposed amendments, the Senior Vice President for Finance and Administration of UMDNJ shall provide written notice to the President of UPA of the UMDNJ Board action on the proposed amendment. The failure of the UMDNJ Board to vote against the proposed amendment shall be deemed approval of the proposed amendment.

Amendments proposed by UMDNJ shall be delivered to the President of UPA, who shall promptly submit the amendments to the UPA Board for action. Within 120 days of receipt of the proposed amendments, the President of UPA shall provide written notice to the President of UMDNJ of the UPA Board action on the proposed amendment. The failure of the UPA Board to vote against the proposed amendment shall be deemed approval of the proposed amendment."

13.   Paragraph XIII shall be deleted in its entirety and shall be replaced with the following:

"This Agreement constitutes the entire agreement between the parties pertaining to the subject matter hereof, and supersedes all prior and contemporaneous agreements, and understandings of the parties in connection therewith, including the Affiliation Agreement dated August 14, 1984. No waiver of any of the provisions hereof shall be binding upon party hereto unless in writing and signed by the party or an authorized officer of the party against whom any such waiver is asserted."

14.   This addendum is effective as of June 30, 1996.

15.   UPA and UMDNJ agree to review the present structure of UPA and its relationship to UMDNJ and make specific recommendations to each other for any proposed modification or restructuring. Such review and recommendations will take place and be made prior to June 30, 1998. The parties agree to negotiate any proposals in good faith and to cooperate in such a review.

#0150581.02
27277-02678

5

Addendum and shall continue in full force and effect.

| UNIVERSITY PHYSICIAN ASSOCIATES OF NEW JERSEY, INC. | UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEY |
|---|---|
| By: _Fernand Brelong, M.D._ | By: _Stanley S. Bergen Jr_ |
| Print Name: | Print Name: Stanley S. Bergen, Jr., M. President |
| Date 4.8.98 | Date 4/6/98 |