UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

CIVIL ACTION NO. 04-3530 (PGS)

UNITED STATES OF AMERICA ex
rel. STEVEN S. SIMRING, M.D.,

        Plaintiffs,

   v.

UNIVERSITY PHYSICIAN
ASSOCIATES, UNIVERSITY OF
MEDICINE AND DENTISTRY UMDNJ-
UNIVERSITY HOSPITAL, UMDNJ-NEW
JERSEY MEDICAL SCHOOL, et al.,

        Defendants.

---

## EXPERT REPORT OF WILLIAM B. McGUIRE, ESQ.

William B. McGuire, Esq.
TOMPKINS, McGUIRE, WACHENFELD & BARRY, LLP
Four Gateway Center, 5th Floor
100 Mulberry Street
Newark, New Jersey 07102
wmcguire@tompkinsmcguire.com
Phone (973) 622-3000
Fax (973) 623-7780

TO:     Walter F. Timpone, Esq.
         Robert C. Scrivo, Esq.
         Kristoffer S. Burfitt, Esq.
         McElroy, Deutsch, Mulvaney & Carpenter, LLP
         1300 Mt. Kemble Avenue
         P.O. Box 2075
         Morristown, New Jersey 07102
         *Counsel for Defendant University of*
         *Medicine and Dentistry of New Jersey*

Dear Counsellors:

You have requested that I provide a proposed expert opinion as to the reasonableness of a claim for attorneys' fees primarily made by two lawyers, Harry Litman, Esq. and Henry Furst, Esq. All opinions expressed herein are to a reasonable degree of professional certainty with the intention of complying with the admissibility standards articulated in *Kumho Tire Co. v. Carmichael*, 526 *U.S.* 137 (1999).

Messrs. Litman and Furst were counsel for Relator Steven Simring, M.D. in a False Claims Act action brought against the University of Medicine and Dentistry of New Jersey ("UMDNJ"). No dispute exists that Relator Simring was the prevailing party - UMDNJ having settled the matter for $4.45 million on June 19, 2009 - and is statutorily entitled to reasonable attorney's fees in addition to Relator's $800,000 share of the settlement. 31 *U.S.C.* § 3730(d)(1)-(2); *see also U.S. ex rel. Averback v. Pastor Med. Assocs. P.C.*, 224 F. Supp. 2d 242 (D. Mass. 2002).

From inception of the qui tam litigation on July 23, 2004 through December 17, 2010, Relator's counsel seeks fees, costs and expenses totaling $1,081,570, based on the following calculations:

-Attorney Litman:  846.6 hours at $825/hour - $698,445

-Attorney Furst:   391.8 hours at $450/hour - $176,310

-Expenses - $26,553.18

-Plus 20% requested lodestar enhancement = $1,081,570

You have provided me with, and I have reviewed, counsel's submissions to United States Magistrate Judge Madeline Cox Arleo in which Relator's counsel essentially argues that the fees and proposed enhancement are eminently reasonable, and you, as UMDNJ's counsel, argue that the fees are inappropriately high for a number of reasons.

I have also conducted independent research by contacting colleagues at some of the largest firms in Northern New Jersey to ascertain the billing rates of their experienced litigation partners, and have additionally reviewed secondary sources such as the *National Law Journal*'s 2010 Billing Survey, relevant sections of William G. Ross's book *The Honest Hour: The Ethics of Time-Based Billing By Attorneys* (Carolina Academic Press 1996), together with additional independent research. Finally, I have relied on my extensive experience, both as a Managing Partner of my own firm and as a member, and sometimes leader, of multiple organized bar associations. My experiences and relationships have permitted me to interface with clients and attorneys in a variety of circumstances during which I continue to learn about the practical aspects of both billing practices and rates.

My *curriculum vitae* is annexed hereto as Exhibit A.

## I.   The Standard

The Court is charged with ascertaining a sum for reasonable expenses necessarily incurred plus reasonable attorneys' fees and costs.   31 U.S.C. § 3730(d)(1).   The lodestar method - whereby the total number of professional hours expended on the case are multiplied by the reasonable hourly rate of persons of equivalent experience and quality are charging in the relevant community - has been firmly established for decades, and there appears to be no dispute as to its application in FCA cases. *See, e.g., Blum v. Stenson*, 465 *U.S.* 886, 888 (1984).

Reasonable hourly rates can be determined by examining the prevailing market rates in the relevant community.   *Tenafly Eruv Ass'n v. Borough of Tenafly*, 195 *F. Appx.* 93, 96 (3d Cir. 2006). That rate can be adjusted by the Court based on non-exhaustive factors:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.
>
> [*Id.* at 96 n.5 (quoting *Hensley v. Eckerhart*, 461 *U.S.* 424, 429-30 n.3 (1983))]

4

Relator bears the burden of establishing that the claimed fees correspond with appropriate market rates, *see Lanni v. New Jersey*, 259 F.3d 146, 149 (3d Cir. 2001), and establish that the hours claimed are reasonable under the circumstances, *see Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990). The Court is charged with affirmatively reviewing the fee petition before it, *see Copeland v. Marshall*, 641 *F.*2d 880, 891 (D.C. Cir. 1980), and can equitably reduce the fee to a market rate and the hours to appropriate levels, *see Maldonado v. Houstown*, 256 *F.*3d. 181 (3d Cir. 2001). *See also Blakey v. Continental Airlines, Inc.*, 2 F.Supp.2d 598, 602 (D.N.J. 1998) (calling for the Court to "carefully and critically" review both the proposed rate and claimed hours before it). The District Court has substantial discretion to adjust the fee award in the face of objections. *See Bell v. United Princeton Prop., Inc.*, 884 F.2d 713, 721 (3d Cir. 1989).

Messrs. Litman's and Furst's current counsel, Stone & Magnanini LLP, have submitted well-drafted papers essentially arguing that the rates and hours charged are eminently reasonable under the circumstances; that a 20% enhancement to lodestar is appropriate; and that the reductions urged by UMDNJ are both unreasonable and without factual or legal basis.

Counsel for UMDNJ, in equally well-drafted submissions, argue, inter alia, that the hourly rates charged by Litman and Furst exceed the prevailing rates of comparably skilled attorneys practicing before this Court; that the number of hours billed is excessive; that work could have been allocated to associates; and that the manner of time recordation is occasionally inappropriate. UMDNJ also argues that a lodestar enhancement is not warranted.

## II.   The Rates and Hours

### A.   Foundational Issues

The parties appear to agree that the first step of the relevant analysis is to ascertain the appropriate rate that may be charged. *See Hensley v. Eckerhart*, 461 *U.S.* 424, 433 (1983). Under *Public Interest Research Group of N.J. v. Windall.* Such a rate is one sufficient to attract competent counsel, but not necessarily the attorneys' billing rate, particularly not the billing rate of the attorney in his or her home jurisdiction (assuming that such a jurisdiction differs from that where the litigation is lodged). 51 F.3d 1179, 1185 (3d Cir. 1995); *see also Student Public Interest Research Group of N.J. v. Monsanto Co.*, 721 F. Supp. 604, *modified o.g.*, 727 F. Supp. 876 (D.N.J.), *aff'd*, 891 F.2d 283 (3d Cir. 1989).

6

Mr. Litman's biography on the website of Philips and Cohen, LLP, the approximately seventeen-lawyer Washington, D.C. and San Francisco law firm where he serves as counsel, reveals the following:

Harry Litman graduated in 1986 from the University of California School of Law (Boalt Hall), where he was editor-in-chief of the California Law Review. Before law school and while a law student, Mr. Litman worked as a sportswriter for Associated Press. Following law school, Mr. Litman served as a law clerk to Judge Abner Mikva of the U.S. Court of Appeals for the D.C. Circuit; Justice Thurgood Marshall of the United States Supreme Court; and Justice Anthony Kennedy of the United States Supreme Court.

After working in private practice in Pittsburgh, Mr. Litman in 1990 became an Assistant United States Attorney in the Northern District of California (San Francisco). From 1993 until 1998, he served as a Deputy Assistant Attorney General in the Department of Justice, with responsibility for issues of constitutional law and prosecutorial policy. He was simultaneously a Special Assistant United States Attorney litigating federal cases in the Eastern District of Virginia.

From 1998 to 2001, following nomination by the President and unanimous confirmation by the Senate, Mr. Litman served as the United States Attorney for the Western District of Pennsylvania. As United States Attorney, he launched and directed a number of law-enforcement initiatives, while overseeing a 20 percent increase in federal prosecutions and personally litigating cases in both the district court and the court of appeals. In July 2000, Mr. Litman was nominated by the President to a federal judgeship on the U.S. District Court for the Western District of Pennsylvania.

Mr. Litman has taught at the University of California School of Law (Boalt Hall), the Georgetown Law Center, Princeton University, Rutgers University School of Law, the University of Pittsburgh Law School, and the Department of Justice Advocacy Institute, and has published several articles on federal law and practice.

7

A member of the Bars of Pennsylvania, California and the District of Columbia, Mr. Litman has extensive litigation experience in courts around the country, from state trial courts to the U.S. Supreme Court, where he was co-counsel in two recent cases. He is listed in "Best Lawyers in America," "Pennsylvania SuperLawyers," "Who's Who in American Law," and "Who's Who in America."

Mr. Litman is also the principal of the two-member Litman Law Firm.

Mr. Litman urges that his experience and interactions with the Department of Justice were critical and "no less demanding than the litigation of the matters in court." (Opening Brief, p. 11).

Mr. Litman's skill set, particularly in False Claims Act matters, appears to be beyond reproach, and there exists no doubt that Relator Simring's selection of Mr. Litman as counsel was well-informed.

Mr. Litman seeks retroactive approval of his current $825 per hour rate, as apparently permitted in False Claims Act litigation. He notes that, had UMDNJ settled in 2005, his rate would have been $450 per hour, and his fees $150,000 ($225,000 in 2006; $333,000 in 2007; and $465,000 in 2008). He further observes that the *National Law Journal* reports that partners at McCarter & English and Lowenstein Sandler charge up to $825 per hour and that Gibbons partners command up to $790 per hour.

Mr. Furst apparently does not have a firm website. His counsel briefly argues that his current $450 hourly rate is reasonable "based on his exemplary stature in the Bar, his wealth of experience, and the fact that his rate is commensurate with like attorneys in New Jersey." (Opening Brief, p. 14)

Mr. Furst's supporting Declaration additionally reveals that he was graduated from Princeton University in 1974 and Rutgers School of Law Newark in 1977. He served as Associate Editor, then Editor-in-Chief, of the *Rutgers Journal of Computers and the Law*, a publication secondary to the *Rutgers Law Review*. He has been in continuous practice since admitted to the New Jersey bar in December 1977, and has been admitted to multiple bars since. His current *Super Lawyers* internet biography discloses that Mr. Furst concentrates roughly 50% of his practice on criminal defense law, 30% on consumer law, and 20% on "Personal Injury Plaintiff: General." Mr. Furst has served as Trustee, then Chair of the Criminal Law Section of the New Jersey State Bar Association, and is a member of the American Association for Justice-New Jersey and the Association of Criminal Defense Attorneys of New Jersey. He reports substantial trial and appellate experience, apparently in a variety of practice areas, but seemingly grounded in a core of criminal defense litigation. Raymond Brown, Esq., a well-

respected criminal defense attorney, opines that Mr. Furst's petition for $450 per hour is reasonable, particularly in light of Mr. Brown's $500 per hour rate.

## B.  The Primary Arguments

### (1) The Nature of Qui Tam Fees

As a threshold matter, and by way of full and fair disclosure, it is incumbent upon me to express concern over the "reality" of the rates "charged by" Relator's counsel.  In False Claims Act cases such as this, where fee- and cost- shifting are the statutory right of a successful Relator, it would appear that Relator's counsel could "charge" essentially any rate, as the Relator himself or herself will likely never be called on to pay even a  portion of his counsel's fees or costs.  The fee agreement could almost be considered illusory in nature in that both parties to the agreement - the Relator and his counsel - harbor the expectation that the qui tam defendant will ultimately pay the fees and costs generated by Relator's counsel.[1]  Such an arrangement provides inherent incentives for what I term "phantom hours" - time spent on a matter that would

---

1 Mr. Litman asserts that he has "numerous clients" who have retained him at the rate of $825 per hour.  He does not specify if those clients are qui tam clients that may have no reasonable expectation of actually paying him any portion of his hourly fees.

10

not have been spent if a sophisticated client were reviewing and actually paying the attendant fees.

The ability to confidently fee-shift would seem particularly true for a skilled attorney such as Mr. Litman, who obviously possesses the intellect and experience to evaluate and select his qui tam cases wisely.2   Mr. Litman is in a strong position to pick winners, and winning counsel in plaintiffs' qui tam litigation have their fees and costs paid by persons or parties other than their client(s).  In making this observation, I am mindful of the argument that this case involved the not-insubstantial risk that UMDNJ might be considered immune from a qui tam suit due to its arguable status as a state entity.

### (2) Mr. Litman's Increase in Rates

Additionally, I note Mr. Litman's meteoric increase in his hourly rate from $450 per hour in 2005 to his current petition for $825 per hour would seem to be atypical.  It has been my experience that pressure from paying clients to limit fee increases has intensified from 2005 to the present, and that pressure, together with increased competition and, more recently, a bleak economic environment, has led attorneys to be increasingly conservative in augmenting their hourly rates.  The

---

2 Indeed, the very modestly-sized firm at which Mr. Litman is of counsel, Philips and Cohen LLP, boasts on its website that the firm has recovered $6.89 **billion** in settlements and $670 million in client rewards.

first-page article attendant to the December 6, 2010 *National Law Journal* billing survey cited by Relator's counsel reports that {t]he average firmwide billing rate - a combination of associate and partner rates - increased by 2.7% in 2010 . . . ." A similar front-page *National Law Journal* article published a year before, on December 7, 2009, noted that the average firmwide billing rate climbed 2.5% in 2009, 4.3% in 2008, and 7.7% in 2007. I have not seen any similar study of billing rates attendant to leading litigators practicing before this Court, but I am certain that recent hourly rate increases of leading trial attorneys within the District of New Jersey do not in any way approach the quantum of those charged by Mr. Litman.

### (3) The *National Law Journal* Billing Survey as Further Informed by My Informal Inquiries

Concerning that *National Law Journal* survey, I am aware that it reports the "high" partner rates of the following New Jersey firms, all of which are significantly larger than Mr. Litman's and Mr. Furst's firms combined:

|  |  |
|---|---|
| McElroy Deutsch | $550/hr |
| Archer & Greiner | $560/hr |
| Gibbons | $790/hr |
| Lowenstein Sandler | $825/hr |
| McCarter & English | $825/hr |

It has been my experience that the highest rates commanded in larger firms are generally, but not exclusively, those charged by transactional partners, not litigators. I therefore engaged in my own investigation by contacting colleagues at larger firms familiar to any New Jersey practitioner to inquire as to the hourly fees charged by their **litigation partners** with at least 20 years of experience. The referenced attorneys all have experience trying cases to verdict, and many are Fellows of the American College of Trial Lawyers, Fellows of the International Academy of Trial Attorneys, and/or Fellows or Diplomates of the American Board of Trial Advocates.3 Following are the data I obtained:

| | |
|---|---|
| Firm A: | $435/hr (with limited outliers) |
| Firm B: | $450/hr to $525/hr |
| Firm C: | up to $550/hr |
| Firm D: | $525/hr to $625/hr (with limited outliers) |
| Firm E: | $510/hr to $630/hr |
| Firm F: | $500/hr to $650/hr |
| Firm G: | $500/hr to $650/hr |
| Firm H: | $415/hr to $670/hr |
| Firm I: | $450/hr to $725/hr |

---

3 Neither Mr. Litman nor Mr. Furst are Fellows of any of these organizations, all of which have extremely high requirements for Fellowship.

13

As these data confirm, with extraordinary exceptions, the highest rate for experienced, leading Northern New Jersey litigators in highly-regarded large law firms is roughly $650 per hour. All of those surveyed work in much larger firms than those with which Mr. Litman is affiliated.

### (4)  Legal Research

UMDNJ reports that Mr. Litman spent 178.4 hours engaged in pre-settlement legal research, and that Mr. Furst billed for 57 hours of legal research.

UMDNJ complains that Mr. Litman's legal research should have been unnecessary given his expertise in False Claims Act matters, was unrelated to the case, and was duplicative. UMDNJ further claims that associate rates should be attributed to legal research, given the apparent availability of associate assistance at Philips and Cohen. *See, e.g.*, *In re Fine Paper Antitrust Litigation*, 751 *F.*2d 562, 583 (3d Cir. 1984); *In re Churchfield Mgmt. & Investment Corp.*, 98 *B.R.* 838, 872 (Bankr. N.D. Ill. 1989). Relator's counsel argue that the case was staffed efficiently, and that "in cases where counsel work in small firms, essentially as solo practitioners as was the case here, hours are rarely reduced, because support staffing is, of necessity, lean or unavailable." They further argue that the variety of legal research undertaken was not remedial but

"rather an analysis of nuanced legal principles whose novel application were critical to successful resolution of the case."

I am not of the opinion that all legal research tasks can, or even should be exclusively engaged in by associates. In some instances it is more efficient and time-effective for a partner to perform limited legal research (much like it is occasionally most effective for a partner to review and summarize a deposition). As a general practice, however, it is my experience that paying clients generally do not expect that much of their legal research will be billed at partner rates. Indeed, experience dictates that clients, when billed for legal research conducted at a partner's high hourly rate, will dramatically limit or even refuse reimbursement for that research time. Given what I have reviewed, it would seem that Mr. Litman might have had, through Philips and Cohen, the opportunity to have lower-priced attorneys engage in legal research. It is unclear, based on my review of the submissions, whether Mr. Furst had access to junior attorneys who could have assisted in his research, or if his inquiries could have been responded to by Philips and Cohen associates.

### (5) Block Billing and Vague Time Entries

UMDNJ argues that block billing – the intermingling of hourly charges for discrete tasks, which precludes the

discernment of time allocated to discrete tasks - is strongly disfavored. Relator's counsel disagrees citing, inter alia, a 1999 Middle District of Pennsylvania case (*U.S. ex rel. Doe v. Pennsylvania Blue Shield*, 54 F. Supp. 2d 410 (M.D. Pa. 1999)) and an unpublished decision (*U.S. v. NCH Corp.*, 2101 WL 3703756 (D.N.J. Sept. 10, 2010)) which relies in substantial part on the 1999 Middle District of Pennsylvania case. Our own District Judge Wigenton notes that "[c]ourts within this [Third] Circuit have held that a party 'block bills at his own peril.'" 2010 WL 3703756, at *5 (quoting *Estate of Schultz v. Potter*, 2010 WL 883710, at *7 n.14 (W.D. Pa. Mar. 5, 2010)). Relator's counsel is charged with providing "some fairly definite information as to the hours devoted to various general activities." *Id.* (citing *Keenan v. City of Phila.*, 983 F.2d 459, 473 (3d Cir. 1992)).

In my experience, sophisticated clients generally forbid block billing, and do not pay for any portion of a block-billed entry absent the billing attorney providing the discrete, detailed billing that should have been initially produced. Research reveals that courts have complained about situations in which there exists no legitimate reason why the subject attorney(s) could not have specified the time devoted to individual tasks. *See* William G. Ross, *The Honest Hour* 65

16

(Carolina Academic Press 1996) (citing, inter alia, *LeRoy v. City of Houston*, 906 F.2d 1068, 1080 (5th Cir. 1990); *Jane L. v. Bangerter*, 828 F. Supp. 1544, 1548 (D. Utah 1993); *Hart v. Bourque*, 798 F.2d 519, 522 (1st Cir. 1986); *Gries v. Zimmer, Inc.*, 795 F. Supp. 1379, 1392 (W.D.N.C. 1992)).

Additionally, UMDNJ complains that certain of counsel's time entries are vague and should be stricken. In my experience, vague time entries are called into question and often not accepted by paying clients, again absent the billing attorney producing information sufficient to reasonably identify the discrete tasks engaged in and their individual duration.

## III. The Claim for Enhancement of the Lodestar

The product of reasonable hours times reasonable rate(s) does not end the fee inquiry. The District Court is free to adjust the fee up or down. *See generally Hensley v. Eckerhart*, 461 U.S. 424 (1986). As set forth supra, the fee may be adjusted based on:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

[*Id.* at 96 *n.*5 (quoting *Hensley v. Eckerhart*,
461 *U.S.* 424, 429-30 *n.*3 (1983))]

## III. My Conclusions

### A.   Mr. Litman's Hourly Rate

Based on my experience and research as detailed in my annexed curriculum vitae and above, it is my opinion, within a reasonable degree of professional certainty, that a reasonable hourly rate for a highly skilled and credentialed District of New Jersey practitioner with roughly 25 years of experience is approximately $500 per hour.  There are, of course, exceptions; I am sure there exist highly skilled and vastly more experienced litigators billing at far lower rates, and less skilled and experienced litigators somehow able to command more.  That $500 rate, as I understand it, corresponds with that for legendary former federal jurist Herbert J. Stern in this matter.  Mr. Stern was graduated from the University of Chicago Law School in 1961 and who has been admitted in New York since 1961 and New Jersey since 1971.  He served as United States Attorney for the District of New Jersey, United States Judge for Berlin, and as a United States District Court Judge for the District of New Jersey before returning to his current private practice.  It would seem, at least to me, that Mr. Litman would be honored to be compensated at the same level as an established luminary of

18

the bench and bar - a luminary with far more experience than Mr. Litman.

**B.   Mr. Furst's Hourly Rate**

Both parties' arguments as to Mr. Furst's hourly rate are very limited in comparison with the dispute concerning Mr. Litman's rate.   Having reviewed the arguments, and the certifications of Messrs. Furst and Brown (who opines that Mr. Furst is well worth the $450 per hour charged, particularly in light of Mr. Brown's rate of $500 per hour), I have some difficulties with Mr. Furst's rate, particularly in light of my opinion that Mr. Litman could reasonably be compensated at $500 per hour.

As a threshold matter, I have little doubt that Mr. Furst is an excellent, experienced attorney with a substantial skill set, and nothing that is in this report is intended to diminish or otherwise marginalize his competency and success.

That being said, having been very involved in the New Jersey state and federal bars for decades, I do not believe that Mr. Furst's reputation rises to the extraordinary caliber of such attorneys as Michael Critchley, Esq.; Jack Arsenault, Esq.; Alan Zegas, Esq.; Michael Himmel, Esq.; Ray Brown, Esq.; Brian

Neary, Esq. or Justin Walder, Esq.4   His educational pedigree and False Claims Act experience, although certainly impressive, by no means approaches those of his colleague Mr. Litman.

Further, given Mr. Litman's obviously exceptional intellect and False Claims Act skill set, the papers submitted leave me at somewhat of a loss as to why Mr. Furst's participation in this litigation was necessary.   Relator's counsel urges that the key to this, and often other, qui tam litigation is negotiations with Central Justice over civil liability, a task for which Mr. Litman appears to be eminently qualified.   This is not a situation in which much local litigation is apparent such that local counsel could provide useful advice as to the unique attributes of the local jurists and attorneys involved in the case.

In sum, if Mr. Litman is to be compensated at the same $500 per hour rate as Mr. Stern, it would seem that an hourly rate in the $350 range would be appropriate for Mr. Furst under the circumstances.   With due deference to both Mr. Furst and my friend Ray Brown, Esq., $450 per hour frankly seems excessive in this context.

---

4 I have referred to illustrious criminal attorneys because it is my understanding that the bulk of Mr. Furst's practice is criminal defense litigation.   In terms of civil litigation, notwithstanding my decades at the civil bar, I had never heard Mr. Furst's name before becoming involved in this litigation.

## C.   The Rate for Legal Research

Determining an appropriate rate for legal research requires determining a fair billing rate for a competent associate within the District of New Jersey.   Although the previously-referenced December 6, 2010 *National Law Journal* article does not always include median rates for associate billing, it does include the following median rates for associates at three large New Jersey firms:

> Gibbons:       median of $275/hr
>
> (roughly 58% of the median partner rate of $475/hr)
>
> McCarter:       median of $315/hr
>
> (roughly 70% of median partner rate of $485/hr)
>
> McElroy:       median of $185/hr
>
> (roughly 71% of median partner rate of $260/hr)

Given the relationship between partner rates and associate rates both in the *National Law Journal* article and in my experience, and giving the benefit of the doubt to Relator's counsel given the relative complexity of the subject matter, it would seem that $250 per hour - slightly more than 70% of the $350 per hour rate I suggest for Mr. Furst - would be eminently fair as the rate for which legal research could be compensated. Such a rate is both independently reasonable and further is

proportionate relative to Messrs. Litman's and Furst's hourly rates.

**D.   Block Billing and Vague Entries**

Although I understand that block billing has met with limited success in our federal district, I remain of the opinion that there exists no legitimate reason why specific time entries cannot be made, and in instances in which block billing is employed, the billing attorney should be compelled to justify the reasonableness of the time entry, or be prepared to write it off.  This view is shared - in my experience - with practically every private client I have ever represented.

So, too, is the perspective that vague entries are also subject to clarification under penalty of nonpayment.

Messrs. Litman and Furst are obviously intelligent, experienced, accomplished attorneys who know how to make accurate, descriptive and specific time entries.  To the extent that their time records reflect block billing or vague entries, they perhaps should be given the opportunity to specify and/or clarify their entries to the satisfaction of the Court, barring which I trust the Court will exercise its discretion as the Court sees fit.

Respectfully submitted,

William B. McGuire

Exhibit A: Curriculum Vitae

22